```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3
      UNITED STATES OF AMERICA,
 4
                          Plaintiff,
 5    vs.
                                      Case No. 17-20632
 6    D-1 NOEL EISLEY              Hon. Stephen J. Murphy, III
      D-2 TERRY KOVAC
 7    D-4 FELIPE DOMINGUEZ-MEIJA
      D-6 ERIC JAMES ROBINSON,
 8
                          Defendants.
 9    _____/

10                          SENTENCINGS

11         BEFORE THE HONORABLE STEPHEN J. MURPHY, III
                   United States District Judge
12            Theodore Levin United States Courthouse
                   231 West Lafayette Boulevard
13                 Detroit, Michigan  48226
                    Tuesday, July 17, 2018
14
      APPEARANCES:
15
      For the Plaintiff        APRIL NICOLE RUSSO
16    United States of America:  KEVIN MULCAHY
                               PHILIP A. ROSS
17                             LESLIE W. FISHER
                               United States Attorney's Office
18                             211 W. Fort Street
                               Suite 2001
19                             Detroit, Michigan 48226
                               313-226-9129
20
      For the Defendant        MARGARET S. RABEN
21    D-1 Noel Eisley:         Gurewitz & Raben
                               333 W. Fort Street
22                             Suite 1400
                               Detroit, Michigan 48226-6613
23                             313-628-4708

24                             (Appearances continued next page)

25
```

```
 1    APPEARANCES:  Continued

 2    For the Defendant          RICHARD D. KORN
      D-2 Terry Kovac:           645 Griswold
 3                               Suite 1717
                                 Detroit, Michigan 48226
 4                               313-223-1000

 5    For the Defendant          MARK A. SATAWA
      D-4 Felipe                 Satawa Law, PLLC
 6    Dominguez-Meija:           26777 Central Park Blvd.
                                 Suite 300
 7                               Southfield, Michigan 48076

 8    For the Defendant          CHARLES C. HAYES
      D-6 Eric James Robinson:   Hayes Ruemmele LLC
 9                               141 East Washington Street
                                 Suite 225
10                               Indianapolis, Indiana 46204

11

12

13

14

15

16

17

18

19

20

21

22

23
          To obtain a certified copy of this transcript, contact:
24         Linda M. Cavanagh, CSR-0131, RDR, RMR, CRR, CRC
                        Official Court Reporter
25              (313) 234-2616 • www.transcriptorders.com
```

1                    TABLE OF CONTENTS

2                                                Page

3   VICTIM IMPACT STATEMENTS:

4   On Behalf of Minor Victim 1.........................16
    On Behalf of Minor Victim 4.........................19
5   On Behalf of Minor Victim 5.........................21
    On Behalf of Minor Victim 8.........................22
6   On Behalf of Minor Victim 10........................27
    On Behalf of Minor Victim 11........................25
7   On Behalf of Minor Victim 16........................31
    On Behalf of Minor Victim 21........................32
8   On Behalf of Minor Victim 24........................35
    On Behalf of Minor Victim 27........................35
9   On Behalf of Minor Victim 35........................37
    On Behalf of Minor Victim 50........................42
10  On Behalf of Minor Victim 56........................36
    On Behalf of Minor Victim 66........................47
11

12  SENTENCING AS TO D-2 TERRY KOVAC:

13  Allocution by Mr. Korn..............................53
    Allocution by Defendant Kovac.......................58
14  Allocution by Mr. Mulcahy...........................59
    Further Allocution by Mr. Korn......................72
15  Further Allocution by Mr. Mulcahy...................75
    Comments/Sentencing by the Court....................79
16  SENTENCING AS TO D-4 FELIPE DOMINGUEZ-MEIJA:

17
    Allocution by Mr. Satawa............................90
    Allocution by Defendant Dominguez-Meija.............98
18  Allocution by Ms. Russo.............................99
    Comments/Sentencing by the Court...................109
19
    SENTENCING AS TO D-6 ERIC JAMES ROBINSON:
20
    Allocution by Mr. Hayes............................120
21  Allocution by Defendant Robinson...................129
    Allocution by Ms. Russo............................134
22  Allocution/Sentencing by the Court.................140
23

24

25

# TABLE OF CONTENTS

Page

OBJECTIONS TO THE PRE-SENTENCE REPORT
AS TO DEFENDANT D-1 NOEL EISLEY:

Objection 1:

Comments by the Court............................148

Objection 2:

Comments by the Court............................149
Comments by Ms. Raben...........................150

Objection 3:

Comments by the Court............................150
Comments by Ms. Raben...........................151
Further Comments by the Court....................152
Comments by Ms. Russo...........................153
Further Comments by Ms. Raben...................154
Further Comments by the Court....................154

Objections 4 and 5:

Comments by the Court............................154

SENTENCING AS TO D-1 NOEL EISLEY:

Allocution by Ms. Raben.........................156
Allocution by Defendant Eisley..................166
Allocution by Ms. Russo.........................167
Comments/Sentence by the Court..................176

# EXHIBITS

| Identification | Offered | Received |
|---|---|---|
| Government Exhibits A - F | | 12 |
| Victim Impact Statements | | |

```
1              Detroit, Michigan
2              Tuesday, July 17, 2018
3                        —  —  —
4              (Proceedings commenced at 9:27 a.m., all parties
5              present)
6              THE CLERK:  Court now calls Case No. 17-20632, United
7     States of America versus Noel Eisley, et al.
8              Counsel, please state your appearances for the
9     record.
10             MS. RUSSO:  Good morning, Your Honor.  April Russo
11    and Kevin Mulcahy on behalf of the United States.  Also with us
12    is Leslie Fisher, trial attorney from Washington, D.C., here
13    today, and Philip Ross also from our office, Your Honor.
14             THE COURT:  Good morning.
15             MR. ROSS:  Good morning, Your Honor.
16             THE COURT:  Okay.  All right.  And we will start with
17    D-1 and just go down the line.
18             MS. RABEN:  Good morning, Your Honor.  Margaret Raben
19    on behalf of D-1, Noel Eisley, who sits in front of me.
20             THE COURT:  Okay.  Good.
21             MR. KORN:  Good morning, Your Honor.  Richard Korn
22    appearing on behalf of Terry Kovac who is present in the
23    courtroom and is sitting in front of me.
24             THE COURT:  Okay.
25             MR. SATAWA:  Good morning, Your Honor.  If it please
```

1    this Honorable Court, Mark Satawa on behalf of Felipe

2    Dominguez-Meija.

3              THE COURT:  Okay.  Good morning.

4              MR. PLOTKIN:  Good morning, Your Honor.  Sanford

5    Plotkin appearing with Bret Massey.

6              MS. DWYER:  Your Honor, good morning.  Lisa Dwyer

7    appearing on behalf of William Phillips.

8              MR. HAYES:  Good morning, Your Honor.  Charles Hayes

9    here on behalf of Eric Robinson.

10             THE COURT:  Okay.  Everybody may be seated.

11             And the record should reflect that all six defendants

12   are in the courtroom, they're here with their counsel, and the

13   counsel and the defendants are seated in the jury box given the

14   fact that we have six defendants and only three seats at the

15   counsel table.

16             Need a quick minute.  Let's be in recess for about

17   two seconds.

18             (Brief pause)

19             THE COURT:  Okay.  Back in session.  All right.  So I

20   would ask the government to state how -- how you wish to

21   proceed.  It seems to me that we have six individual defendants

22   and obviously I'm going to do individual sentencings.  It would

23   not seem appropriate to me to call Mr. Eisley's case and go

24   through the usual sentence and hear from victims and then do

25   that again with D-2, D-3 and D-4, et cetera because the victim

1    statements would seem to be cumulative.

2          It would also seem to me that forfeiture and things

3    of that nature, which would apply across the board, should be

4    addressed en masse, if you will, for purposes of efficiency.

5          And then it would seem to me that we would hear --

6    have hearings on the objections to the Pre-Sentence Report, the

7    guideline computations and the allocution and sentencing on

8    each individual defendant.

9          But that's just my -- my thought.  If you have a

10   different thought, I'd be glad to entertain it, but if you

11   don't, that's how I'd like to proceed.

12         MS. RUSSO:  Your Honor, that is pretty much how the

13   government had thought that this hearing would go.  What we'd

14   like to do is have all the victim impact statements, which are

15   the same for each of these defendants, and then incorporate

16   those statements into each of their individual sentencing

17   hearings after the victims are all done making their

18   statements, Your Honor, and we've read those statements that

19   victims requested be read.

20         With respect to forfeiture, I agree that that's going

21   to apply to each defendant.  However, of course, each

22   individual defendant has their own individual devices that have

23   been forfeited and the U.S. --

24         THE COURT:  But most -- sorry to interrupt.  Most of

25   that's been disposed of by agreement as I understand it, right?

 1    I mean there's nobody fighting restitu -- or forfeiture, is

 2    there?

 3            MR. ROSS:  No, Your Honor, that is correct.  The

 4    Court has already entered Preliminary Orders of Forfeiture for

 5    Eisley, Kovac, Massey, Dominguez-Meija and Robinson, and with

 6    the Court's permission, the government would like to provide to

 7    the Probation Department the appropriate language for inclusion

 8    in the judgments.

 9            Also by agreement, Defendants Eisley, Kovac, Massey

10    and Dominguez-Meija have agreed to a housekeeping order that

11    will correct some of the property descriptions that were

12    mistaken in the previous orders.

13            So that would conclude the forfeiture matters unless

14    the Court has additional questions at this time on that.

15            THE COURT:  I don't have any questions, but let me

16    just summarize my understanding so we're clear.  The United

17    States counsel along with counsel for all six of the defendants

18    have entered into stipulations as to a Preliminary Order of

19    Forfeiture.  That was presented to the Court and I've seen it

20    in each case.  Those will be amended in four cases to more

21    specifically describe the property at issue without objection

22    from the defendants.  And then once sentencing occurs, we as a

23    court will incorporate the forfeiture language from the

24    Preliminary Order into the final Judgment and Commitment, and

25    then forfeiture will be accomplished as to all six defendants

1    because all the property has been taken and disposed of,

2    correct?

3            MR. ROSS:  I have no quibble with that, Your Honor,

4    except there is no forfeiture for D-6 so we don't need to go

5    anything with D-6; it's just Defendants 1 through 5.

6            THE COURT:  Okay.  All right.  So Mr. Robinson you

7    didn't forfeit anything and he has nothing to agree to and

8    there's no order relevant to him, right?

9            MR. ROSS:  I believe it's Ms. Dwyer's client who's

10   Defendant Number 6.

11           THE COURT:  He's Number 5.

12           MR. ROSS:  Oh.

13           THE COURT:  That's William Phillips.  That's all

14   right.

15           MR. ROSS:  Defendant -- that defendant, Defendant 5,

16   did not forfeit any property.

17           THE COURT:  Okay.

18           MR. ROSS:  It would be Defendant 6.  So --

19           THE COURT:  All right.

20           MR. ROSS:  -- cumulatively we have five defendants

21   who forfeited property.

22           THE COURT:  Any defendant want to object to anything

23   that I said or concluded as to forfeiture?  No?  It looks like

24   everybody is satisfied.

25           All right.  Then we will accept the Preliminary Order

1    of Forfeiture, we will amend the five orders as necessary to

2    properly identify the property, we will go to sentencing, and

3    without objection from counsel, we will enter Judgment and

4    Commitment Orders reflecting forfeiture of property that the

5    United States seized as proceeds or instrumentalities of the

6    criminal activity in this case, correct?

7            MR. ROSS:  That is correct, Your Honor.

8            THE COURT:  All right.  Very good.  Thank you for

9    your hard work, defense lawyers and Mr. Ross, and thank you for

10   taking care of forfeiture in such an efficient and

11   straightforward manner, and we will move on from there.

12           MR. ROSS:  Thank -- thank you, Your Honor.  May at

13   this time I be excused?

14           THE COURT:  Of course.

15           MR. ROSS:  Thank you.

16           THE COURT:  Yeah.  Seems to me like your work is

17   done.  Thank you again, Mr. Ross.

18           All righty.  Ms. Russo, we have taken care of

19   forfeiture and I think your next issue was victim impact, is

20   that what I understand?

21           MS. RUSSO:  Yes, Your Honor.

22           THE COURT:  Well, let me say a couple of things

23   before we get started on that.  I -- I -- I would like to say

24   that obviously I'm working within the parameters of the Victim

25   Witness Act of which we are all well familiar.  It's my

1    obligation to entertain here and provide an opportunity for

2    victims to address the Court.

3            I have received a number of materials already, all of

4    which I've thoroughly reviewed.  But the government filed a

5    Sentencing Memorandum and the United States Attorney's Office

6    dropped a courtesy copy to my office last -- actually about two

7    weeks ago, 48 pages of Sentencing Memorandum in -- in each

8    matter, largely the same but individualized as to each

9    defendant.

10           I have, as you can all see I'm sure, a binder worth

11   of exhibits.  Exhibit A is the same as to all of the defendants

12   and those are a photograph and a victim statement.  There's a

13   number of other statements starting with Exhibit A-1 and

14   running through Exhibit MV-66 inclusive.  Those would include

15   photographic evidence, memoranda, exhibits and statements of 66

16   victims of the criminal activity in the case.  Again, I am

17   thoroughly familiar with -- with that.  And I received a few

18   things after this particular document was filed which would

19   include some additional victim impact statements and materials

20   of that sort from the -- from the United States Attorney.

21           So I guess the first question I'd ask Ms. Russo is

22   whether or not I'm missing anything or if there's anything that

23   you need to provide to the Court that I haven't received

24   already.

25           MS. RUSSO:  Your Honor, along with the exhibits that

```
 1    we e-mailed, the letters that we received from victims a little
 2    bit later last week, we have a few additional statements that
 3    were submitted.  We've given copies to the defense of all of
 4    those statements.  It would be Exhibits A through F for
 5    purposes of this sentencing hearing.  Exhibit A and B that
 6    you've already seen, Your Honor, but were e-mailed yesterday to
 7    the Court.
 8                THE COURT:  Okay.
 9                MS. RUSSO:  And the other ones are new, Your Honor.
10                THE COURT:  Okay.  If you want to give those to Mr.
11    Parker, he will pass those up and I will review them when we
12    have an opportunity.
13                With that in mind, I will receive Government's
14    Exhibit A through F for purposes of sentencing only.
15                And I will also let the defendants know I've received
16    all their sentencing memoranda, but I'll get to those when we
17    do individualized sentencing later in the proceeding.
18                For now, I just want to simply acknowledge receipt of
19    the government's sentencing memoranda -- memorandum --
20    memoranda as to all six defendants and -- and the victim
21    materials that have been discussed as well as A through F, and
22    that's what I have in front of me to this point as we consider
23    and receive victim impact testimony evidence and exhibits under
24    the -- under the act, right?
25                MS. RUSSO:  Yes, Your Honor.
```

1       THE COURT:  All right.  What else do I need to do

2   with regard to victim impact before we allow you to present

3   individualized testimony and things of that nature?

4       MS. RUSSO:  Nothing else, Your Honor.  We can proceed

5   with calling the first individual who would like to make a

6   statement.

7       THE COURT:  Okay.  Very good.  Anything else from the

8   defendants before we get started here?  No?  Okay.

9       For purposes of housekeeping, what -- what's your

10   timing look like, what are -- what's your intent?

11       MS. RUSSO:  Um, Your Honor, we have approximately --

12   there are approximately a dozen parents and/or victims who are

13   here in the courtroom.  Some of them are just here, they want

14   to be in attendance.  They -- they want Your Honor to know that

15   they're here but they don't necessarily want to make a

16   statement.  And then some of them do want to make statements.

17   Some of them are reading statements they've already submitted

18   and some of them just want to talk to you, Your Honor, off of

19   the cuff.

20       And then there are a few of the statements that have

21   been submitted, the written statements, where the parent or the

22   minor could not be here in court and they've asked us to read

23   their statement.  We are planning on reading very short

24   excerpts from those statements rather than read the whole

25   statement given that Your Honor already has a copy of it, but

```
1    we also do want to honor their wishes and read those statements
2    to Your Honor.
3            THE COURT:  Okay.  That's fine.  And I appreciate all
4    that and that's certainly responsive.
5            The thing that I would like to know that you didn't
6    touch on is -- it's 9:40.  How long you think this process is
7    going to take?
8            MS. RUSSO:  Your Honor, I think it will take about an
9    hour.
10           THE COURT:  Okay.  All right.  Good.  We'll set aside
11   an hour til about 10:45, maybe 11:00 o'clock, we'll have a
12   recess at that time.  My understanding is that notwithstanding
13   the fact that he's D-1, Ms. Raben wants some time with her
14   client, so we'll go out of order and allow her and Mr. Eisley
15   to meet outside of the courtroom, and around about 11:00
16   o'clock we'll start sentencing presumably with Mr. Kovac, okay?
17           MS. RUSSO:  Thank you, Your Honor.
18           THE COURT:  All right.  Go right ahead.
19           MR. SATAWA:  Your Honor?
20           THE COURT:  Yes.
21           MR. SATAWA:  Before the government begins, you know
22   what they say about assuming --
23           THE COURT REPORTER:  I'm sorry, I can't hear you.
24   You're going to have to speak up.
25           THE COURT:  Just speak up so Linda can get your...
```

 1          MR. SATAWA:  Judge, before the government begins, I

 2    don't want to assume, but Your Honor just said that Mr. Kovac

 3    would go second.  Based on the prior conversation I've had with

 4    Ms. Russo, it's my understanding that I would go after that, so

 5    second, Kovac going first, my client going second.

 6          I just want to confirm that, and the only reason I'm

 7    asking, Your Honor, is because I have a 3:00 o'clock sentencing

 8    in front of Judge Michelson in this building, and if we're

 9    keeping to the government's expected time schedule, I don't

10    think that's going to be anywhere close to being a problem for

11    me, but if it was, I'd like to let Judge Michelson's courtroom

12    know.

13          THE COURT:  All right.  We'll get -- we'll get -- you

14    go in the order that you want and we'll get -- we'll you out of

15    here on time, I -- I guarantee you that, Mr. Satawa.

16          MR. SATAWA:  Thank you, Your Honor.

17          THE COURT:  Okay.  Thank you.  All right.  Go --

18    go right ahead.  That -- that means if I'm wrong about D-1, 2,

19    3, 4, 5, you just go in the order that you had agreed with the

20    lawyers, okay?

21          MS. RUSSO:  Yes, Your Honor.

22          THE COURT:  All right.  Go right ahead.

23          MS. RUSSO:  Your Honor, we are going to call the

24    parent of MV-1.  Specifically, we're going to call the father.

25    I'm on purpose not stating the name of these individuals to

 1    protect them, Your Honor, and their privacy.  So I'd like to

 2    call the father of MV-1 at this time.

 3            THE COURT:  All right.  Can you also direct me in

 4    your book to where I ought to go.  Is this Exhibit A-1?

 5            MS. RUSSO:  It is, Your Honor.

 6            THE COURT:  All right.  Okay.  Thank you very much,

 7    Ms. Russo.

 8            Sir, you can identify yourself, but obviously if you

 9    don't want to you don't have to, but we're happy to hear what

10    you have to say.

11            THE WITNESS:  Yes, I will decline to identify myself

12    except I am the father of MV-1.

13            THE COURT:  Okay.

14            THE WITNESS:  Yes.  This case concerns my daughter,

15    MV-1, who was a victim of sexual exploitation on the Internet.

16    At the time of those events I was unaware of what was taking

17    place but I did observe that my daughter was exhibiting a

18    number of aberrant behaviors: extreme inexplicable panic

19    attacks, prolonged unconscious trance states, chronic insomnia,

20    chronic violent nightmares and extreme black hole suicidal

21    depressions.

22            Once these crimes were brought to my attention and my

23    daughter and I were able to talk about them together, I found

24    that these aberrant behaviors discontinued.  It's been quite

25    obvious that these crimes had a severe negative psychological

1    impact on my daughter which was significantly destabilizing for

2    her and her ability to function in her life, in her school and

3    in her relationships.

4            My daughter and I are both very grateful that the

5    perpetrators of these crimes are being brought to justice so

6    that they will be able to cause no further harm.

7            THE COURT:  Thank you very much.

8            MS. RUSSO:  And if we could call now the mother of

9    MV-1.

10           THE COURT:  Good morning.

11           THE WITNESS:  Good morning.

12           THE COURT:  Go right ahead.

13           THE WITNESS:  It is very difficult to recount and in

14   a sense relive what MV-1 has gone through as a result of the

15   abuse she has suffered under the assailants' hands.  Her

16   innocence was taken from her and her self-esteem and ability to

17   trust others was severely damaged.  As a result, she had great

18   difficulty performing in school, and her relationships with her

19   peers and her family members suffered as she withdrew into a

20   dark, closed world of shame and self-hatred.

21           I am very grateful for that cold January day when the

22   FBI officer knocked on our door for from that moment on what

23   was dark and secret was brought out into the light and we began

24   a long climb toward healing, facilitated by love, patience and

25   many years of counseling.

```
 1              Although MV-1's innocence can never be restored, a
 2   hard sentence for these men would go a long way toward a sense
 3   of justice and vindication.  I hope that the perpetrators
 4   receive the maximum sentence of jail time as well as hefty
 5   fines enough to assist all of the victims with the cost of
 6   whatever treatment they needed to recover from this brutality.
 7              THE COURT:  Thank you very much for those words as
 8   well.
 9              MS. RUSSO:  Your Honor?
10              THE COURT:  Yes.
11              MS. RUSSO:  We call MV-1 at this time.
12              THE COURT:  Okay.
13              (Brief pause)
14              MS. RUSSO:  Your Honor, MV-1 would like me to read
15   her statement.  She does not want to come up here at this time.
16              THE COURT:  Okay.  Go right ahead.
17              MS. RUSSO:  "In many ways it is hard for me to write
18   this and it is hard for me to remember a lot of details
19   surrounding what happened a few years ago.  Though I feel sick
20   and broken and very ill at the thought that I was convinced to
21   participate in the events of those perverted chat sites, I
22   don't know how these inhuman individuals parted these ideas
23   into my head: how being exposed is such a good thing; how
24   experimenting online sexually is the best thing to do; how you
25   don't have to worry about these predators online.  Yes, they
```

1    said this to me and how nothing I do is wrong.

2         "I am humiliated that I thought these thoughts were

3    the right thoughts to think.  I am devastated that I am

4    possibly now exposed in the flesh online.  I am mortified that

5    I cannot do anything but write about my experiences with these

6    disgusting predators.  All I can feel is stupid for all the

7    things I have done with these inhuman beings.

8         "For me now, my life is in shambles.  Ever since

9    these encounters with these predators, I have never felt the

10   same.  My work in school has lost its quality, my life at home

11   felt like hell from day to day in high school, my friends

12   turned into foes, and I lost my spirit to live a happy life.

13        "I am only just now starting to realize my horrible

14   mistakes so long ago and only now am I starting to heal from

15   these memories.  I hope that these animals get what they so

16   rightfully deserve: an entire lifetime inside a cage with no

17   hope for release.  MV-1."

18        THE COURT:  Okay.  Thank you.

19        MS. RUSSO:  Your Honor, at this time I'd like to read

20   an excerpt from the mother of MV-4's statement.  Both the

21   mother and father of MV-4 wanted these statements submitted and

22   wanted these excerpts read, Your Honor.  However, they felt

23   that this incident was too traumatizing for them to come to

24   court today.

25        THE COURT:  Okay.

1        MS. RUSSO:  The mother of MV-1 writes -- or MV-4

2   writes, "To say that the evil you brought into our lives nearly

3   destroyed us would be an understatement.  We thought we had

4   done everything to protect our children, to give them the

5   childhood that would lay a foundation that would prepare them

6   to navigate a world that is so potentially dangerous and evil;

7   to daily instill in them a value and worth that he -- that we

8   had hoped would be evil-proof, at least while they were under

9   our roof; to create in them a heart and desire to bring love

10  and hope into a hurting world, to be part of the solution.

11       "But here we sit under the new reality that you

12  introduced into our home, our little world, our precious

13  family.  I am so disheartened that you were obviously so

14  wounded and decrepit in your soul that you purposed your days

15  and nights for the trapping and destruction of the innocent.

16  What kind of man does this?  You designed and executed such a

17  plan of evil and soul-crushing consequences that if we did not

18  have a greater hope than what the world has to offer, we would

19  be crushed.

20       "But we are not.  We are a family of hope.  We are in

21  the midst of God's great love and he is faithful.  What you

22  designed for our daughter's destruction God has redeemed for

23  her good.  You may have stolen a sacred piece of us that we

24  will tragically never have back, but you will not have another

25  day of my daughter's or ours.  I as a mother am counting down

1    the days til fear does not have another moment of our lives.

2         "You deserve no mercy from the courts.  You are sadly

3    part of a brood of vipers that is hunting our children behind a

4    screen, and I am praying that the Lord leads the justice system

5    to make such an example of you that you will fall to your knees

6    and beg for mercy."

7         And for the father of MV-4 he also wrote a statement.

8    He writes, "People like this need to be stopped since they are

9    preying on helpless children that have not matured and do not

10   know who can be trusted in their lives.  I can only express and

11   communicate my requests that these men be put away for a very

12   long time.

13        "Unfortunately my daughter and wife will need to cope

14   with the effects from this event as well as embarrassment for

15   the future.  They will both need to learn how to accept this

16   and work together to get past this event in our lives when in

17   reality this should never have happened."

18        And, Your Honor, there is a statement from the mother

19   of MV-5 and she writes, "That grown adults choose to spend

20   their God-given life destroying children's lives, sense of

21   well-being and manipulating their innocent growth into

22   adulthood is repulsive.  I remain in disgust of their heinous

23   actions and what they have taken from my child that can never

24   be replaced.

25        "The Internet continues to be a very complicated yet

```
 1   easily accessible tool that allows criminals into our private

 2   lives.  Each group of manipulative cretins perpetuating pain,

 3   loathing and offensive behavior that can be brought to justice

 4   is hope that some day kids of the future will not be

 5   susceptible to these outrageous actions."

 6           And then, Your Honor, a statement from the mother of

 7   MV-8.  If you recall, MV-8 is discussed quite a bit in the

 8   government's sentencing memos and MV-8 we have talked about,

 9   and also, Your Honor, this is the victim that these defendants

10   knew was having some suicidal tendencies and yet continued to

11   prey on her anyway as well as prey on her younger sister, Your

12   Honor.

13           THE COURT:  All right.  Brief interruption.

14           MS. RUSSO:  Yes.

15           THE COURT:  You -- you mentioned that MV-4's parents

16   were not here, and I just, for matters of completeness, if --

17   if you'd make a similar showing on MV-5 and M -- MV-8 and --

18   and the future statements that you read, we'd appreciate that.

19           MS. RUSSO:  Absolutely, Your Honor.  MV-5's mom is

20   not here today, Your Honor.  MV-8's mother is not here but

21   MV-8's father is here and he does wish to address the Court.

22           THE COURT:  Okay.  So you are in excerpts of

23   Exhibit 8, which is the mother of MV-8 and another victim.  Go

24   right ahead.

25           MS. RUSSO:  Thank you, Your Honor.  The mother of
```

1    MV-8 writes, "After all of this, my oldest spent a long time

2    crying every night and it created more stress and depression.

3    Her amount of sleep declined.  We had to find a counselor who

4    could help our family work through this.  We now see this

5    counselor regularly.

6           "My youngest has retreated and is more quiet now.

7    She used to be happy every day and is now more pessimistic.

8    She goes to therapy sessions as well.

9           "As their mom, I feel defeat, embarrassment and

10   shame.  I feel I failed my girls.  But I also feel angry

11   because it is these men's fault for luring these girls in,

12   lying to them, making them do things that they should never

13   have even thought of.

14          "I worry about what it has done to their psyche.

15   Will these pictures and videos show up again in life?  Will it

16   affect them getting a job?  Will it impact their future

17   relationships?  I worry about them every day.  There isn't a

18   day that I don't think about what this has done to them and how

19   I have to be strong for them and work on trying to build their

20   confidence back up.  I worry about trust issues with males.

21          "They have changed our lives forever where we won't

22   be the same.  Will they feel this for the rest of their lives?

23   I will worry that they will do this to other sweet, innocent

24   girls.

25          "We need closure for our family so we can heal.  I

1    beg you to give the maximum sentence possible to keep others

2    safe."

3            And, Your Honor, with that, the father of MV-8 would

4    like to come forward and make a statement.

5            THE COURT:  Good morning to you.

6            THE WITNESS:  Good morning, Judge Murphy.  It's a

7    tough day.

8            THE COURT:  There's Kleenex there if you'd like.  And

9    I'd -- I'd urge you to take your time, okay?

10           THE WITNESS:  I can just say that I'm finally and

11   forever affected by this.  As a parent, you know, you do

12   everything that you possibly can.  I've always enjoyed trying

13   to teach my girls to live their lives the right way.  You know,

14   all the sacrifice and the hopes that you have for them and for

15   it to be just taken away, it's so hard.

16           My wife couldn't be here because of the anguish.  I

17   felt like I needed to be, but pretty hard.  We hope that you'll

18   do everything you can so that this doesn't happy to others.

19           Thank you.

20           THE COURT:  Thank you very much.

21           MR. MULCAHY:  Your Honor, next, one of the exhibits

22   that Ms. Russo handed up at the beginning of our hearing today,

23   it's marked as Government Exhibit F as in Frank, so it's one of

24   these separate ones.

25           THE COURT:  Mm-hmm.

1          MR. MULCAHY:  As a quick introduction, this is for

2    Minor Victim 11 whose mother wrote this letter and whose father

3    I've spoke with on the phone on several occasions or traded

4    e-mails with as well.  Neither the father, the mother nor MV-11

5    could be here.  She submitted this late last night, and when I

6    spoke with her, she'd indicated that she was having her husband

7    sort of shield her from the goings on in this -- in this

8    courthouse, and -- but hoping for a last-minute effort to -- to

9    speak to the Court, she offered this statement late last night,

10   and I will read just an excerpt from it.

11         THE COURT:  Okay.

12         MR. MULCAHY:  "My daughter was a bright-eyed, happy,

13   engaging honor student.  She enjoyed running, arts and crafts

14   and interacting with her friends and family.  Because these

15   deranged individuals lured my daughter on the Internet with

16   their lewd behavior, she became reclusive, sad, depressed,

17   angry and literally a shell of herself.  She spent weekends

18   locked in her room refusing to come down and eat, and this was

19   completely out of character for her.

20         "In our wildest dreams we would never think that

21   grown man -- grown men lured her into teen chat rooms and were

22   calling her names such as flat-chested or baby or stuck up or

23   nerd because she would not send naked photos of herself.  This

24   constant daily verbal bullying led to an acute depressive

25   episode."

1          What follows, Your Honor, is a series of discussions

2    about the costs, including a months' long commitment into a

3    wilderness program in Utah.  "We did not" -- and as a result of

4    that, Your Honor, she writes, "We did not see her for her 16th

5    birthday, for Christmas or for Thanksgiving due to her

6    intensive treatment programs.  Prior to this Internet

7    exploitation and bullying, she was -- she had no history of

8    mental illness.

9          "This exploitation has left a major impact on my

10   daughter, her two siblings, my marriage and our family.  She

11   has missed an entire year of school and has been in treatment

12   with -- which has cost us over $100,000, exhausting all of our

13   savings.  She is still undergoing weekly treatment by a

14   psychiatrist and psychologist to rebuild her self-worth, her

15   self-esteem and her confidence through therapy and medications.

16   She no longer has the same smile, bright eyes or sense of

17   childlike wonder or joy.  Each day is a challenge as she

18   continues to struggle."

19         And, Your Honor, what follows are drawings that MV-11

20   herself made.  The first I believe is a self-portrait, and the

21   second, Your Honor, is a -- is a drawing that I know is

22   difficult for the Court to read the sort of top of the page.

23   There are certain words written.  These are the words that she

24   was called on the Internet by the men in this courtroom,

25   including some of the words I think Your Honor can read.

```
 1              THE COURT:  Mm-hmm.  These were drawn after the

 2   therapy started or --

 3              MR. MULCAHY:  Yes, Your Honor.

 4              THE COURT:  -- as part of the therapy or...

 5              MR. MULCAHY:  Exactly right, as part of the therapy.

 6              THE COURT:  All right.  Okay.  I read the entire

 7   letter as you were speaking so...

 8              MR. MULCAHY:  Thank you, Your Honor.

 9              THE COURT:  Okay.  Thank you.

10              MR. MULCAHY:  Your Honor, next the government would

11   ask the mother of MV-10 to come forward.

12              THE WITNESS:  Good morning.

13              THE COURT:  Good morning.

14              THE WITNESS:  Thank you.  I'm the parent of MV-10,

15   and she's not here with me today because she forbid -- I -- I

16   brought this up.  She's now 16 years old, but I brought this up

17   almost a year ago, about eight months ago, that she might be

18   able to come, and she absolutely doesn't want to talk about it

19   and she forbade me from coming and she forbade her father from

20   coming, but because she's at camp and I felt it was very

21   important for us as a family for me to at least see and talk

22   about what has happened.

23              She started eighth grade as a normal girl.  She was

24   smart and goofy and confident and she played guitar and went to

25   Girl Scouts.  She was even writing her own songs and playing
```

1     them.

2          And in eighth grade she started getting migraine

3     headaches.  Halfway -- about halfway through she was getting

4     migraine headaches.  She started missing a lot of school

5     because of her headaches.  She quit guitar.  She quit Girl

6     Scouts.  She was getting angry.  She was hard to deal with.  I

7     knew teenage girls could be difficult, but I also knew that

8     something was wrong with the scale of what we were

9     experiencing.

10          She got very private over the summer, she got very

11    moody, she started getting very obsessive, making sure

12    everything had to be just so, and I really didn't know what was

13    going on.  At the end of that summer she decided she wanted to

14    live with just me instead of alternating between her father's

15    house and mine and she was considerably more needy than she had

16    been.

17          She started high school and she was in all honors

18    courses, and in her first semester she missed 15 days of school

19    for migraines.  Because of that, she failed three courses and

20    she also thought she was stupid.  But her teacher said don't

21    take her out of the honors classes; it's not her ability, she

22    just needs to be here more.  But her confidence was gone.  Her

23    second semester she continued in those courses and she had to

24    take two online recovery courses for the credits she had

25    missed.  But -- but her confidence was just gone.

1          It was in March of her freshman year that I got the

2     call from the local FBI office and we learned of what happened.

3     It caused a huge struggle in our family.

4          My daughter doesn't know how to process these things.

5     She still won't talk about it.  She wouldn't talk about it that

6     day.  She reacted with anger.  She was embarrassed.  She was

7     scared.  And as someone she loves, I was the one who bore the

8     brunt of all this and really doesn't -- didn't know what to do.

9          She'd been very sure it was private.  She thought she

10    was talking with teenagers.  She swore they were lying to her

11    at the FBI.  But she wouldn't talk about any of it and

12    continued to be very defiant and difficult to live with.

13         Her sister moved home from college and didn't really

14    know how to, you know, engage with someone who was going

15    through all these -- all these things.  So, you know, we didn't

16    give her a lot of details either.  So her relationship with her

17    sister is not real good right now.  It hasn't been since that,

18    you know, time of her -- well over a year ago.  They just had

19    screaming fights.  They have not been on good terms.

20         When her sophomore year started, she started having

21    bouts of dizziness, nausea and occasional vomiting.  We've had

22    her tested in various ways.  She spent a day in the hospital,

23    she got an MRI.  They -- they can't find what's wrong.  She has

24    vertigo.  She vomits a few times a week.  They -- they can't

25    find any solutions.  They've indicated that it's probably

1    stress, but she was refusing to go to therapy until just

2    recently when she's had one appointment.

3            So all this, you know, she'd gone through a couple of

4    years of stress by this time.  And she now keeps calendars, she

5    tracks, she organizes.  She can't stand anything going wrong

6    out of her plan for her day.  She obsesses about her nails, her

7    hair, her skin, you know, whether or not she's going to be sick

8    and miss her next babysitting job, you know, all the normal

9    things that a kid would do.  She's just got too much going on

10   in her head to -- to really function well.

11           But in her sophomore year she did learn how to manage

12   her headaches, and despite missing ten days of school each

13   semester, she still got all As and Bs in her honors classes.

14   So she's a kid who wants more and wants to go forward in life,

15   but she comes to me every week crying, recalculating her GPA

16   because she says, "If I don't get a 90 on this test, I'll lose

17   a chance to get into any college I want to go to."  You know,

18   she -- she's calculating her GPA out a couple of years ahead

19   because she knows she messed up her freshman year so badly due

20   to all the stress that she was under.

21           Her physical health, her mental health, her family

22   relationships, her creativity and her grade point average, you

23   know, have all been damaged by this, and -- and I don't know

24   how long it'll last or whether she will be able to talk about

25   it or share it.  She doesn't want to speak to anyone to this

```
 1   time, but I'm -- I'm hoping as we go forward she can heal.  But
 2   I'm very, very upset about what was taken from us.
 3           THE COURT:  She's going to be a senior in the fall?
 4           THE WITNESS:  Junior.
 5           THE COURT:  Junior.  Okay.
 6           THE WITNESS:  Yeah.
 7           THE COURT:  Thank you.
 8           THE WITNESS:  Thank you.
 9           MS. RUSSO:  Your Honor, I'm going to read a short
10   excerpt from the father of MV-16.  MV-16, Your Honor, resides
11   in the Eastern District of Michigan.  However, her father could
12   not be here because he was afraid of how traumatized he was by
13   this and -- and seeing these individuals in person.
14           That said, he's been in constant contact with us,
15   even calling last night to ask me if I'll tell him as soon as
16   the sentencing is over what the sentences were.
17           He writes, "It's increasingly difficult to describe
18   my feelings.  I've been angry, sad and disgusted.  I'm too
19   paranoid to allow my now adult daughter to do anything without
20   supervision.
21           "I absolutely refuse to be in the same room as these
22   people.  My daughter refuses to be in the same room as these
23   people.
24           "We are respectfully requesting that a maximum
25   sentence be granted for all victims involved."
```

1          And, Your Honor, with that, we would like to call the

2   parent of MV-21 at this time.

3          THE WITNESS:  Good morning, Your Honor.

4          THE COURT:  Good morning, sir.

5          THE WITNESS:  My name's Jeremy and my daughter's a

6   victim in this case.

7          I'm just beginning to understand the gravity of harm

8   that has been caused by these defendants.  My daughter and my

9   niece were both victims.  Their relationship as well as the

10  dynamics of our family has been forever changed.  They were the

11  best of friends and now they rarely see one another.  That

12  bond, their relationship, our family I believe forever has been

13  altered.

14         Your tears can't take that back.  Nothing that you

15  say can take that back.  I see no remorse, none.  And even if

16  there was any, you can't take that back.  You can't give back

17  what you've taken from those little girls.

18         I'm sure many others also have struggled to find the

19  answers to mend our broken children and then to find a way to

20  help them heal.  I've taken my daughter to counseling, which is

21  just starting to help.

22         And I hope, Your Honor, that you can start to see

23  that while these vultures, these precise, practiced, planned

24  and skilled predators, to give all their excuses to find

25  sympathy and to gain leniency, I assure you they can say

1    nothing, nothing that can repair or take away or mend the

2    innocence and the childhood that they have taken from my family

3    and many, many others, including their own, including their

4    own.

5           As a judge, I don't believe that it's possible for

6    you to totally get back some of the things that they've taken

7    away either, but I do humbly ask you to give these victims the

8    most that you can give them, which is the maximum justice that

9    you can give these guys.  Justice to my -- my daughter, I'm

10   sorry.  The maximum sentence to these guys is the maximum

11   justice is that you can give to these children.  The videos,

12   the pictures, we, I, Your Honor, we can't get it back.  They're

13   out there.  You can't get them back.  You can't fix it.  I

14   can't fix it.

15          I would ask you not be swayed, Your Honor, please,

16   with their pleadings, just as they pled with our daughters and

17   their victims, deceiving them, but I beg of you to level the

18   maximum sentence possible and do your very best to give our

19   brave victims, my little girl justice, closure, and by doing

20   so, maybe we can begin to heal and regain faith in this world

21   in which we live.

22          I want to thank the men and women that were stepped

23   in to protect our children.  They've done their part.  Our

24   families, our daughters, we're here to do ours, and I ask that

25   this Court, this most Honorable Court of this great country

1    finish it for our children.

2         THE COURT:  Thank you.

3         MR. MULCAHY: Your Honor, at this time I'd ask MV-21

4    to step forward.

5         (Brief pause)

6         Your Honor, the moment is big her for her so she has

7    handed me a note and I will read it on her behalf with the

8    Court's permission.

9         THE COURT:  Yep, go right ahead.

10        MR. MULCAHY:  "At the time of all of this I was a

11   naive teenage girl, and my parents taught me that most people

12   are good so I trusted these men that I thought were my age.  I

13   felt comfortable because I was not the only girl.  They talked

14   us into doing -- they talked us into doing these horrible

15   things.  No older man should want a teenager to undress herself

16   for them, but we thought we were talking to someone our age.

17   Yes, we made a bad choice, but if the FBI would not have showed

18   up, us girls would be gone wherever these people wanted us to

19   be.  These men knew better.

20        "When the FBI showed up and told me these people are

21   not who they said they were, I lost my trust in many people

22   and people lost trust in me.  My relationships with my family

23   have changed and sometimes I feel like people are watching me.

24   It is not okay for me or any of these girls to feel this way.

25        "We should not have to be here today.  We should be

1    hanging out with our friends.  We are teenage girls.  We are

2    going to make mistakes.  Just don't let this be possible for

3    other teenage girls like us."

4        Next, Your Honor, I'd like to read the victim impact

5    statement from Minor Victim Number 24.  She is unable to be

6    here today as well.  And she writes, "After becoming aware that

7    I was taken advantage of by adult men, it made me feel

8    uncomfortable around my parents and it was tortuous being in my

9    own skin.  Because of this, it makes me unable and unwilling to

10   trust anyone anymore.

11       "In the beginning I was led to believe that these are

12   male individuals that I was communicating with who claimed to

13   be the same age as me.  They were fun and gained my trust over

14   time.  Within a few weeks they asked me to expose myself and

15   made me feel uncomfortable.  The day after it happened, I

16   noticed that the teen has asked other girls to do much worse.

17   I then left the website and never came back.  The impact this

18   incident had on me made me feel violated, betrayed and have a

19   loss of self-worth."

20       Your Honor, next, Minor Victim 27's mother, father

21   and sisters co-wrote a letter that I will read a portion of.

22   Minor Victim 27 could not be here, neither could her parents or

23   her sisters.

24       "My wife and I get sick to our stomach when we think

25   about the defendants, how the defendants used the Internet to

```
 1   physically abuse our daughter.  She is a sweet, innocent
 2   teenager in high school just trying to find someone she can be
 3   friends with.  Her Catholic high school teachers were extremely
 4   caring as she was missing class and grades falling.  They
 5   supported her and they kept her in school.
 6            "But she stopped giving me hugs in the morning.  Her
 7   weight dropped dramatically even though she was just skin and
 8   bones to begin with.  She was five foot six and just
 9   110 pounds.
10            "So many questions about how I could have been a
11   better father, how I could have protected her better against
12   the defendants' Internet -- the Internet child predators, how
13   the cruel event may come back to haunt her in later years or if
14   the same people are able to contact her using their knowledge
15   of her to manipulate her again with other photos and texts not
16   uncovered by the FBI I assume and others like them.  We are not
17   certain that all of the evidence has been recovered.  We are
18   not sure how much the cruel events hurt her recovery but we
19   know that it has caused her great harm.
20            "Please, please keep these defendants from contacting
21   any other children in any way and put them in custody for as
22   long as possible."
23            Judge, I'm going to read -- lastly, I'm going to read
24   excerpts from a letter written by the mother and father of
25   Minor Victim 56 who could -- neither the mother, the father nor
```

1    the victim could be here today.

2         "This has come as a terrible shock to my wife and I

3    and has caused heartache and stress to our lives and our

4    relationship.  We are very concerned about our daughter's

5    mental health.  We now question her development through a

6    different lens.  We worry that her exposure and involvement in

7    this child pornography ring will ruin her chances of normal

8    sexual development.

9         "We cannot share what happened with anyone else in

10   our extended and very close family.  It has become our dark

11   secret that is not spoken about other than between the three of

12   us.  This does not feel right and our family should not have to

13   deal with these kinds of emotions.

14        "I trust that you will take this into account when

15   you are sentencing these awful criminals.  They have exposed

16   their sick perversions in front of very innocent children and

17   caused irreparable harm."

18        Your Honor, next we'd ask the family of MV-35 and

19   MV-35 to step forward.

20        THE WITNESS:  Okay.  So sorry if I stutter or

21   anything.  I'm not that --

22        THE COURT:  Just take your time.

23        THE WITNESS:  As a typical teenager, all I wanted

24   really was attention.  I wanted people to like me.  I had a

25   friend that introduced me to the Internet.  I started making a

1   bunch of online friends more than I had in the day-to-day real

2   life.  The Internet was my escape from depression that I didn't

3   know I had at the time.

4         My friend made videos that looked real but really

5   weren't, but her videos got lots of reviews and responses so I

6   decided I would start making videos.  The videos were not

7   provocative whatsoever.

8         After being on the website for so long, I started

9   getting messages to join chat rooms.  After a while of getting

10   the requests, I decided I would accept one.  This is where the

11   problems began.  I was the only one on the webcam and there was

12   just chat underneath me.  It felt normal at first, and then I

13   started to feel -- I started feeling strange because I was

14   looking at myself with a bunch of words underneath me.  I

15   brushed it off and continued because I enjoyed having friends

16   to talk to every day.  They were always there no matter what

17   time of day.

18         After a while of them gaining my trust and getting to

19   know them, I started being flirtatious with them.  They seemed

20   to enjoy it and I liked the attention they were giving me so I

21   continued to do so.  I teased them and one of them recorded the

22   video.

23         Then from then on, I was blackmailed.  They

24   blackmailed me by threatening to come to my house and hurt my

25   family and I -- they named everyone that lived in my house so I

1    knew that these threats were serious.  I never told anyone

2    about it because I thought I could fix it myself.

3           They would tell me to take off my clothes and touch

4    myself in sexual ways so I tried to accommodate to their

5    desires.  Every time I would do so they would record me and

6    blackmail me over and over again, which turned into an

7    intimidating and vicious cycle.

8           I felt like -- I felt like I was being watched 24-7

9    and this started to take a turn on my daily life.  I started

10   hurting myself and I was in and out of the hospital for

11   self-harm and attempt of multiple -- I was attempt from --

12   attempted suicide.

13          I had enough of being harassed and manipulated that I

14   ended up never wanting to touch a computer again.  The tragic

15   pain this has caused me still today eats my soul.  Even though

16   I still never touch a computer to this day, I still live in

17   fear that they would find a way to hurt my family.  Okay.

18          THE COURT:  Thank you.

19          MS. RUSSO:  And, Your Honor, the mom of MV-35 would

20   also like to speak.

21          THE WITNESS:  Thank you for the opportunity to speak.

22          THE COURT:  Of course.

23          THE WITNESS:  This has affected us.  Sorry.

24          MS. RUSSO:  Take your time.  That's okay.

25          THE WITNESS:  I have a very, very close relationship

1    with my daughter.  We're -- we've always been pretty much

2    inseparable.  This has been a shock, and the bits and pieces

3    have been coming out of her slowly for months and so many

4    things have begun to make sense.  In high school, as she just

5    said, she just stopped using her laptop and refused to touch it

6    and to this day doesn't, won't -- won't touch one.  I've gotten

7    into so many arguments with her over it because it didn't make

8    sense.  I have a store that I opened with the intent for her to

9    take over one day, and she can't manage it because she won't

10   touch a computer.  So I can't tell you the guilt that I have

11   for the arguments over this.  And knowing now what I know, I --

12   I don't know -- I don't know how we're going to proceed after

13   this.  I don't want her to have to touch a computer now.

14   That's hard in this day and age.

15           She almost didn't graduate over this.  The school

16   didn't let us know until the week of.  And come to find out,

17   she had done all of the work.  She just didn't -- you know, it

18   had to be on the computer.  So she had six credits worth of

19   high school work that weren't submitted and she almost didn't

20   graduate over that.  The school allowed us one extra day and I

21   went to school with her.  I even put on her uniform that

22   morning as a joke, you know.  I had no idea why she -- none of

23   it made sense.

24           I didn't let them go out very much, my kids, because

25   we lived in the city and I thought that they were going to be

1    safe in my home.  This happened in our home.

2         They may be caught now but they've gained something

3    that I don't know how to get back for her.  They took her

4    security and they robbed her of being able to be a child.  Even

5    though they never touched her physically, she was still raped

6    by them, and she was not the only one.

7         The sentencing can never equal the pain that they've

8    caused my daughter and so many countless children that they

9    interacted with, but we are relieved that they are caught now

10   and that my daughter and so many others' daughters will be safe

11   from them whatever you sentence them.

12        Thank you.

13        THE COURT:  Okay.

14        MS. RUSSO:  Your Honor, MV-41 and her mother also

15   submitted some statements.  Those are in the new exhibits.

16   We're not going to read an excerpt from those but I just wanted

17   to point that out to Your Honor.

18        And then right now we're going to have MV --

19        THE COURT:  Hold on a minute.

20        MS. RUSSO:  Oh, I'm sorry.

21        THE COURT:  I have 41 with a -- tab 41 has only a

22   photo.

23        MS. RUSSO:  Yes, Your Honor.

24        THE COURT:  So where -- where should I look for --

25        MS. RUSSO:  These would be ones that we submitted

```
1   today, Your Honor, the ones that we passed forward.  They were
2   submitted to us last night by --
3           THE COURT:  What number?  Oh, here it is, E -- E-1
4   and E-2?
5           MS. RUSSO:  It is, Your Honor, that's correct.
6           THE COURT:  Okay.  Okay.  Go right ahead.
7           MS. RUSSO:  Thank you, Your Honor.
8           We are going to at this time move on to MV-50, Your
9   Honor.  Her mother is here.
10          THE WITNESS:  Good morning, Your Honor.
11          THE COURT:  Good morning.  Okay.  Go right ahead.
12          THE WITNESS:  Today as I stand in this room, I stand
13  as a woman, an ex-wife and a single parent, but most
14  importantly, I am a mother.
15          I'm here to speak to six men who loved to look upon
16  young girls, watch young teenagers, probably mostly girls,
17  whether in person, in picture or in videos.  How dare you,
18  especially any of you who have children, especially any of you
19  who have children who think you're a good father?  To take the
20  mistakes that these children made for your pleasure, just who
21  do you think you are?  What goes through your minds?  Have you
22  ever asked yourself, "Self, does this get me off more than an
23  adult woman?"
24          My daughter was one of these teenagers you watched
25  and looked at.  She was raised by me, a single mother who has
```

1    had medical problems since before she was even thought of.

2              As a small child she never really had a father who

3    honestly loved her, tried to teach her what she wanted --

4    excuse me, tried to teach her what to watch for when boys start

5    noticing -- taking notice of her or even how to love or to

6    teach her what love really is or how to love herself.

7              Susan, my daughter, was a child whose father bought

8    her love but left me to try to raise her as both parents.  Do

9    you know how hard that is?  Do you know exactly how hard it is

10   to do what you -- to do -- excuse me, I'm so sorry.  But left

11   me to try to raise her as both parents.  Do you know exactly

12   how hard that is?  Do you know how unfair it is to my child?

13   To any child?  Guess not.

14             However, as I said, she was an underage, stupid kid

15   who did not know any better.  She didn't know it was illegal to

16   send, quote-unquote, nude photos.  Once I found out, I tried to

17   explain to her how dangerous it was because of men like you.

18             I honestly don't know how bad it was until I saw cut

19   marks on her body, her wearing long sleeves and pants during

20   the summertime, when she tried to run away and I had to have

21   her placed in treatment programs for emotional and suicidal

22   thoughts.  But I also didn't know was that she was having

23   homicidal thoughts towards me, her mother, the only person who

24   always was in her corner.

25             Little did I know the extent of her mental, emotional

1    and physical side until she told me that her first boyfriend

2    abused her in every way and she never told me.

3          She has always had low self-esteem, never felt like

4    she was pretty, but most of all not worthy of any goodness.  If

5    anyone pays her a compliment, she just brushes it away.  Now

6    any guy she might want to talk -- excuse me, try to date thinks

7    it's okay to treat her how they -- try to treat her how they,

8    quote-unquote, "heard, saw or seen," unquote, about her.  If

9    she is friends with a guy, after a while it starts all over

10   again.

11         As I said before, she would cut to realize she still

12   felt things.  She is now proudly one and three-fourth years

13   clean this past Sunday from not cutting.

14         Her depression, anxiety, replays of the past has come

15   back.  She is so bad that her body is covered with hives from

16   head to toe.  That's why she could not be here.  Nothing of

17   over-the-counter medication nor prescription has cleared or

18   calmed her skin.  Susan has been diagnosed with ADHD, ODD, OCD

19   and has a co-dependency to me more than any -- more than she

20   was when she was a small child.

21         My children were raised very modestly.  If their

22   jeans hugged their butts, they didn't wear them.  If their

23   shirts, swimsuit were too tight, nope, sorry, they didn't wear

24   them.  Now that they are both over the age of 18 and as long as

25   they do not live underneath my roof, they can wear, do whatever

1    they want.  Susan still lives with me and will not walk out

2    looking, quote-unquote, like a hoochie mama or in Daisy Dukes.

3            Since she started ninth grade, having all of this

4    crap started, putting up with her being a teen/minor and

5    hanging around people who influenced her badly, we've had our

6    ups and downs.  I never imagined I would ever have Susan

7    arrested for hitting me while she was 15.  Five months after

8    that I had her hospitalized.

9            As a parent, I went to the police when pictures were

10   on Facebook, but because of the city limits of where I live,

11   they did nothing.

12           I did everything I knew how to do.  In our counseling

13   sessions at home we, her sister and I, tried to explain to her

14   what could happen.  She accepts her responsibility.  The

15   boyfriends in which she's only had two were probably part of

16   this, I don't know.

17           But the two of you who have children or any of you

18   who have children, do you feel weird or do you look at them as

19   you did our children?  How would you feel if it was your

20   children men were looking at?  I bet you'd want to beat the

21   snot out of them and then some.

22           As parents we try to do our best, raise our children

23   with love, respect and try to teach them to accept

24   responsibility for their actions.  The law says as parents we

25   are responsible for our children's actions.  You betcha we are.

1          The six of you sitting here had better understand

2     that pleading guilty, listening to all of us parents give you

3     the, quote-unquote, what-for as my mom used to say, guess what,

4     guys?  You're part of the responsibility.

5          When you get to prison, I -- people like you better

6     damn well -- damn well watch yourselves.  You're going to be

7     known even before you get your foot in the cell.  Sexual

8     predators are the ones who are in a gang all of their own.  The

9     men in prison, no matter what they did, hate any man, any men

10    who are like you who exploit children.  They will make you,

11    quote-unquote, their bitch, and you better not drop the soap.

12         I prayed about this situation that my daughter put

13    herself in.  Just as you know, just so you know, she graduated

14    high school with everything going on.  She walked proudly

15    across the stand, accepted her diploma, hugged her principals

16    and came and hugged me.  She's a beautiful young woman now.

17    She's always going to have to live her life knowing what she

18    did and it's going to make her -- it's going to make her a

19    stronger person.

20         For taking more of my child's self-esteem,

21    self-confidence, self-worth, self-respect, 20 years is not long

22    enough.  Being registered sex offenders is a start.  If you are

23    sentenced to 40 years, you could be out in 20 with good

24    behavior.  If you're offered any classes while in prison,

25    especially sex offender classes or for pedophiles, take them,

1     learn from them, learn what you did to our children and why we

2     as parents look at you in disgust. We don't want to but that's

3     the only way you've given us.

4          But one thing I do want to know is when you look at

5     your children, the men who have -- who have them, what do you

6     tell them? How do you explain what you did, why it's okay for

7     you to do that to other children?

8          Thank you, Your Honor.

9          THE COURT: Thank you very much.

10          MR. MULCAHY: Your Honor, I have one final minor

11    victim who wants to be heard. She could not be today but she

12    wrote a letter to the Court. She is Minor Victim 66. She just

13    recently turned 18.

14          And in part she writes, "I would have anxiety attacks

15    during school, and my depression was so bad I would stay home a

16    lot. I had turned to online chat groups because no one knew me

17    and I could just be myself. Looking back now, I feel violated

18    and completely taken advantage of. I was naive and admit that

19    I could have been smarter with my actions, but that's coming

20    from the older me, not from when I was a child.

21          "It makes me sick to my stomach knowing that these

22    men took pictures and took advantage of me. At first when I

23    found everything out, I didn't know how to feel or react so I

24    stood tall because it hadn't sunk in about what had happened.

25    A week later I became more self-conscious and all I could think

1    about was this case and my pictures.  It has been tearing me to

2    pieces just wanting to know who's seen them and how much have

3    they been spread around.  I've been just disgusted with myself

4    and haven't been motivated to do anything.  I'm learning to

5    cope because life has to go on.

6              "I have a job now that I've held down for 11 months

7    and I'm loving every minute of it.  I graduated in 2017 and

8    have been working full time because I decided college wasn't

9    for me and I would rather be working with horses one on one all

10   the time.  Working at my job now and with my horses are more

11   forms of therapy, and I've been writing everything down to help

12   cope.  I have to move on but this case will be on my mind until

13   the day I die."

14             Your Honor, those are the entirety of the victim

15   statements and presentations that we have for the Court.  Thank

16   you.

17             THE COURT:  All right.  Thank you very much.

18             All right.  Well, the government suggested a dozen

19   presentations and an hour of length and that's essentially what

20   we've done.

21             I don't really know what else to -- to say right now.

22   I guess I should ask -- I think I've been over this but I don't

23   want -- I don't want to make any process mistakes.  We've had a

24   number of individuals representative in nature.  As I

25   mentioned, I've looked at the entire sentencing memorandum and

1    all the victims' statements, which come up to about 66-plus,

2    and then beyond -- and then A through F today, two of which I

3    read, E and F, while the government lawyers were speaking.

4    Just want to make sure no other victims, no other statements,

5    testimony, anything that I'm missing at this time?

6            MR. MULCAHY:  No, Your Honor, that's the entirety.

7            THE COURT:  Okay.  All right.  It's 10:40.  Let's

8    take a less than 10-minute break.  I think the defendants can

9    stay here.  We'll get back at 10:50 and we'll begin sentencing

10    with Mr. Satawa's client, correct?

11           MR. MULCAHY:  No, Your Honor, with Mr. Kovac, which

12    is Mr. Korn's client.

13           THE COURT:  Okay.

14           MR. MULCAHY:  Who would be Defendant Number 1.

15           THE COURT:  Okay.  How do you want to handle Mr.

16    Eisley and Ms. Raben?  What -- what --

17           MR. MULCAHY:  Ms. Raben?

18           MS. RABEN:  Your Honor, what I had thought might

19    happen was if the marshals can take Mr. Eisley downstairs so

20    that I can --

21           THE COURT:  I don't know if they can split things up

22    like that.  Are you able to get a --

23           MS. RABEN:  No, I haven't had a chance to talk to

24    him.

25           THE COURT:  Yeah.  Supposing we wanted to send one

1    defendant downstairs and -- I'll tell you what.  Why doesn't

2    the United States Attorney work with the marshals and -- and

3    get a solution and we'll take 15 minutes til 11:00 o'clock.

4    But Mr. Eisley needs to meet with his lawyer, hasn't had a

5    chance, but we want to have the other defendants stay here so

6    we can sentence them sequentially, okay?

7              MR. MULCAHY:  Yes, Your Honor.

8              THE COURT:  All right.  Let's be in recess til 11:00

9    o'clock.

10             THE CLERK:  All rise.  Court is now in recess.

11             (Court in recess at 10:44 a.m.)

12             (Proceedings resumed at 11:04 a.m., all parties

13             present)

14             THE COURT:  Okay.  Everybody may be seated.

15             Okay, Mr. Korn.

16             MR. KORN:  Your Honor, we're ready to proceed.

17             THE COURT:  Thank you.

18             MR. KORN:  May I have Mr. Kovac sit near me during

19   the sentencing?

20             THE COURT:  I was just going to invite the marshals

21   to escort Mr. Kovac to the table here.

22             MR. KORN:  Thank you, Your Honor.

23             THE COURT:  If I could.

24             Okay.  While you're doing that, I will get organized.

25             (Brief pause)

 1           THE COURT:  Okay.  I have too many files here.  Just

 2    relax for a minute.  I don't have a folder for Mr. Kovac.

 3           (Brief pause)

 4           THE COURT:  Thank you very much.

 5           THE CLERK:  You're welcome.

 6           THE COURT:  All right.  Okay.  My apologies.

 7           Mr. Mulcahy, ready to go?

 8           MR. MULCAHY:  Yes, Your Honor.

 9           THE COURT:  So we're going to conduct sentencing on

10    Mr. Kovac, correct?

11           MR. MULCAHY:  Yes, Your Honor.

12           THE COURT:  And you're prepared as well, Mr. Korn?

13           MR. KORN:  We are ready to proceed, Your Honor.

14           THE COURT:  Let me invite you and your client to come

15    on up to the microphone.

16           MR. KORN:  Thank you, Your Honor.

17           THE COURT:  You are welcome.

18           And the first question I am going to ask is for Mr.

19    Kovac.  Have you, sir, had an opportunity to read over and

20    thoroughly discuss the Pre-Sentence Report with your lawyer

21    before you came to court here today?

22           DEFENDANT KOVAC:  Yes, Your Honor.

23           THE COURT:  Okay.  Very good.  There are no

24    objections to the report.

25           The guideline range in the Plea Agreement and the

```
 1   guideline calculation arrived at by the probation officer are
 2   the same.
 3            Are there any issues you want to state with regard to
 4   the Pre-Sentence Report only at this time, Mr. Korn, in terms
 5   of computations or corrections or anything else?
 6            MR. KORN:  No issues, Your Honor.
 7            THE COURT:  Okay.  Mr. -- who's going to do this, is
 8   it going to be -- Mr. Mulcahy, anything on the --
 9            MR. MULCAHY:  I am.
10            THE COURT:  Okay.
11            MR. MULCAHY:  Yes, Your Honor, there are no
12   objections on behalf of the government.
13            THE COURT:  All right.  Very good.  Then the Offense
14   Level is 43, Criminal History Category is I.  The guideline
15   range at that level calls for a life sentence.  And the factual
16   findings of the probation officer in her report will be
17   considered the factual findings of the Court for purposes of
18   this sentencing only.
19            Again, I have too much paper here so just let me make
20   a couple of comments.
21            The issue of forfeiture has been resolved.
22            The issue of restitution is open and I'll hear
23   argument on that as need be.
24            There are no factual or legal disputes.
25            There's no grounds for a departure, but I have read
```

1   Mr. Korn's excellent and lengthy sentence memo of approximately

2   14 pages.  That discusses the 3553(a) factors and it also

3   contains exhibits, a number of exhibits, some of which are 10

4   pages and longer, and those support a -- a request for a

5   variance to 20 years as well as mitigating factors and other

6   materials.

7            So with that in mind, I think we're ready to go to

8   sentencing on Mr. Kovac.  And for that purpose -- and -- and I

9   want you to know, I read the sentencing memorandum.  I read all

10  of the supporting materials.  I've read the government's

11  sentencing memorandum which is specific to this defendant,

12  34 pages.  Obviously I've heard from the victims.  I think I've

13  considered the entire body of the case that I have available to

14  me.

15           And so with that in mind, without restriction but

16  bearing that in mind, Mr. Korn, if you'd like to make any

17  remarks on behalf of your client, Mr. Kovac, I'd be very glad

18  to hear them now.  Go right ahead.

19           MR. KORN:  Thank you, Your Honor.

20           Your Honor, the pain, the anguish, the suffering that

21  these defendants caused the minor victims in this case and

22  their families is beyond comprehension.  I sat there and

23  listened to the statements of the parents, the letters that

24  were read, the statement of the minor victim, and I do not have

25  the words to express the sorrow that I felt.

1            But the nature and circumstances of the offense is

2     only one of the factors that this Court must consider in

3     fashioning a sentence that would be sufficient but not greater

4     than necessary to effectuate the purposes set forth in the

5     sentencing statute.  This Court is bound by law to consider all

6     the factors that are set forth in the sentencing statute,

7     including, but not limited to, the history and characteristics

8     of the defendant.  And this Court is mandated by the sentencing

9     statute to impose a sentence that is sufficient but not greater

10    than necessary to effectuate the objectives set forth in --

11    in -- in the statute, and the key here is sufficient but not

12    greater than necessary.  And as I stated in my sentencing

13    memorandum, Your Honor, it is my position that a 20-year

14    sentence on Mr. Kovac, who is 49 years old, would be sufficient

15    and therefore just given all the circumstances of this case.

16            I have met with Mr. Kovac on numerous occasions and

17    he has expressed genuine remorse for the pain and anguish that

18    he has caused the minor victims and their families.  He has

19    submitted a letter to the Court which I think sincerely

20    expresses the remorse that he feels.  He stated to the Court

21    that he just cannot believe -- he stated to the Court in his

22    letter that he just cannot believe that he did what he did, and

23    he prays that somehow these families, these minor victims can

24    overcome what he did to them and somehow find a way to deal

25    with this and find a way to lead in his words a happy life.

1          Mr. Kovac has no criminal record of any kind.

2          He has an exemplary work history going back decades.

3          He has the love -- and -- and -- and the letters that

4   I attached to my sentencing memorandum will attest to the fact

5   that he has the love of his family who will be there during his

6   period of incarceration and will be there upon his release, if

7   this Court allows him to be released from prison, to help with

8   his rehabilitation.

9          He has stated to me over and over again and stated in

10  his letter that he wants to avail himself of every program,

11  every form of therapy that would be available to him to deal

12  with this illness and addiction.  He knows that he is a sick

13  man and he wants to do whatever he can to overcome the illness

14  so that he does not harm anyone ever again.

15         I submitted a psychological report in which the

16  psychologist, Karen Wickline, administered numerous

17  psychological tests, and I think what is most important about

18  that, the most important conclusion of those tests and her

19  assessment of Mr. Kovac is that based on the results of her

20  evaluation, she concluded that Mr. Kovac would be a low risk of

21  re-offending, that his risk of recidivism would be extremely

22  low.

23         This is important because in -- in deciding what

24  sentence would be sufficient, one of the things that the Court

25  needs to consider is how long a sentence would I have to impose

1    on Mr. Kovac to make sure that he does not do this again, that

2    he does not harm any other children in the way that he harmed

3    these children?  A 20-year sentence, and that is what I

4    suggested to the Court, would be a sufficient and just

5    sentence.  A 20-year sentence on a 49-year-old person is a huge

6    sentence.  And in lieu of the sincere remorse expressed by Mr.

7    Kovac and in lieu of the psychological report that determined

8    that he would be a low risk of recidivism, clearly a 20-year

9    sentence would ensure and be sufficient to prevent Mr. Kovac

10   from ever doing this again.

11          The government is requesting -- in its sentencing

12   memorandum the government requested a sentence of 50 years.

13   50 years for a 49-year-old male is a life sentence.  And I am

14   asking this Court, I am urging this Court to consider all the

15   circumstances in the case, to consider the history and

16   character of Mr. Kovac and fashion a sentence that would allow

17   him at some point to be released from prison and show this

18   Court that he can rehabilitate himself, and that is his goal,

19   to rehabilitate himself while in prison, and to show this Court

20   that he, after 20 years, under the supervision of the Probation

21   Department on supervised release in which he can be required to

22   continue in therapy, which is what he needs, that he can be a

23   law-abiding citizen.

24          It would seem to me that if 20 years is sufficient

25   under all the circumstances of this case and all the purposes

1    set forth in the sentencing statute, if 20 years is sufficient

2    to do what Congress has mandated should be done with a

3    sentence, if 20 years is sufficient, then that would be a just

4    sentence because that is the key.

5            And it would be my position in light of the remorse

6    and -- and let me just say that the remorse is very important

7    in a case like this because, yes, a significant sentence will

8    motivate a person not to commit another offense, but in my

9    experience, in my life, I would say that the one thing that

10   really motivates a person, including myself, not to do

11   something again that they know is wrong and has hurt people is

12   how bad you feel inside for doing what you did.  It is that

13   kind of pain that is etched into a person's brain that truly

14   prevents that person from committing the same act again.  Mr.

15   Kovac has shown sincere and deeply felt remorse.

16           In view of all the circumstances, I would urge the

17   Court to impose a sentence of 20 years, which, again, I think

18   would be a sufficient and just sentence in view of all the

19   circumstances of this case.

20           Thank you.

21           THE COURT:  Thank you very much, Mr. Korn.  Thanks

22   for the hard work and service of your client, for taking the

23   appointment on behalf of the Court, and grateful for your words

24   and the arguments that you made.

25           Next, Mr. Kovac has the opportunity to address the

1   Court directly to say anything consistent with or in addition

2   to what Mr. Korn said on his behalf, and Mr. Kovac, I'd

3   recognize you for that purpose at this time.  Go right ahead.

4           DEFENDANT KOVAC:  Thank you, Your Honor.

5           I'll try to get through this as best as I can.  This

6   is hard.  I first want to apologize to all of the victims and

7   also their families as I'm deeply saddened and ashamed in my

8   inappropriate and disgusting behavior and actions towards the

9   victims.  I took advantage of their -- of their vulnerability

10  and I took -- and I took their innocence away from them.  I was

11  being selfish and was only thinking about myself.

12          I didn't realize the impact of my actions or the

13  consequences and the effect that I had on all of the victims.

14  I just want to let them know that I pray every night for them

15  and ask God to look over them and to protect them and -- and to

16  keep them safe and to comfort them and their families through

17  this difficult time.

18          And none of these victims should have ever had to go

19  through something like this, and I felt like I've taken a very

20  precious piece and part of their life away from them.  This has

21  been some of the happiest times of their lives, and I stripped

22  them of that and I made it to be the worst times of their

23  lives, and they -- I can never give that back to them and I'm

24  so sorry for that.

25          After listening to the victim impact statements and

1    the -- and the emotion from their parents and the anger and to

2    see what I did to those victims, I know I have put enormous

3    amount of the damage on them and I realize that and I regret it

4    to the day and I have to live with that forever and ever and

5    I'll never forget it.

6           I just want to let them to know that I am truly,

7    truly sorry from the bottom of my heart, and I just pray and

8    hope in time -- because I see that they've got a strong, loving

9    family and they're going to get a lot of support and help

10   through therapy, their counseling -- that they can hopefully

11   one day return and have a normal life again.  And I just want

12   to reiterate how deeply sorry and remorseful I am for my

13   egregious actions.

14          Thank you, Your Honor.

15          THE COURT:  Okay.  Thank you very much.  Appreciate

16   those sincere words.

17          Mr. Mulcahy, on behalf of the United States, you have

18   the right to speak to the appropriate sentence on behalf of the

19   People of the United States or any other factors under the

20   statutes and guidelines that you'd like to address at this

21   time.  Go right ahead.

22          MR. MULCAHY:  Thank you, Your Honor.

23          I appreciate that the Court has reviewed the

24   sentencing memoranda in this case, heard from the victims

25   today, read their letters.  And while I won't venture to repeat

1   everything that was written because I know Your Honor has read

2   them, I would take this opportunity to highlight a couple of

3   facts about this group and about Mr. Kovac in particular for

4   the Court to consider in fashioning an appropriate sentence in

5   this case.

6           As we start with the nature and circumstances of the

7   offense, this group of men, this -- have all pled guilty to a

8   crime that we call child exploitation enterprise, and it is an

9   enterprise by any definition of that word.  This group was

10  organized, they were rule-bound to one another, so much so that

11  they actually wrote their rules out to share with each other,

12  they strategized together.

13          They played different roles, and that's important

14  because what they did was identified one another's strengths.

15  One individual might be a good talker while the other is

16  charming so that the girls may follow him to this chat room.

17  Still others are more computer savvy so they were more adept at

18  starting a website, a website dedicated solely for this group,

19  what we've identified as Website B, which ran very similarly to

20  Website A.  They started that Website B so that they could

21  continue their hunt of these girls.

22          What also is important, Your Honor, is their strategy

23  sessions.  You can imagine each of these defendants sitting in

24  front of multiple computer screens having different windows

25  open, each window representing a chat room of a little girl who

1    came and thought she was talking to men -- to boys her age.

2    All the while each one of these men were appearing in a Skype

3    chat just among themselves knowing they were -- there were

4    other men, grown men just like they in that chat room trying to

5    convince or trying to strategize how to best convince these

6    girls to undress and masturbate on camera.  These girls showed

7    up alone without any support and these men showed up together.

8            And to say that they're an enterprise also is

9    important because of the roles that they played.  I talked

10   about the roles they played with the girls, but also important

11   for an enterprise is when one individual can't make it to work

12   that day, couldn't make it to the enterprise sessions those

13   nights, they had backup.  They recorded these videos for one

14   another and shared them so that if somebody went on vacation or

15   was at work or otherwise couldn't attend, he could trust his

16   confederates, he could trust his friends to do his bidding for

17   him to get this ultimate win as they would call it.

18           So when I think about this enterprise, we think about

19   how this group managed to work together for all of these years

20   and the wild success that they had with victims over a hundred,

21   I notice a theme running through the defendants' memoranda, and

22   that theme is -- is understandable.  It's trying to find a

23   comparison.  This crime is so outrageous and so large, child

24   exploitation enterprise crimes are not charged very often in

25   this country, and, in fact, in our office this is, by my count,

1    the third and the second of which that relates to Website B.

2          So these are rare cases.  And as a result of them

3    being rare cases, I recognize and appreciate counsel attempting

4    to try to reach for some type of comparison, and where they've

5    all landed, Your Honor, is on child pornography crimes.  And

6    that's a good place to land as a defense attorney because child

7    pornography crimes, at least the most baseline of crimes,

8    receipt, possession, distribution, are under somewhat of

9    attack.  They are fertile ground for debate about what the

10   appropriate sentences should be in those cases.

11         But it's a false comparison.  It doesn't work in this

12   case because child offenses don't run like this enterprise ran.

13   Judge, the apt comparison in this case is an organized crime

14   case.  This is a gang case.  Just like organized crime, these

15   are folks who work together.  They have disproportionate power

16   vis-a-vis their victims as they run together as grown men three

17   times the age of their victims, their victims not knowing that

18   they're working together collaboratively with their degrees,

19   with their experience, with their life experience, while these

20   kids are trying to find their way in the world, and they

21   overcome the will of these kids.

22         And so the comparison here, Judge, is not to child

23   pornography crimes, which maybe there's a day and a time for a

24   healthy debate about those, but this is an enterprise, this is

25   a gang, this is an organized crime case.

1          And even in that genre of cases, these men stand out.

2     I told the Court that child exploitation enterprise was rarely

3     charged in this country.  It's not rarely charged because

4     prosecutors are afraid to charge it.  It's rarely charged

5     because groups like this are rare.  They stand apart based on

6     their size and scope.

7          In this courtroom today, Judge, there are six men.

8     Two others have recently been arrested and will face charges

9     related to the same scheme.  There are a half dozen more, Your

10    Honor, littered throughout the world that we continue to

11    pursue.  This is a large group.  So the size of the group is

12    big.  The scope of the group is big.  It lasted for years on

13    multiple websites, the only theme being this Skype chat, these

14    series of Skype chats that these men engaged in.

15         And they also stand apart based on the child

16    exploitation that they sought.  As the government tried to give

17    some, and it was a sliver of evidence that we had, and as not

18    to overwhelm the Court with evidence, we provided just a sliver

19    of the chats between these defendants and these victims.  And

20    the theme that seemed to grow is that the sexual depravity that

21    these mean asked these kids to engage in grew.  It wasn't

22    enough to show your breasts, it wasn't enough to show your

23    vagina, it wasn't enough to masturbate.  They wanted more and

24    more depraved images: urination, bestiality, getting a friend.

25    It was never enough.

1          So what about Mr. Kovac?  As we look at Mr. Kovac in

2     particular and where he sits in this group, his volume was

3     remarkable.  As the government wrote in its sentencing memo and

4     as it has in its slide before the Court, more than 48,000 child

5     exploitive images and videos.  That's 900 hours of content.

6          I told the Court about the Skype chat.  He made more

7     than 15,000 entries to these men.  They were his friends, they

8     were his hobby.

9          His conduct lasted six years.

10         And unlike most of these men, there's only one other

11    in this group that's like him, he was in two different groups.

12    To say it in another way, Mr. Kovac wasn't satisfied with the

13    more than hundred victims resulting from the Skype Group.  He

14    needed another group because he wanted more victims.

15         The number of logins that he had from Website A

16    amounted to 14 times each and every day.  By his own admission

17    he spent hours a day every day on Website A.

18         So that's the volume.  And while that's bad enough,

19    the content is shocking: urination videos; bestiality videos;

20    infants and toddlers; masturbation with objects; his role in

21    the group as a talker, as a looper, as a moderator; and the

22    words he said about these girls, they're shocking.

23         So when we think about the nature and circumstances

24    of this offense, Judge, we can't think solely of this group or

25    solely of Mr. Kovac.  We also must consider the victims in this

1    case.  And I know the Court has read those sentencing

2    memoranda.  I know the Court has heard the victims today and

3    paid close attention.  And I can't improve on the words they

4    wrote and I won't try to, but I would underscore this.  These

5    victims' lives are going to be divided in two parts: before

6    they met this men -- these men and after they met these men.

7    These men brought our victims a lifetime of hard conversations.

8    Every boyfriend they make, their spouse, their children, their

9    loved ones, their friends, to really know these victims, they

10   are probably going to have the conversation about these men.

11          The victims don't include just these girls; their

12   parents as well.  Your Honor heard from them, and I thought a

13   theme that ran through the -- the -- what the Court heard today

14   as well as the letters was this guilt, a lot of them blaming

15   themselves.  You heard from Minor Victim 8 and Minor Victim

16   15's father talking about how they thought that they were safe.

17   The relationships with wives has changed.  The relationship

18   with husbands have changed.  The relationships with these

19   children, these victims has changed.  A lot of these parents

20   identified themselves as being failures.

21          But the last thing I want to say about the nature and

22   circumstances of the offense, Judge, is that the victims here

23   were heartfelt, the victims here were sincere, and they offered

24   to the Court their sincere words of how this case affected

25   them.  But for every victim that spoke today, there are ten

1   that did not speak today because it was too hard, perhaps

2   because the FBI has not found them.  Some just don't want

3   anything to do with this case because the pain is too great.

4   So I would ask the Court do consider not just the words that it

5   heard today but the words that it did not hear today.

6            So what about Mr. Kovac and the nature -- and I agree

7   with Mr. Korn, there are few matters where he and I are in

8   agreement.  One is that this Court can't just look at the

9   nature and circumstances of the offense.  If it did, this would

10  be a very easy sentencing hearing because it is unmatched, the

11  nature and circumstances of the offense.

12           But when we turn to the history and characteristics

13  of the defendant, what do we make of Mr. Kovac?  What's been

14  offered is a consistent work history.  And I mean no disrespect

15  to Mr. Kovac, but having a job does not render one worthy of a

16  downward variance.  That should be the minimum we expect of

17  folks.  And even this man with his consistent job history

18  acknowledged that he accessed Website A while at work.

19           What about the letter that he wrote?  I agree with

20  Mr. Korn that there were portions of that letter that were

21  sincere, but there were two things that stood out to me, Your

22  Honor, as I read that letter.  And what stands out is when Mr.

23  Kovac says twice, "I didn't realize the impact my actions had

24  upon these girls.  I didn't understand the enormous

25  consequences."  Color me skeptical.  These girls openly talked

1   about suicide, about cutting, about depression.  In his

2   psychological report the evaluator suggests that Mr. Kovac

3   himself had talked about depression and suffering from that.

4   He ought to know what it looks like.  And it wasn't a mystery,

5   these girls did not keep it from these offenders.  So I reject

6   this idea that he didn't understand.  Maybe the whole scope,

7   sure, but they knew these girls were suffering.

8         And when they identified these girls as suicidal or

9   cutting, the object was not to save them or leave them alone

10  and say maybe we ought to move on to the next one.  Instead, it

11  was "Let us be nice to these girls, let's build them up, let's

12  give them compliments so that we can get them to do what we

13  want them to do all along."  It was a means to an end, Judge.

14        He also talks about the fact that he lacks criminal

15  history, and I think that generally that is an important point.

16  It is something that we often look at with favor.  I ask the

17  Court to counterbalance the fact that he's never been before a

18  judge and never suffered a criminal conviction but that for six

19  years of his life he went to bed every night and he woke up

20  every morning in the midst of committing a crime, and not just

21  any crime, an epic crime.

22        So the idea that he has no criminal history, that

23  this is somehow equivalent to a man who has a blip in the radar

24  of an otherwise lawful life, that this is aberrant behavior,

25  one-time deal, I think should be wholly rejected.  This man

1    does not stand here like others who said, "I committed a crime,

2    I made a mistake but I otherwise lived a law-abiding life."  He

3    has lived a lawless life for the past half a dozen years.

4         Your Honor, next the guidelines and the -- actually,

5    I'm sorry, Your Honor.  The last thing on history and

6    characteristics of the offense, the only other thing that I

7    think points mildly in Mr. Kovac's favor is this evaluation and

8    it calls him a low risk of recidivism, and I think it's fair to

9    push back on a couple of points there.

10        First and foremost, Mr. Kovac apparently told the

11   evaluator that his time on Website A lasted approximately three

12   years.  That's on page 5.  That's not true.  It lasted six

13   years.

14        Only one group is mentioned throughout the evaluation

15   report.  Leads me to believe that the topic that the evaluator

16   believed that she was evaluating Mr. Kovac for was his

17   participation in the Skype Group, but he was a member of two

18   groups.

19        He denied to the evaluator that he had a sexual

20   interest in prepubescent girls, and while the evaluator at

21   least acknowledged that there were some images of prepubescent

22   girls, it did not say anything about whether those images were

23   infants or toddlers, which there were some on his computer as

24   well.

25        So these omissions, coupled with the idea that a man

1    who spent every single day, by his own admission, without

2    stopping -- the only time he stopped was when the FBI showed

3    up -- spent every day of his life, adult life, manipulating

4    young girls, that he doesn't pose a risk of re-offending is

5    frankly just not worth the paper it's written on.

6         And we ask the Court to consider the facts that were

7    omitted and just its common sense and suggest -- because Mr.

8    Kovac, the last thing he said about that evaluation or in that

9    evaluation was that he didn't think that his Internet use

10   caused any problems in the rest of his life, another conclusion

11   that doesn't make any sense.  And I think the entirety of the

12   psychological report makes very little sense and should be

13   given very little weight.

14        And as we look to the last couple of factors, Your

15   Honor, and I'm almost done, I appreciate the Court's time, are

16   the nature -- excuse me, the guidelines and the types of

17   sentences available.  3553 talks about the types of sentences

18   available, and Mr. Korn has asked for and every defense

19   attorney has asked for 20 years in prison for this case.

20        What that equates to, Your Honor, is a request to

21   find these men, Mr. Kovac in particular but all of these men,

22   as the least culpable offenders to commit child exploitation

23   enterprise.  Congress has decided that anyone, no matter how

24   big or how small the enterprise is, who commits this crime of

25   child exploitation enterprise ought to get 20 years.  That

1    means the offenders who are a group of let's say four, and

2    there are two victims, and for two days they convinced these

3    girls to take pictures of themselves and send them, that if

4    that is the universe, that is a child exploitation enterprise,

5    and Congress has said those men deserve 20 years.

6           These men are not the least culpable offenders to

7    commit child exploitation enterprise; they are among the worst.

8    More than a hundred victims, 10 to 15 offenders, years of work,

9    multiple websites and ongoing chat discussion where they

10   strategize.  Congress said 20 years for the baseline least

11   culpable, but for the most culpable they allow a sentence of up

12   to life in prison.  Congress I submit to the Court had this

13   group in mind.  The guidelines themselves call for life.

14          The last factor, Your Honor, is to avoid unwarranted

15   sentencing disparities, and in here it's a fair question to

16   pose to the government, why is Mr. Kovac -- why is the request

17   50 years for Mr. Kovac, which is the highest among his

18   confederates?  Mr. Kovac, unlike these men here, did not

19   cooperate with the government.  There is some dispute about

20   whether he offered to, and I agree that he offered to cooperate

21   but far too late, closer to the plea date when the government

22   had its case fairly well known.  He did provide information at

23   the time of his arrest, that is true.  But his true cooperation

24   as we know it, substantial assistance, he stands apart from

25   these men because these men sat down and he didn't.

1    More importantly, Your Honor, Mr. Kovac, unlike most

2    of the defendants here, was involved in two groups and not just

3    one.  And unwarranted sentences disparities do not mean Mr.

4    Kovac versus Mr. Eisley or Mr. Dominguez or Mr. Massey.  It is

5    against other offenders who commit the same crime with the same

6    criminal history.  That's what that factor means.

7    And as I indicated earlier, child exploitation

8    enterprise is the kind of crime that isn't charged very often

9    because it doesn't happen very much and it certainly doesn't

10   happen to this level.  A sentence of 50 years in this case

11   would not be an unwarranted sentencing disparity against the

12   men that sit here or against child exploitation enterprise

13   defendants who are at large.  It is less than a year for every

14   victim.

15   Your Honor, for all the reasons that we've stated,

16   for everything that the victims said and for those who couldn't

17   speak today, the government asks for a sentence of 50 years.

18   THE COURT:  Okay.  All right.  Thank you very much,

19   Mr. Mulcahy.

20   Let me ask a quick question.  I think I glossed over

21   or at least stated that there wasn't going to be an issue with

22   restitution, but indeed you did arrive in your Plea Agreement

23   at a $5,000 payment to each victim, and whereas that -- it's

24   hard to determine what the exact amount would be based on the

25   uncertainty of what was lost or at least the inability to put a

1    monetary figure on it, the simple fact is that any legal

2    dispute or factual dispute about the amount is irrelevant

3    because you've all agreed on a $5,000 payment per victim for

4    each defendant, is that right?

5            MR. MULCAHY:  That's right, Your Honor.  The total

6    ends up at $235,000.

7            THE COURT:  All right.  Okay.  So restitution is

8    going to be $235,000 without objection from either party.

9            No fine, no costs of incarceration due to the

10   inability to pay.  Forfeiture has been taken care of.

11           So I will address the sentence, give the lawyers both

12   an opportunity to object and then state the final sentence.

13   The --

14           MR. KORN:  Your Honor?

15           THE COURT:  Yes.

16           MR. KORN:  If I may, and I apologize, but I would

17   like to respond to one issue that Mr. Mulcahy raised, if I may.

18           THE COURT:  Okay.

19           MR. KORN:  I feel compelled to say that he raised an

20   issue as to Mr. Kovac's cooperation.

21           THE COURT:  Right.

22           MR. KORN:  And let me say that Mr. Kovac at the time

23   of his arrest, this is like within hours after he was arrested,

24   he agreed to talk with the FBI agents.  He gave a two-hour

25   recorded statement in which he repeatedly said that if there's

1    any way he could offer some kind of assistance to the

2    government to further their investigation, he was willing.

3    They asked him, "Would you be willing to allow us to assume

4    you're online identity?"  He said yes.  "Would you be willing

5    to allow -- would you advise us of your passwords and

6    everything else?"  He informed the government that he would.

7    And as I said, he repeatedly told the agents that whatever he

8    could do he was willing to do.

9            There was a -- a -- a -- a reference in Mr. Mulcahy's

10   statement to the Court that everybody else sat down and was

11   debriefed by the government but Mr. -- Mr. Kovac didn't and

12   somehow that's a reflection on him.  Let me say that right from

13   the time I met Mr. Kovac, he has advised -- he told me that he

14   may not have because he doesn't know the other participants by

15   name, he's not sure what information he has that would be

16   helpful to the government, but he has repeatedly asked me to

17   have the agents come and debrief him to see if there's anything

18   that he would know that would help them with their

19   investigation.

20           I on multiple occasions have approached the AUSAs in

21   this matter and said, "My client would like to be debriefed.

22   Are you interested in having the agents" -- and this is early

23   on in the case -- "Are you interested in having the agents talk

24   to him?"  And they said, "Well, we're not sure at this point

25   whether we want to debrief him, but if we do, we'll let you

1    know."  And I repeatedly throughout the case asked them to meet

2    with him, because they certainly have more information about

3    the case than I did, and see whether or not Mr. Kovac would

4    have any information that would help them with their

5    investigation, and they repeatedly say, "At this time the

6    agents don't think it would be helpful to meet with him."

7         So if -- if cooperation is an issue, he has bent over

8    backwards to cooperate to the best of his -- his ability with

9    the government in -- in furtherance of the investigation.

10         THE COURT:  If he offered to cooperate from the

11    get-go, Mr. Mulcahy, but didn't because the government rejected

12    his efforts, whatever, why should he get 50 as opposed to

13    somebody who offered to cooperate and -- and gave some -- some

14    information?  Because we're talking about life sentences across

15    the board, and it seems to me that if we're going -- first of

16    all, everybody wants a departure or at least a variance, not

17    only the defendants but the United States, and I think the

18    United States is driven by -- I don't want to say -- in fact, I

19    probably shouldn't get into what I believe the government's

20    sentencing recommendation is driven by.

21         But the question I would have is if we're talking

22    about life sentences across the board, why do we vary for some

23    as opposed to others?  I mean there's a lot of distinctions

24    within the familial, medical, psychological and other

25    backgrounds of -- of these defendants.  What we do know is that

1    everybody did the same thing and no one had a criminal record.

2    What would distinguish about who should get more of a departure

3    than less from the recommendation of the government, Mr.

4    Mulcahy?

5              MR. MULCAHY:  Yes, Your Honor.  All recommendations

6    are based in some measure on cooperation, in some measure on

7    some of the other factors that Your Honor identified: familial

8    issues, things like that.

9              But as to Mr. Kovac in particular, it's -- it's --

10   it's certain that he offered to cooperate very late in -- it

11   wasn't throughout.  When he first got here -- when he -- when

12   he was in Nevada, he offered to give a password.  Everything

13   that Mr. Korn said about his behavior in Nevada is accurate.

14             He came here.  At first there was a delay in whether

15   he wanted to meet with us, and by the time he came through to

16   say, "Yes, I want to meet with you," we had met with everybody

17   and we felt like our case was solid, we didn't need his

18   assistance.

19             And more importantly, Your Honor, even if he had sat

20   down with us, that the recommendations that we're making here

21   are based on the substantial assistance provided.  So some of

22   these men have been given a lesser recommendation because they

23   actually moved the needle, they helped the case along, while

24   others got a very little, if any, of a reduction based on their

25   cooperation because they did not move the needle.  But --

 1          THE COURT:  Hold on.  I'm sorry to interrupt you.  I

 2     understand what you're saying.  I guess I should ask explicitly

 3     why -- why doesn't -- why doesn't the government recommend a

 4     life sentence for this individual then?

 5          MR. MULCAHY:  Because we wanted to put it in a term

 6     of years for a couple of reasons.  One reason to put it in a

 7     term of years is so there could be -- more accurately show the

 8     waterfall effect of the different recommendations.  In other

 9     words, where Mr. Kovac sits based on all of his circumstances

10     of the offense based on his conduct versus where the next

11     individual sits and the next individual sits, sits.

12          So the idea was to put up a set term of years.  For

13     Mr. Kovac it is -- and I don't necessarily disagree with Mr.

14     Korn, that it is essentially a life sentence because with good

15     time and credit, he gets out at about the age of 90.  But we

16     wanted a term of years for -- for one reason, which is to show

17     a consistent pattern, which we know recommendations for each

18     defendant.

19          THE COURT:  Yeah.

20          MR. MULCAHY:  As well as with a term of years, Your

21     Honor, he can earn good time credit and have that -- not only

22     that ability to get good time credit but that motivation to get

23     good time credit such that his behavior would be better in the

24     Bureau of Prisons.  So that's the other reason why a term of

25     years is preferable than just a straight life sentence in this

```
 1    case.
 2              THE COURT:  That also means -- that also means that a
 3    younger member of the enterprise gets a break randomly because
 4    of the age in which they entered the enterprise.
 5              MR. MULCAHY:  I don't know if it's a break, but
 6    yes --
 7              THE COURT:  Why -- why -- does Mr. -- Mr. Kovac gets
 8    a life sentence because he entered the enterprise when he was
 9    40, and someone else might have entered the enterprise when
10    they were 20 and they get presumably, life expectancy being the
11    same, much less time in prison?  See what I mean?
12              MR. MULCAHY:  I do.  And I think the argument if the
13    defendant was 20 is his brain hasn't developed, and so he
14    shouldn't be punished like a -- like a person who's been
15    through the life experience like Mr. Kovac has.  All of these
16    men are at least in their 30s or 40s, and our recommendation is
17    not necessarily tied to age but the conduct that they
18    committed.
19              And Mr. Kovac's conduct, being involved in two
20    groups, being constantly in these groups, never taking a break,
21    having multiple roles and ultimately not providing substantial
22    assistance, is what led us to the -- to the 50-year
23    recommendation.  I think he sits apart from most of these men
24    except for the men who we've recognized in our sentencing memo
25    would otherwise deserve a life sentence but cooperated to such
```

1   a degree that we feel the need to file a 5K in this case.

2          THE COURT:  Either one of you can answer this.  When

3   he was arrested and offered to speak about his -- his activity

4   in -- in Nevada, was he counseled or represented by a lawyer at

5   that time?  I'm sensing not.

6          MR. KORN:  He was not represented by an attorney,

7   Your Honor.  He was read his Miranda Rights.  He was not -- he

8   waived his Miranda Rights.  He waived his right to an attorney

9   and he was not represented by an attorney.

10         And I do have to say, Your Honor, if I may, and I

11  don't want to belabor this point, but Mr. Mulcahy said it was

12  late in the game when he came forth and said, "I want to be

13  debriefed.  We had already debriefed everybody else."  Mr.

14  Kovac through me, I spoke with Assistant U.S. Attorney Russo at

15  the arraignment on the indictment and I said that Mr. Kovac

16  would like to be -- would be willing to be debriefed to see

17  whether or not he has any information that will be helpful to

18  the government.  This was at the arraignment on the indictment.

19  And Ms. Russo -- Russo said that she would talk to the agents

20  and see if they wanted to meet with him.

21         So right from the very beginning -- and I'm not

22  saying he had substantial assistance, but I'm saying right from

23  the very beginning he wanted to meet with the government and

24  give them whatever information he had so they could determine

25  whether or not it would be useful to their investigation.

1        MS. RUSSO:  Your Honor, can I respond since he's --

2        THE COURT:  No, I -- I don't think we need to get

3    into any more of this.

4        MS. RUSSO:  All right.

5        THE COURT:  All right.  The Court will state the

6    sentence and give both lawyers an opportunity to reject.

7        I personally believe the conduct in the case calls

8    for a -- a sentence of life imprisonment with no chance of

9    parole.  I think that Congress on behalf of the United States

10   people has expressed very clearly that individuals who engage

11   in child exploitation enterprise are so dangerous and so

12   criminal that they should not be on the street.  By and large

13   and philosophically I share that view.  Need I have my view

14   reinforced, it would certainly be through the victim impact

15   statements that I've received in the past weeks and in court

16   today.

17       I, however, have one simple motive driving me to

18   grant a downward variance, which is that I believe part of my

19   obligation as a judge is to not sustain or perpetuates --

20   perpetuate the rights of -- of victims per se but to be fair to

21   both parties of the dispute.  And my personal view, in looking

22   at -- at both punishment, protection of the community and

23   deterrence, all of which I believe support the imposition of a

24   life sentence, is very simply mercy and an opportunity for an

25   individual with no prior criminal record to have some

1    opportunity to look to the future and -- and some opportunity

2    at least finishing life in -- in free circumstances, and -- and

3    I kind of gathered that that was behind the government's

4    recommendations below the life term for which they give.

5        So, you know, very simply put, I think a life

6    sentence is -- is -- and by the way, I would like to say that

7    the characteristic or at least the characterization of the

8    offense is correctly given by the United States.  These are not

9    child pornography production or possession crimes.  These are

10   crimes of organized criminals, intelligent, aberrant and the

11   worst of -- of the worst, and this is not a simple crime of

12   possessing, taping.  And what's sad about this is that it --

13   it -- it -- well, that's all I have to say.

14       Pursuant to the Sentence Reform Act of 1984, the

15   Court, having considered the sentence guidelines and factors

16   contained in 18 USC, Section 3553(a) that I just went over,

17   will hereby commit the defendant, Terry Kovac, to the custody

18   of the Bureau of Prisons for a term of 444 months.

19       It's further recommended that the defendant be

20   designated to an institution with a comprehensive sexual

21   offender treatment program.

22       Upon release from imprisonment, the defendant shall

23   be placed on a supervised release term of five years.

24       The defendant must pay a special assessment of a

25   hundred dollars, that'll be due immediately, and a Justice For

1    Victims of Trafficking Act assessment of $5,000.

2         The Court is aware that the parties agreed to a

3    restitution amount of $5,000 per identified victim, and the

4    Court will impose therefore a restitution amount of $235,000.

5    The Court waives any interest, penalties and fees that might --

6    may -- might accrue.

7         The Court waives the imposition of a fine, the costs

8    of incarceration, the costs of supervision due to the

9    defendant's lack of financial resources.

10        While in custody, the defendant shall participate in

11   the Inmate Financial Responsibility Program.  The Court is

12   aware of the requirements of the IFRP and approves the payment

13   schedules of the program and hereby orders the defendant's

14   compliance.

15        Mandatory drug testing is suspended because I believe

16   that the defendant poses a very low risk of future substance

17   abuse.

18        While on supervision the defendant shall abide by the

19   standard conditions adopted by the U.S. District Court for the

20   Eastern District of Michigan and he must also comply with the

21   following special conditions.  Due to the nature and

22   circumstances of the offense, the following extensive special

23   conditions are ordered:

24        Number one, the defendant shall comply with the

25   requirements of SORNA, that's the Sex Offender Registration

1    Act, 42 USC, Section 16901, 16901.  That will be directed by

2    the probation officer, the Bureau of Prisons and any state Sex

3    Offender Registration Agency in which he resides, works as a

4    student or is convicted of a qualifying offense.

5            The defendant shall successfully complete any sex

6    offender diagnostic evaluation, treatment and counseling

7    program and polygraph examination as directed by the probation

8    officer.

9            Reports pertaining to sex offender assessments,

10   treatment and polygraphic examination shall be provided to the

11   probation officer as directed by the Court.

12           The defendant shall pay all or part of the cost of

13   diagnostic evaluations, treatment or counseling programs and

14   polygraphic examinations based upon the ability to pay.

15           The defendant shall be required to submit to periodic

16   polygraphic testing at the discretion of the probation officer

17   as a means to ensure compliance with the requirements of

18   supervision or treatment.  No violation proceedings will arise

19   on the results of the polygraphic examination.  Based on the

20   defendant's ability to pay, he shall pay the cost of the

21   polygraph examination in an amount determined by the probation

22   officer.

23           The defendant shall not associate with minor children

24   under the age of 18 except in the presence of a responsible

25   adult who's aware of the nature of the defendant's background

1    and the current offense without prior approval of the probation

2    officer.

3            The defendant may have unsupervised contact with his

4    or her own children at the discretion of the probation officer.

5            He shall not frequent places where children

6    congregate on a regular basis such as, but not limited to,

7    school grounds, playgrounds, child toy stores, video arcades

8    and things of that nature.

9            The defendant shall notify anyone they date or marry

10   with a minor child under the age of 18 of their conviction.

11           The defendant shall not purchase, sell, view or

12   possess images in any form of media or live venue that depict

13   pornography, sexually explicit conduct, child erotica or child

14   nudity.  The defendant shall not patronize any place where such

15   material or entertainment is available.

16           The defendant shall have employment pre-approved by

17   the Probation Department.

18           The defendant shall not be employed at or participate

19   in any volunteer activities that involve contact with minors

20   under the age of 18 or adults with disabilities without prior

21   approval of the probation officer.

22           The defendant shall have all residences pre-approved

23   by the Probation Department.

24           The defendant shall not provide care or live in a

25   residence where children under the age of 18 or adults with

1    disabilities shall also reside without prior approval of the

2    probation officer.

3              The defendant shall participate in the Computer/

4    Internet Monitoring Program administered by the Probation

5    Department.  He shall abide by the program agreement in effect

6    at the time of the supervision and comply with any amendments

7    to the program during the term of supervision.  Due to the

8    advances in technology, the Court will adopt the amendments of

9    the program as necessary.

10             For the purpose of accounting for his person,

11   residence, computer and/or vehicle, the defendant shall submit

12   to a search conducted by the Probation Department at a

13   reasonable time and manner.  He must inform any other residents

14   that the premises may be subject to a search warrant pursuant

15   to this condition.

16             He shall provide the probation officer with access to

17   any requested financial information and billing records.

18             The defendant shall submit his person, residence,

19   office, vehicle, papers, business or place of employment or any

20   property subject under his control to a search.  Search must be

21   conducted by Probation at a reasonable time and in a reasonable

22   manner based upon the reasonable suspicion of contraband or

23   evidence of a violation of a condition of release.  Failure to

24   submit to such a search may be grounds for revocation.  The

25   defendant shall warn any residents that the premises may be

1    subject to search.

2           And the defendant shall not have any contact,

3    directly or indirectly, with any victim or witness in the

4    instant offense unless approved by the probation officer.

5           In light of the restitution, the defendant shall not

6    incur any new credit charges or open additional lines of credit

7    without the approval of the probation officer unless the

8    defendant is in compliance with the payment schedule.

9           The defendant shall provide the probation officer

10   access to any requested financial information.

11          He has to make monthly installment payments on any

12   remaining balance of the fine or a special assessment at a rate

13   and schedule recommended by the Probation Department and

14   approved by the Court.

15          That will be the sentence of the Court.  Any

16   objections from Mr. Korn?

17          MR. KORN:  No objections, Your Honor.

18          THE COURT:  Any objections from Mr. Mulcahy?

19          MR. MULCAHY:  No, Your Honor.

20          THE COURT:  Okay.

21          MR. KORN:  Your Honor, if I may.

22          THE COURT:  Yes.

23          MR. KORN:  Could the Court -- I would ask the Court

24   to recommend that -- and I -- and I understand it's just a

25   recommendation, but that recommend that the Bureau of Prisons

1    place Mr. Kovac in a prison that has a sexual offender

2    treatment program.  And I know one of the ones, if he meets the

3    qualifications, and I don't know whether he does, but one of

4    the ones that I know that has programs like that is FCI Elkton,

5    but I would certainly ask the Court to make that

6    recommendation.

7           THE COURT:  I'll endorse that completely.  I think

8    the defendant would benefit from treatment.  He wants to

9    achieve something there.  And I would recommend he be placed at

10   a facility with a sex offender treatment facility, and if

11   Elkton's the one, that's -- that's -- that's something I would

12   endorse.

13          The sentence as stated earlier without objection will

14   be imposed.

15          The defendant has waived the right to appeal both his

16   sentence since it's below that called for in the Plea Agreement

17   and the conviction itself as part of the plea.  Mr. Kovac, the

18   waivers, the sort you signed are generally enforceable.  If you

19   don't think yours is, you can take that up directly with the

20   Court of Appeals.

21          The defendant will be remanded to the custody of the

22   marshal for service of his sentence.

23          Both parties have copies of the Pre-Sentence Report.

24   Final copies will be sent to the Bureau of Prison and the

25   Sentencing Commission.  Any other copies are to be kept

1    strictly confidential.

2         Anything else on this defendant, Mr. Mulcahy?

3         MR. MULCAHY:  Yes, Your Honor.  Pursuant to the terms

4    of the Plea Agreement, the government moves to dismiss

5    Counts 1 -- 2 through 6 of the indictment.

6         THE COURT:  That's granted without objection.

7         Anything else from you, Mr. Korn?

8         MR. KORN:  Nothing further, Your Honor.  Thank you.

9         THE COURT:  All right.  Good luck to you, Mr. Kovac.

10        DEFENDANT KOVAC:  Thank you, Your Honor.

11        THE COURT:  You're welcome.

12        MR. KORN:  Thank you.

13        THE COURT:  All right.  You're welcome.

14        (Proceedings concluded at 12:12 p.m.)

15                       —  —  —

16

17

18

19

20

21

22

23

24

25

```
1          Detroit, Michigan

2          Tuesday, July 17, 2018

3                        —  —  —

4          (Proceedings commenced at 12:12 p.m., all parties

5          present)

6          THE COURT:  Let's go -- Mr. Massey is with Mr. --

7    with Mr. Satawa, is that right?

8          MR. MULCAHY:  No, Your Honor, it's Mr. Dominguez.

9          THE COURT:  Let's go with Mr. Dominguez, Mr. Massey

10   and Mr. Robinson.  Can we do that, in that order?

11         MS. RUSSO:  Mr. -- I'm sorry, Mr. Dominguez and then

12   Mr. Robinson and then you said Mr. Massey?

13         THE COURT:  I said the opposite, but either way.  Mr.

14   Dominguez, Mr. Massey and Mr. Robinson, either -- either --

15   either or is fine with me.

16         MS. RUSSO:  That sounds good.  If we could do Mr.

17   Robinson after Mr. Dominguez, that would be great.

18         THE COURT:  That's fine.  Okay.  All right.  Next

19   case is USA versus Felipe Dominguez-Meija.  Mr. Mulcahy and Ms.

20   Russo are here and Mr. Satawa is here as well.

21         Let me interrupt briefly.  Linda, are you making one

22   transcript or are you doing separate...

23         (Brief discussion held off the record)

24         THE COURT:  Okay.  Thank you.  I apologize for that

25   interruption.
```

1          And let me turn to Mr. Satawa and ask him and his

2    client to come up to the microphone and we'll get started.

3          Let me ask Mr. Meija, sir, have you had an

4    opportunity to thoroughly read the Pre-Sentence Report along

5    with your lawyer, and including any revisions that have been --

6    might have been made to it after it first came out?

7          DEFENDANT DOMINGUEZ-MEIJA:  I have, Your Honor.

8          THE COURT:  Okay.  All right.  Pull that microphone a

9    little -- thank you.  Okay.  Very good.

10          As with the previous defendant, Mr. Kovac, there

11    appears to be no dispute as to the guideline range or the

12    probation officer's report.  No objections were filed.  And I

13    would ask you, Mr. Satawa, whether or not you'd like to make

14    any corrections, changes, or objections to the Pre-Sentence

15    Report at this time.

16          MR. SATAWA:  No, Your Honor.

17          THE COURT:  Okay.  Thank you.  Mr. -- or Ms. Russo,

18    how about you?

19          MS. RUSSO:  No, Your Honor.  Thank you.

20          THE COURT:  Okay.  Then the Pre-Sentence Report will

21    be accepted by the Court.  The factual findings of the officer

22    will be those of the Court for purposes of this sentence only.

23          The Offense Level is 43, the Criminal History

24    Category is I.  The guideline range contemplates a life

25    sentence as does the Plea Agreement.  Again, both sides offer

1    in their sentencing memoranda requests for variances, which I

2    am going to consider.

3         The issue of restitution, as I mentioned with Mr.

4    Kovac, is addressed.  The parties have agreed on a $235,000

5    joint and several figure for restitution.

6         There's no ability to pay any fine.

7         We spoke about forfeiture at the beginning of the

8    proceeding.

9         And again, there's no ground for departure but

10   variances are requested and we'll consider those as we go

11   further.

12        On behalf of Mr. Meija, Mr. Satawa has the

13   opportunity to make any remarks as to the appropriate sentence

14   as to mitigation.  Go right ahead, sir.

15        MR. SATAWA:  Your Honor, I will note for the record

16   that I'm sure the Court -- in light of the fact that the Court

17   commented on the excellent and lengthy sentencing memorandum by

18   Mr. Korn and has not remarked on the -- the -- the content or

19   substance of mine, that I would certainly still expect and

20   believe that the Court has reviewed it extensively and

21   understands the basic framework of the arguments I'm making on

22   behalf of Mr. Meija.

23        THE COURT:  1 through 24, read, considered,

24   thoroughly digested.  I certainly did read the entire

25   sentencing memorandum.  I am in receipt of that.  I -- I

1    probably should have mentioned everything I'm in receipt of,

2    and I appreciate that correction, but, of course, you filed

3    that on the 10th, which was a week ago today, and I read that

4    not only over the weekend but again this morning.

5            Go -- go right ahead, Mr. Satawa.

6            MR. SATAWA:  Thank you, Your Honor.

7            Your Honor, the substance of my arguments are

8    contained in that memorandum.  I don't think I need to repeat

9    them for the Court or -- or the government.

10           Your Honor, I -- I -- I note that the Court has --

11   has just discussed with its court reporter the idea of making a

12   joint transcript.  I would in that vein, rather than repeat

13   some of the arguments made by Mr. Korn, I would ask the Court

14   to adopt many of those arguments just for the sake of

15   efficiencies' sake.

16           Your Honor, these cases are without question

17   difficult and troubling.  And as I stand before Your Honor on

18   behalf of Mr. Meija, the -- the thing that really struck me as

19   I heard both Mr. Korn and Mr. Mulcahy speak is that many of

20   the -- of the comments made by both sides in this case

21   highlight the -- the difficulty and sort of the uniqueness that

22   these cases present.

23           I -- I -- I -- I can only state that my impression of

24   this case was that -- that both sides have been represented

25   extraordinarily well by counsel, and I have had nothing but

1     a -- a -- a very professional relationship with both Ms. Russo

2     and Mr. Mulcahy as this case has gone through the -- its -- you

3     know, through that court system.  I know that they are

4     aboveboard and professional and have made arguments that they

5     feel best represent their client, the United States, and -- and

6     I stand before Your Honor in that -- in that same vein.

7            I guess the -- the -- the real rub or point of the

8     adversarial system is to have lawyers representing both sides

9     to come up in front of Your Honor and make arguments.  And

10    there's no question that these crimes are abhorrent.  There's

11    no question that they caused suffering.  There's no question

12    they caused damage.  There's no question that they've caused in

13    some cases I'm sure lifetime damage, and -- and in other cases

14    it sounds like some of the victims are -- are -- are -- are

15    doing better than that.

16           And, Your Honor, there's -- there's -- there's

17    nothing that any advocate can do on either side to -- to undo

18    what has been done.  Your Honor's comments that Congress has

19    clearly identified this as a -- a case that deserves the -- the

20    most stringent and lengthy punishment permeates throughout this

21    case.

22           And on behalf of Mr. Meija, I think it's important

23    that as I listened to Mr. Mulcahy and the sentencing argument

24    he made as it related to the first sentencing defendant, what

25    strikes me, Your Honor, is the point I tried to make in my

1    sentencing memorandum that almost everything the government
2    said is taken apart -- is taken into account by the guidelines.
3    I know of no other offense where your base level starts in the
4    40s.  I -- in -- in researching the guidelines, I could come up
5    with terrorism and -- and, you know, obviously, you know,
6    severe, serious racketeering enterprise type cases.  And I
7    understand the government's argument that this is an enterprise
8    by any definition and that it is no different from an organized
9    crime or drug -- a drug gang that's racketeer -- that's
10   racketeering and running drugs and guns or -- or whatnot.  I --
11   I understand that argument.
12            But I -- I think it's important for your Court when
13   analyzing -- for this Court, when analyzing the 3553 factors,
14   to -- to start with the idea that we are starting with a life
15   sentence.  An individual that has had never contact with the
16   criminal justice system, not an arrest, not a conviction, a
17   Level I, and not a Level I with some minor criminal history but
18   a true Level I, no criminal record, stands before Your Honor
19   with a presumptive sentence of -- of life, a guideline range
20   that starts him at life, and that is solely driven by the
21   guidelines which is solely driven by those kind of factors that
22   the government argues.
23            Of course the crime is abhorrent.  That's taken into
24   account by the guidelines.  Of course it's caused damage.
25   That's why the guidelines are so high.  That's why there is a

1    repeat and -- and dangerous sex offender enhancement that when

2    started with a level 35 combines with that five points to make

3    this a level 40, and you only need three more points to get to

4    a life, a presumptive life sentence with a Criminal History

5    Category I. It is without question a serious offense. It is

6    without question an offense that caused serious and -- and --

7    harm and damage to untold amounts of young people.

8         But the way I understand 3553 and the way I

9    understand the guidelines is is this Court is not supposed to

10   compare this offense or this offender to somebody who had been

11   convicted with the federal crime of trespassing on federal

12   forestry. I mean Mr. -- Mr. Meija's sentence is to be

13   fashioned by comparing him to others convicted of this offense,

14   like offenses. The guidelines are -- are designed to -- to

15   drive that point home, that -- that like offenders who commit

16   like offenses, the Court is -- the guidelines are to try to

17   establish, however fleeting and difficult, that -- that maybe

18   unattainable goal of uniformity and -- and -- and avoiding

19   disparate treatment as -- as -- as required by 3553.

20        When -- when -- when one does that, when one looks at

21   the unique circumstances, personal background of Mr. Meija,

22   yes, Mr. Meija was one of the most active talkers of this

23   group. Mr. Meija's role was -- was critically important to the

24   group's success and sustainability. I understand that and Mr.

25   Meija understands that.

```
 1              But regardless of what arguments were made as it

 2      relates to other defendants, Mr. Meija was arrested and gave a

 3      full confession almost immediately.  When he was brought to

 4      this district, he sat down with counsel, myself, with the

 5      government and gave a full and complete debriefing.  He offered

 6      passwords, he offered information, he offered active

 7      cooperation if they were, in fact, motivated to get it.

 8              THE COURT:  Yeah.

 9              MR. SATAWA:  You start from a place of a young man

10      who as a child had to live with the guilt and the suffering of

11      his own mother having died during childbirth.  He grew up after

12      that in a house where his stepmother viciously and violently

13      abused him, in a family that had little or no money.  And

14      despite those things, after coming to this country, and again,

15      Your Honor, coming to this country without status, which means

16      he will be -- and I don't know why I put in my sentencing

17      memorandum Canada -- Canada; it's obviously Mexico.  I -- I --

18      that's just a typographical error, Your Honor, that I apologize

19      for.  Mr. Meija is going to be deported back to -- to Mexico

20      upon his release, to go back to a country he's never known

21      without family who is basically all here.

22              Despite that background, despite that environment,

23      where he himself, in fact, attempted suicide by cutting his

24      wrists due to the abuse by his stepmother, he himself suffered

25      from psychological problems as a teenager, serious
```

1   psychological problems as a teenager, became a -- a valuable

2   employee.  The -- the comments by his boss at the time of his

3   arrest are part of the Pre-Sentence Report and quoted in my

4   sentencing memorandum.

5           Your Honor, I think that when one examines the

6   history and characteristics of Mr. Meija as a defendant, the

7   idea of a sincere amount of remorse and a significant

8   acceptance of responsibility for his actions jumps off the page

9   and really, really is highlighted by -- by -- by the actions

10  that Mr. Meija took upon his arrest and in the immediate

11  aftermath of his arrest and early in this case.

12          No -- at no point has Mr. Meija to myself, to the

13  Court or to the government has ever tried to justify or explain

14  away his actions.  This is an individual who has wholeheartedly

15  embraced what he has done and understands he has a part to

16  play.

17          Your Honor, his -- his background and

18  characteristics, particularly again the fact that he is a true

19  offender, first-time offender without a criminal record, speak

20  to a -- a -- a -- speak to a variance ground that this Court

21  should seriously consider.

22          Finally, Your Honor, I'd like to say this.  Unlike I

23  believe every other defendant in this case who can benefit from

24  the sex offender treatment program at Butner, who's going to

25  get good time credit, who is going to be eligible for 54 days a

1   year for good time credit and perhaps reductions in the

2   sentence for completion of various programs including the sex

3   offender treatment program offered at Butner and other

4   facilities in this -- in the BOP, Mr. Meija is ineligible for

5   almost all of them due to his -- his status as -- as a

6   deportable alien.  He is going to do by any projection day to

7   day, day for day for his -- his -- whatever -- whatever this

8   Court sentences him.  He is 54 days per year times the length

9   of his sentence behind every other defendant in this case.  So

10  when this Court fashions a sentence that is unique to Mr. Meija

11  under 3553, I think that's something this Court really has to

12  take into account because over ten years that's 540 days.  Over

13  20 years that's over a thousand.  You know, over 30 years,

14  that's, again, over 15 or 1600 days that Mr. Meija sits in jail

15  or in custody longer than the co-defendants because of that

16  status as a deportable alien.

17          Judge, the question is not where this crime fits in

18  the greater spectrum of crimes.  It is at the top as Mr.

19  Mulcahy said.  It is at the top of the pyramid and it's at the

20  top of the pyramid because Congress says it belongs there,

21  because the Sentencing Commission says it belongs there,

22  because society says it belongs there, and it's at the top of

23  the pyramid for a reason.

24          But within that tip of the pyramid, where does Mr.

25  Meija fall?  Does he fall at life or does he fall at 20 years?

1    And, of course, I don't think the Court is at all surprised by

2    every defendant came in to court asking for a 20-year sentence,

3    which is, of course, the mandatory minimum this Court must

4    give.

5           But when this Court looks at the unique circumstances

6    of Mr. Meija, I believe that a sentence of 20 years is

7    justified in his case for all the reasons I've said here today

8    and for all the reasons contained in my sentence -- sentencing

9    memorandum.

10          And I thank Your Honor, I thank you for Your Honor's

11   time and consideration.

12          THE COURT:  Okay.  Thank you very much, Mr. Satawa.

13   And I will not forget to thank you for your hard work

14   throughout the representation of your client through the case

15   and for taking the appointment.  The Court greatly appreciates

16   quality lawyers like you representing indigent defendants as

17   well, so thank you.

18          And let me now turn to Mr. Meija.  Sir, you have the

19   right to make any statement on your own behalf in addition to

20   or combined with your lawyer's statements as to the sentence

21   and anything else you'd like to say.  Go right ahead.  You'd

22   move the microphone.  Okay.  Thank you, sir.

23          DEFENDANT DOMINGUEZ-MEIJA:  First of all, how you

24   doing, sir?  I'm not going to make excuses for what I did and I

25   know I hurt a lot of people, especially victims, their parents,

```
 1    their families.  And I went through something similar so I
 2    should have, you know, not done anything like that, but it's a
 3    thin line, I crossed it, and I just deserve what's coming my
 4    way.  I'm not going to make excuses.  I'm sorry.
 5            I'm giving away part of my life.  This payment is not
 6    enough.  I know my life is probably worth nothing for them.
 7    But, you know, I just want to tell them that I'm sorry.  I
 8    never meant to hurt anybody.  I didn't think about the -- the
 9    volume, the -- the -- the level that I -- of -- of -- of the
10    crime that I was making, and all I can say is that I'm sorry,
11    no excuse for what I did.
12            THE COURT:  Okay.
13            DEFENDANT DOMINGUEZ-MEIJA:  Thank you.
14            THE COURT:  Thank you, sir.  Thank you for those
15    remarks.
16            Ms. Russo, on behalf of the United States.
17            MS. RUSSO:  Thank you, Your Honor.
18            I guess I would like to just incorporate the victim
19    impact statements that were made today on the record and
20    Exhibits A through F into this sentencing hearing just in the
21    event that they aren't already incorporated.
22            I want to start with talking a little bit about some
23    of these arguments about the sentencing guidelines that have
24    come up in the sentencing memo and again here today, Your
25    Honor.  A lot of the -- the criticisms that were cited in
```

1    the -- in the sentencing memo deal with receipt and

2    distribution of child pornography cases, and I think my

3    colleague, Mr. Mulcahy, has made very clear that this is just

4    an entirety -- entirely different animal.  This case obviously

5    involves production, not receipt or distribution.  It involves

6    the exact sort of case that actually the writers of the

7    sentencing guidelines and the Commission have found would

8    warrant additional sentencing enhancements.

9            So maybe perhaps the use of a computer enhancement,

10   for example, might be something that the Court and the

11   Commission have been critical of.  However, when you look at

12   the additional enhancements that the Commission has requested

13   for things like the content of the videos and images on an

14   offender's devices, the offender's conduct and the level of

15   sexually charged interactions with minors an offender has, the

16   degree of an offender's engagement with other offenders, Your

17   Honor, you would find that all of the suggestions that the

18   Commission has about applying additional enhancements would be

19   applicable in this case.  And so, Your Honor, I assure you,

20   regardless of whether we took out the use of a computer

21   enhancement and added those enhancements in, these defendants'

22   guidelines are all appropriately life in prison.

23           The defense makes some arguments about child

24   exploitation enterprise and suggests that every child

25   exploitation enterprise case is going to have a guideline of

1   life imprisonment because of the 4B1.5(b) enhancement, Your

2   Honor, but that's just not true.  We have a spectrum of child

3   exploitation enterprise cases.  The predicates for child

4   exploitation enterprise count can include distribution of child

5   pornography that a defendant's downloaded on the Internet; they

6   can include receipt of child pornography; they can include

7   access with intent to view child pornography.

8        Your Honor, none of those situations, if -- if that

9   were the type of child exploitation enterprise case we were

10   having, if these defendants got together and for a week maybe

11   traded some child pornography that they found online, that

12   would still be a very serious offense and it would still

13   warrant the 20-year mandatory minimum, the fact that they were

14   working together to do this, but their guidelines wouldn't be

15   life in that situation and the 4B1.5 enhancement wouldn't

16   apply.

17        So when defense counsel says that the base Offense

18   Level for CEE is 40, they're incorrect.  The base Offense

19   Level, the starting Offense Level is 35.  In this case we do

20   have a 4B1.5(b) enhancement for a pattern of activity involving

21   the production of child pornography, not distribution, not

22   receipt, not access with intent to view.  And that's why the

23   guidelines are life, because there aren't two victims in this

24   case, because there are hundreds of victims in this case;

25   because there aren't two victims of distribution or access with

1    intent to view; because these are victims of production because

2    the defendants recorded them engaging in sexual activity in the

3    first instance.

4           The defense also makes an argument about 4B1.5(a)

5    and suggests that the guidelines shouldn't be life in this case

6    because the defendant doesn't have a prior sex offense

7    conviction and the guidelines, the 4B1.5(b) enhancement,

8    shouldn't apply for that reason, Your Honor.

9           But there is a separate enhancement that would have

10   applied in this case had any of these defendants had a prior

11   conviction for a sex offense, and not enhancement actually

12   would have increased their Criminal History Category to a V,

13   and so instead of being a Criminal History Category I, they

14   would have been a V.  They didn't get that enhancement because

15   they don't have that prior offense.  So that has already been

16   taken into account by the Commission when they wrote the

17   guidelines.

18          So then let's go to the nature and circumstances of

19   this offense, Your Honor.  It warrants life imprisonment.

20   That -- there's no doubt about that.  And for many of the

21   defendants who haven't been sentenced by Your Honor, perhaps

22   the other two that are involved in this conspiracy and others

23   down the line, we may be asking for life sentences because that

24   is what the guidelines call for.

25          In this situation we did not ask for a life sentence,

1    even though that is what Mr. Dominguez deserves, because of two

2    things.  We did not ask for a life sentence for Mr. Dominguez

3    and instead ask today for a 40-year sentence, Your Honor, for

4    him because of his history and characteristics, which defense

5    has talked a little bit about.  He did have a childhood where

6    he was physically abused, and the government has taken that

7    into account in not recommending life for him.

8            And the other factor that the government took into

9    account is that Mr. Dominguez did come to the government, did

10   cooperate, and that cooperation did lead to strengthening the

11   probable cause and an additional search warrant for an

12   additional defendant, Your Honor.  And so that cooperation did

13   assist the government, and in that way the government feels

14   like that should be taken into account by Your Honor.

15           However, Your Honor, those things aside, this

16   defendant is the most aggressive of the talkers of this group

17   that has so far been convicted.  He had horrible, egregious

18   content on his devices.  I would say that him and Mr. Kovac had

19   the worst content of any of these six individuals in terms of

20   his devices.  He is the only defendant that recorded a minor

21   cutting her arms and bleeding profusely while having her shirt

22   taken off, Your Honor.  He is the only defendant of the six

23   that we found a video like that on.  He has many bestiality

24   videos that he personally recorded.

25           And there's something else that sets him apart in a

1    negative way from the other co-conspirators here today, Your

2    Honor, and that is that this defendant was incredibly

3    sophisticated.  He used a VPN to anonymize his identity and to

4    make it harder for law enforcement to detect him, and as a

5    result, for many years law enforcement did not detect him.

6          And so I think that those are the aggravating factors

7    for this defendant.

8          He admitted as well upon the day of his arrest that

9    not only did he use this VPN but that he also accessed the dark

10   web, and he did so in order, in his words, to watch little

11   girls being raped by their fathers.  That is why he did that.

12         So these are the numbers for Mr. Dominguez: 15,735

13   child exploitive images and videos.  What do we mean by that?

14   We mean that these are videos that may not constitute child

15   pornography.  These are videos of these girls at their homes,

16   playing, painting their nails, sleeping, dancing, those types

17   of videos, or it could be videos of girls who are taking off

18   their shirts but not necessarily engaging in the type of sexual

19   activity that under the federal definition meets child

20   pornography requirements.

21         The longest video we had, Your Honor, was 25 hours

22   and 37 minutes long of one of these girls.  The total length of

23   the video collection he had was 1,820 hours.  9,024 child

24   pornography videos total, Your Honor.

25         These are the types of chats he had.  So when he

1   tells me that he's remorseful and that he did not want to hurt

2   these girls, it's -- it's hard for me to believe that because

3   this is a chat with MV-8, Your Honor.  This is a 14-year-old

4   child and this is the defendant trying to get her to engage in

5   sexual activity with her pet dog.  You heard from MV-8's father

6   today, Your Honor.  And this is the sort of things that he

7   would say to these young girls.

8            His attitude towards the victims, whether he cared or

9   knew what they were cutting or suicidal, he absolutely did

10  know.  Here we have a co-defendant's, Massey, saying, "How do

11  girls learn about cutting, do they talk about it in school?

12  Hey, girls don't do this.  They can't all just randomly figure

13  it out themselves."  And his response, this defendant's

14  response is to put in a laughing emoticon about this.  This is

15  like a discussion that they're having about these children

16  harming themselves and laughing about it.

17           And, Your Honor, when Mr. Mulcahy says we have given

18  you a small sliver of the chats, we have 16,000 pages of chats

19  with these defendants.  We have given you the smallest of

20  slivers.

21           In terms of the videos he had of some of the minors

22  that you heard from today, Your Honor, he had 26 videos of

23  Minor Victim 8.  You heard from her father.

24           He had 18 videos of Minor Victim 35 who spoke to you

25  herself and her mom spoke to you as well.

1      He had 12 videos of Minor Victim 11.  This is the

2    14-year-old girl who attempted suicide during the pendency of

3    this case.  It's Exhibit F in your victim impact statements

4    that we submitted to you this morning, Your Honor.

5      Video titles he had included horribly explicit

6    things.  The one of this girl self-harming, Your Honor, he

7    entitled "MV Cutting Arms and Covered in Blood."

8      He also argues to Your Honor that this is aberrant

9    behavior.  He should get a downward departure because this is

10    just something that happened and it's just one offense and he

11    has no criminal history.  Your Honor, that argument is frankly

12    ridiculous.  This defendant was doing this every day for four

13    years for hours at a time.  And if we were to just try to do

14    some numbers and some math on that, one victim every day for

15    four years equates to 1,460 federal crimes.  That's how many

16    crimes this defendant committed.  Now, is it just one victim a

17    night?  Oh, absolutely not, Your Honor.  These defendants were

18    targeting seven or eight girls per night that they were on

19    doing this activity.

20      So when we think about this decision, this is not a

21    spontaneous decision, it's not an impulsive mistake that this

22    defendant made one night.  It is a decision he chose to make

23    again and again and again and again each and every time he

24    recorded one of these minors, each and every time he logged on

25    to social media to talk to one of them, and each and every time

1    he coordinated with his fellow group members to figure out how

2    best to get these 13, 14, 15, 16-year-old girls to unrobe and

3    to engage in sexual activity.

4            So when we talk about promoting respect for the law

5    and specific deterrence and specifically risk of recidivism in

6    these sorts of cases, Your Honor, I think the Sentencing

7    Commission's comments about those offenders who are most likely

8    to commit future offenses are helpful.

9            And the Sentencing Commission has said a number of

10   things.  They've laid out the fact that if there's child

11   pornography on multiple devices, if the defendants have used it

12   for purposes of masturbation, if they maintain larger

13   collections than other offenders, and if they communicate with

14   other child pornography offenders.  We know that's true of each

15   of these defendants, and so they are in the highest risk

16   category for recidivism and future offenses.

17           And I think the Court has heard some studies from

18   defense suggesting that there are low rates of recidivism in

19   this case.  And, Your Honor, you -- you might be wondering why

20   does the government have these studies that say there's over a

21   50 percent chance of recidivism and why does the defense have

22   these studies that say 4 percent, 5 percent chance?

23           So I just want to explain that difference a little

24   bit, Your Honor, because the defense studies are based on

25   conviction data whereas a lot of the government's studies that

1    are -- that are saying 50 percent or more rates of recidivism

2    are based on self-report, in other words, a defendant who has

3    admitted his prior behavior, and so that's where this

4    discrepancy comes in.

5            And so which sort of studies should you rely on?  And

6    I would submit that the government studies are more reliable,

7    Your Honor, because as you know, only 5 percent of victims in

8    these cases actually report when something has occurred.  Many

9    of these girls, until the FBI came to their house, their mom

10   and their dad had no idea that this was happening, and there

11   are a multitude of reasons why these young girls did not tell

12   their parents what was going on.

13           And so I would submit when you look at studies of

14   recidivism, to keep that in mind, that the defense studies and

15   the evaluations they've used and the tools they've used are

16   based on conviction data and not on actual data of the number

17   of offenses that an -- an offender has.

18           Okay.  Another argument that you have heard over and

19   over again came up in Kovac's sentencing and it's come up again

20   as --

21           THE COURT:  You don't need to say it if I've heard it

22   over and over again, please.

23           MS. RUSSO:  Yes, Your Honor.

24           My only point here is that there is absolutely no

25   empirical basis to account for age in sex offenders when

1   assessing future risk of re-offending, especially in an offense

2   like this, Your Honor, where someone just had a computer.  They

3   can easily do that when they're in their 70s or 80s.

4        So the way I'd like to just conclude, Your Honor, is

5   when we talk about protection of the public with respect to

6   these victims, this case is so hard to quantify in terms of the

7   harm that was done.  But if you took even one of these victims

8   and you tried to think what's the appropriate sentence just

9   based on the damage that one of these offenders has done to

10  that victim, and then you thought about the fact that there's

11  not just one victim, there's not just two, there's not three,

12  there's hundreds, some of whom you've heard from and some of

13  whom you haven't, I think the appropriate sentence in this case

14  is 40 years.

15       Thank you, Your Honor.

16       THE COURT:  Thank you very much, Ms. Russo, and thank

17  you for advocacy on behalf of the United States as well.

18       All righty.  I think we have discussed all relevant

19  legal issues and we are ready to impose sentence.  I will state

20  the sentence and then give both of the lawyers an opportunity

21  to object.

22       I spoke on the record about deterrence, punishment

23  and protection of the public when Mr. Kovac was here.

24  Obviously the Sentencing Commission has determined that very

25  few circumstances would justify ever releasing an individual

1    with these specific factors being outside -- outside of prison.

2         I really believe that individuals who engage in child

3    exploitation enterprises are dangers to the community, the

4    significance of which to deter themselves and others from

5    committing these types of crimes should be life in prison

6    without further opportunity.  But again, in discretion and in

7    conscience, I find that some sort of variance to an individual

8    without prior criminal history is in order.

9         Mr. Satawa makes some points which I think support

10   variance here and a couple of others that I noted on my own.

11   The defendant did come from a -- a poor childhood and had not

12   only a mother pass away during his childbirth but -- but also

13   physical abuse by his father's significant others -- other.

14        In addition to that, I think it is quite evident from

15   not only the lack of a personal written statement but the way

16   the defendant presents himself in -- in court, I think his

17   education is certainly less than what we see in some other

18   members of the conspiracy, and I think that's all due or that

19   aspect, of course, is due to the fact that he is a -- not a

20   citizen of the United States but born here and obtained status

21   in the country without naturalization.

22        Mr. Satawa makes a very good point that custodially

23   he'll be treated differently and more aggressively by the

24   Bureau of Prisons than other co-defendants who are citizens, so

25   I think he should get some mild credit for that as well.

1          Nevertheless, this was a repulsive offense with an

2    extensive amount of criminal activity that the government went

3    over and needs no further buttressing.

4          Again, I'm going to note, and I think this might be a

5    factor that we see throughout these sentences, I'm going to

6    give Mr. Meija a sentence -- because I believe he should get a

7    life sentence, but I'm going to give him a sentence that's less

8    of a departure and therefore longer of a sentence than I gave

9    to Mr. Kovac, but puzzlingly, he will emerge from prison at a

10   younger age than Mr. Kovac does.  So I'm trying to balance

11   those factors as well.

12         Therefore, pursuant to the Sentence Reform Act of

13   1984, the Court, having considered the sentence guidelines and

14   factors contained in 18 USC, Section 3553(a), hereby commits

15   the defendant, Felipe Dominguez-Meija, to the custody of the

16   U.S. Bureau of Prisons for a term of 492 months.

17         It's further recommended that the defendant be

18   designated to an institution with a comprehensive sexual

19   offender treatment program.

20         Upon release from imprisonment, the defendant shall

21   be placed on a supervised release term of five years.

22         It's further ordered that the defendant pay a special

23   assessment of a hundred dollars.  That will be due immediately.

24   And a Justice For Victims of Trafficking, JVTA, assessment of

25   $5,000.

1          I am aware that the parties agreed to restitution in

2     the amount of $5,000 per identified victim and I will therefore

3     order restitution in the amount of $235,000.  I will waive any

4     interest, penalty and fees that may accrue on that restitution

5     amount.  It's also joint and several.  Is it joint and several?

6          MS. RUSSO:  Um --

7          THE COURT:  Should I be saying that or not?

8          MS. RUSSO:  Your Honor, it's not joint and several.

9          THE COURT:  All right.

10         MS. RUSSO:  For -- and -- and it is a little bit

11    different for Mr. Dominguez because he wasn't in the two

12    groups.

13         THE COURT:  Yeah.

14         MS. RUSSO:  So his total amount would be 215,000, and

15    the parties will prepare a stipulation though for Your Honor.

16         THE COURT:  215,000 at $5,000 per identified victim,

17    not joint and several.

18          No fine, no costs of incarceration, no costs of

19    supervision because the defendant has no financial resources.

20          While in custody, participation in the Inmate

21    Financial Responsibility Program is ordered.  The Court is

22    aware of the requirements of that program and I will approve

23    the payment schedule of the program and order the defendant's

24    compliance.

25          Mandatory drug testing will be suspended based on my

1    determination that Mr. Meija poses a low risk of future

2    substance abuse.

3          While on supervision, Mr. Meija shall abide by the

4    standard conditions adopted by the U.S. District Court for this

5    district and he must comply with all of the 20 -- excuse me,

6    all of the -- well, let me just summarize.  These special

7    conditions will be ordered in Mr. Meija's case.  I believe

8    there are 14 of them and I believe they track exactly those

9    that were given to Mr. Kovac so I'm not going to go over them

10   in depth.

11         But compliance with the SORNA.

12         Successful completion of diagnostic evaluations,

13   treatment and polygraphs.

14         Periodic polygraphic testing by the probation

15   officer.

16         No association with minor children.

17         Notification of anyone who he marries of this

18   particular conviction.

19         No purchasing, sale or possession of any sort of

20   pornographic image.

21         Employment pre-approved by the Probation Department.

22         Residences pre-approved by the Probation Department.

23         And then participation in the Computer/Internet

24   Monitoring Program, CIMP.

25         The defendant must also submit his person to a search

1    if reasonably assessed by the Probation Department.

2           No contact of any sort with any victim.

3           Due to the restitution amount, no credit charges or

4    open lines of credit.

5           Any financial information requested by the probation

6    officer shall be turned over.

7           And monthly installment payments on any remaining

8    balance of the fine -- of the special assessment.

9           Now, those conditions were all stated in depth and in

10   great detail when I sentenced Mr. Kovac.  Mr. Meija was here

11   for that, and therefore I will incorporate and adopt those by

12   reference for Mr. Meija as well.

13          Is there any objection to the sentence I just gave,

14   Ms. Russo?

15          MS. RUSSO:  No, Your Honor.

16          THE COURT:  Mr. Satawa?

17          MR. SATAWA:  No, Your Honor.

18          THE COURT:  Okay.  Thank you very much.  The sentence

19   that I just imposed will be -- excuse me, that I just stated

20   will be imposed without objection.

21          The defendant has waived his right to appeal his

22   conviction within his Plea Agreement.  He has also waived the

23   right to appeal his sentence because the sentence that I gave

24   was below the guideline term that was called for within the

25   Plea Agreement.

 1          Mr. Meija, if you believe you have the right to

 2     appeal notwithstanding that waiver, which most courts honor,

 3     you would have to take that up directly with the U.S. Court of

 4     Appeals.

 5          The defendant will be remanded to the custody of the

 6     marshal for continued care pending the service of his sentence.

 7          Complete copies of the Pre-Sentence Report will be

 8     sent to the Bureau of Prisons and the Sentencing Commission.

 9     All other copies will be kept strictly confidential as is the

10     practice of the district.

11          Is there anything else from Ms. Russo?

12          MS. RUSSO:  Your Honor, I'll move to dismiss Counts 2

13     through 6 of the indictment at this time.

14          THE COURT:  Okay.  Those are dismissed without

15     objection.

16          Anything else from Mr. Satawa?

17          MR. SATAWA:  No, Your Honor.

18          THE COURT:  Okay.  Thank you.  And good luck to you,

19     Mr. Meija.

20          DEFENDANT DOMINGUEZ-MEIJA:  Thank you.

21          THE COURT:  Okay.  Thank you.  All righty.

22          (Proceedings concluded at 12:58 p.m.)

23                         —  —  —

24

25

```
 1              Detroit, Michigan
 2              Tuesday, July 17, 2018
 3                        —  —  —
 4              (Proceedings commenced at 12:58 p.m., all parties
 5              present)
 6              THE COURT:  Moving forward, Mr. Massey.
 7              MS. RUSSO:  We can do Mr. Robinson, Your Honor.
 8              THE COURT:  Why do you want to do Mr. Robinson
 9    instead of Mr. Massey?
10              MR. HAYES:  May I approach with Ms. Russo?
11              THE COURT:  You want this on the record or off the
12    record?
13              MR. HAYES:  Off the record.
14              (Brief discussion held off the record)
15              THE COURT:  So remind me, Ms. Russo, we're going with
16    Mr. Robinson?
17              MS. RUSSO:  Yes, we are, Your Honor.
18              THE COURT:  Okay.  You can stand at the microphone,
19    Mr. Robinson, and your counsel, you can unload, and whenever
20    you're ready to go let me know, okay?
21              MR. HAYES:  Thank you, Judge.
22              THE COURT:  Thank you.
23              (Brief pause)
24              MR. HAYES:  Good afternoon, Your Honor.
25              THE COURT:  Good afternoon to you.
```

1         MR. HAYES:  Certainly I'd like to start again by --

2         THE COURT REPORTER:  Counsel, could you please give

3    your appearance?

4         MR. HAYES:  Sorry.  Charles Hayes, Your Honor, for

5    Eric Robinson.

6         THE COURT:  Okay.

7         MR. HAYES:  And first of all, we'd like to again, as

8    our colleagues have done previously, incorporate our sentencing

9    memorandum into today's record as well.

10        THE COURT:  Yes.

11        MR. HAYES:  And I'd also like to point out, Your

12   Honor, to the Court today Mr. Robinson's sister, brother,

13   ex-wife and mother have made the drive to -- from Minnesota

14   today.  I did want to acknowledge their presence in the

15   courtroom today.

16        THE COURT:  I'm glad you did.  Thank you very much.

17   And welcome to the family of Mr. Robinson.

18        I -- I don't think -- I think this is merely a typo,

19   but the Pre-Sentence Report says that the defense lawyer was

20   Mr. Walker, and I know you filed an appearance and you're here

21   and I did receive your sentencing memorandum along with all the

22   exhibits.  I just want to make sure, is that -- who was here at

23   the plea?

24        MR. HAYES:  Mr. Walker was here at the guilty plea

25   hearing, Your Honor.  I was retained subsequent to that event.

```
 1              THE COURT:  All right.  Okay.  Good.  That would make
 2      sense.  Then we will have Mr. Hayes added as counsel of record
 3      by Ms. Irizarry in the Pre-Sentence Report, okay?
 4              THE PROBATION OFFICER:  Yes, Your Honor.
 5              THE COURT:  Okay.  Thank you very much.  I appreciate
 6      that.
 7              All righty.  Let me turn to Mr. Robinson directly and
 8      ask you, sir, whether or not you've had the opportunity to read
 9      over the entire Pre-Sentence Report with your lawyer, Mr.
10      Hayes, have it explained to you and look at any changes that
11      have been made after it first came out?
12              DEFENDANT ROBINSON:  Yes, Your Honor.
13              THE COURT:  Okay.  Very good.  As with the previous
14      two defendants that were here, there appear to be no objections
15      to the Pre-Sentence Report.  And there was -- there was an
16      addition that was made April 10 that included a couple of
17      statements from Mr. Robinson which I have -- which I have read
18      that deals with the service provider of psychological records
19      and, again, Mr. Robinson's statements.
20              Is there anything about the Pre-Sentence Report that
21      I haven't addressed or that you'd like to correct, object to or
22      otherwise be heard on, Mr. Hayes?
23              MR. HAYES:  No, Your Honor.
24              THE COURT:  Okay.  Ms. -- Mr. -- Ms. -- Ms. Russo?
25              MS. RUSSO:  Yes, Your Honor.
```

1        THE COURT:  Anything on the Pre-Sentence Report?

2        MS. RUSSO:  No, Your Honor.

3        THE COURT:  All right.  Very good.  The Offense Level

4   is 43, the Criminal History Category is I.  The guideline

5   provisions at that level along with the Plea Agreement call for

6   a life sentence in the case.

7        I will make the factual findings of the probation

8   officer in this particular Pre-Sentence Report the findings of

9   the Court for purposes of this proceeding only.

10       And I will, so that we don't get off track, state

11  that Mr. Hayes filed a 29-page sentencing memorandum on behalf

12  of his client.  That contains a stack of 17 letters, of

13  psychological matters and other issues that would aid the Court

14  in sentencing and certainly do so.

15       In addition to that, Mr. Robinson on the 13th, which

16  was last Friday, filed a number of supplemental exhibits,

17  donation history, sample donations that he's made, CV of

18  Jennifer White, all of which I have received and reviewed as

19  well.

20       I should note -- I -- I don't want to make too big of

21  a deal of this, but -- but I should note that the donation

22  history actually evidences donations to the National Center For

23  Missing and Exploited Children which I think is -- is quite

24  good.

25       And of course I have the government's entire

1    sentencing memorandum.  I have the government's supplemental

2    memorandum and reply to Mr. Hayes' memorandum, which I've read.

3    And I heard from the victims today.

4              I have the Preliminary Order of Forfeiture.

5              I have the stipulation as to restitution.

6              I don't think there's any grounds for a fine, costs

7    of incarceration or anything of that nature given the

8    defendant's financial situation.

9              And I think I've covered the waterfront and we're

10   ready to hear from Mr. Robinson's lawyer, Mr. Hayes.  The

11   defendant through counsel has the right to make any remark or

12   set of remarks on his own behalf as to the sentence or in

13   mitigation.  Again, I've read everything I mentioned and I'd be

14   clear -- glad to hear anything else you have to say at this

15   time, Mr. Hayes.  Go right ahead.

16             MR. HAYES:  Thank you, Your Honor.

17             I think preliminarily I should mention I did have an

18   opportunity to review Ms. Russo's reply brief to my sentencing

19   memorandum, and I had erroneously seen on the PSI from

20   calculating Mr. Fuller's sentence as 360 months as opposed to a

21   420-month aggregate sentence, and so she was correct on that so

22   I did want to address that with the Court.

23             THE COURT:  Okay.

24             MR. HAYES:  Which if you do the math, then on the

25   average sentence of the defendants in that indictment from --

1    again, from the PSR would be 322 months instead of 312 months,

2    and so I thought it was important that I -- I do correct it.

3            I would like to point out that Mr. Fuller's sentence

4    I believe came after a lengthy jury trial in which certainly

5    there were multiple victims or victims' family members who had

6    to testify at a lengthy trial for the 420-month sentence that

7    he ultimately did receive.

8            I don't want to spend much time, Your Honor,

9    discussing the policy arguments.  I think some of my colleagues

10   have already done a good job of contextualizing, and, of

11   course, they would have been included in our sentencing

12   memorandum.

13           But instead I'd kind of like to focus on what I

14   believe to be a fair question here, Your Honor, is why should

15   my client get a better sentence than his co-defendants, and I

16   think that's a fair question the Court essentially was

17   pondering when it ultimately administered the sentence to Mr.

18   Kovacs.

19           I'd like to look at three separate things, Your

20   Honor, but I think it's important that I address what I believe

21   to be the appropriate sentence today, Your Honor, and that's a

22   three-level variance from his 43, his calculated guidelines

23   score of 43, which would put him into Level 40, which would

24   have a minimum sentence at Level 40 of 292 months.  And I look

25   at three real points here, Your Honor, of why a three-level

1   variance seems appropriate in Mr. Robinson's situation.

2            And I start with remorse, repentance and

3   rehabilitation, Your Honor.  I think those three often go hand

4   in hand but don't always.  It's obviously pretty easy for

5   courts, defense attorneys, prosecutors to be somewhat cynical

6   when a defendant comes up here and makes an allocution or

7   writes a letter to the Court.  And certainly the victims have

8   every right to be cynical as -- as for what a particular

9   defendant's remorse is for his actions, and ultimately it's in

10  the eye of the beholder on what you believe to be a remorseful

11  person and who you believe is just trying to -- to act the way

12  that they feel is necessary in front of a judge or in front of

13  a court.

14           Certainly I would start by discussing the victim

15  impact statements today.  I'm sure everyone in the courtroom

16  could see the genuine remorse on my client's face as he

17  listened to the -- the horrific details of what he and his

18  co-conspirators did to these victims and their family and even

19  right now as Mr. Robinson stands next to me.  But remorse in --

20  in itself is -- is often hollow because we can say whatever we

21  want, we can act in different ways, but it's really how we

22  process our remorse in making ourselves a better person and to

23  repent, to repent for what we have done.

24           And I'm glad the Court has already pointed out in the

25  sentencing memorandum we filed the donations that Mr. Robinson

1    made to the National Center For Missing and Exploited Children,

2    and it's important to discuss that because the timing of when

3    he started doing that was in the fall of 2016 which was

4    essentially three months after the search warrant was served on

5    his residence and about seven months or eight months before he

6    was ultimately arrested or, excuse me, nine months before he

7    was ultimately arrested in August of 2017.

8            But when he started doing this, he was at a pretty

9    low point in life, Your Honor.  He -- he had a failed business

10   that he'd had to declare bankruptcy for as a result of -- of a

11   lot of issues, but certainly a lot that had to do with his

12   behavior.  His wife filed for divorce and he was struggling,

13   and financially this was not a -- a time where it would be easy

14   for someone to make contributions to this organization.  And,

15   yeah, Judge, I understand it's not a ton of money, but for Mr.

16   Robinson at the time it certainly was.  But more importantly,

17   it was his way of trying to redeem himself and repent for what

18   he had previously done.  And again, Your Honor, this was well

19   before certainly I ever became involved in this case, well

20   before he had counsel in this case and well before these

21   charges ever came forward.

22           So it's certainly easy for people to make

23   life-changing decisions when the Court has officially

24   intervened, and that wasn't the case here.  This was Mr.

25   Robinson trying to use his remorse to -- to do good things and

1    to try to help what he knew he had done to children previously.

2            The other thing, Your Honor, that -- that is

3    important with remorse is ensuring that you don't continue the

4    behavior that constituted your -- not only your violation of

5    law but -- but really in this situation allowed Mr. Robinson to

6    devolve for a period of three or four years into a soulless

7    man, and he readily admits that.

8            And instead of thinking back on that and just feeling

9    guilty about it or feeling bad about it, which he clearly does,

10   he did something about it.  He started going to AA in the early

11   summer of 2016 and shortly thereafter began getting treatment

12   for not only his alcohol addictions but also his -- his

13   Internet addictions but also the -- the problems that he has

14   with -- with his sexuality.  And he attended meetings, as -- as

15   the Court is well aware in the evaluation, for over a year,

16   weekly meetings.  I think he attended something like 53

17   meetings, Your Honor, over the course of little over a year

18   with -- with Ms. White.

19           And she did at -- at the conclusion of -- of meeting

20   with him -- of course, his -- his meetings with her were

21   interrupted by his arrest in this case and he's remained in

22   custody since August of 2017, but certainly she provided an

23   analysis report.  And again, it is just a projection, Your

24   Honor.  It's -- it's based off of studies certainly, and as all

25   studies are, maybe they're not all infallible.

1          But what's important to note is -- is this came from

2     a licensed clinician in this field but not someone who is just

3     a hired gun, Your Honor, by my office to -- to -- to file a

4     report on Mr. Robinson.  This is a person she had treated for

5     over a year, well before he had any clue on how severe his

6     penal punishments would be in this case.  He was doing this on

7     his own volition and not only to remedy the problems that he

8     had caused but to make sure that they never happened again, and

9     by all accounts, he had done just that when he was arrested.

10    And that's in some ways part of the tragedy of this whole case

11    is that when Mr. Robinson finally gets his act together, here

12    we are, and that's of his own fault.

13          And he's not here to make any excuses, Your Honor,

14    for what he did.  He understands that he can't use his

15    alcoholism or his depression as a crutch for his actions.

16    They're just part of his life story, Your Honor.  But I think

17    that that story, Your Honor, his remorse, his repentance, his

18    rehabilitation, that's certainly at least one level off as a

19    variance.

20          Mr. Robinson has been an -- an avid cooperator in

21    this case.  Certainly, again, cooperation sometimes ends up in

22    the eye of the beholder, Your Honor, because we can cooperate

23    all we want, we can try and provide as much information as

24    possible to the government.  Ultimately we can't be the ones

25    who necessarily are the ones who give the substantial

1     assistance that -- that get other people arrested or convicted.

2          But certainly Mr. Robinson has done everything he

3     could, everything he can, and continues to cooperate with the

4     government.  He's made himself available to testify in grand

5     juries or in future trials.  As recently as within the last

6     month continues to provide information to the government.  And

7     again, whether there's a formal 5K1 filed, Your Honor, I think

8     certainly his cooperation, his intentions to continue to

9     cooperate in the event any -- any future defendants are

10    arrested certainly is -- is worth at least one level off for a

11    variance.

12         And, Your Honor, the -- the third point that needs to

13    be discussed is certainly his -- his characteristics as a

14    person.  He's struggled with depression, Your Honor.  And

15    again, that's not an excuse because instead of seeking

16    professional treatment, he instead isolated himself and drank

17    inordinate amounts of alcohol as a numbing effect.

18         But he also, Your Honor, does have -- like I said, he

19    has not had the easiest upbringing as we discussed in the

20    sentencing memorandum.  Certainly has a loving family, but as

21    everybody in this courtroom is aware, that doesn't mean that

22    everything's been perfect.  He was the victim of -- of a sexual

23    abuse issue himself.

24         And it's also important to discuss what his role in

25    the conspiracy was, Your Honor, and certainly his actions were

1    deplorable, inexcusable.  But he was Defendant Number 6 in this

2    case in -- in -- large part from when you look at the

3    government's memorandum because he didn't seem to be as

4    aggressive or as targeting as some of the individuals and

5    certainly wasn't as mean spirited as some of these other

6    people.

7           And that -- again, that has nothing to do, Your

8    Honor, with his acceptance of responsibility or justifying

9    his -- his actions, but it's important that you distinguish him

10   from some of the other people in this conspiracy because

11   ultimately, Your Honor, that is a -- a difficult thing for the

12   Court to do is say why this person should get less time than

13   some other person when the sum of the parts in this case is so

14   horrific and so terrible.

15          Your Honor, we're asking for a three-level variance

16   which we believe is appropriate given his remorse, his

17   repentance, his rehabilitation, his ongoing cooperation and the

18   mitigation of his life history as well as taking into account

19   his actual role in the conspiracy.

20          And given, Your Honor, that he does have children,

21   certainly this hits home probably more to him than anybody

22   else.  I think one of the -- the mothers earlier today really

23   made some very poignant things to Mr. Robinson that he's been

24   feeling for a long time.  Having to address this with his

25   children is probably worse than anything the Court can do

 1    today, and he brought it upon himself, Your Honor.

 2            But given he has children, given his aging mother,

 3    we're requesting a 292-month sentence.

 4            And I think at this point, Your Honor, I think it'd

 5    be appropriate for Mr. Robinson to give his allocution if

 6    that's okay.

 7            THE COURT:  Okay.  That's great.  Thank you, Mr.

 8    Hayes.

 9            I would like to note -- I understand your argument.

10    As I mentioned, the range is 43, Level I.  Each of the factors

11    you argue would result in a diminution of the overall range of

12    one point, so you'd be looking at 40, Base Level 40 or Overall

13    Level 40, Criminal History I, which is 292 to 365, and that

14    forms the basis at the lower end of your sentencing request

15    which is tied to the guidelines and I think a very well thought

16    out argument.

17            I -- I hate to ask, but it'll be my only opportunity,

18    you are from Indianapolis.  Are you a former AUSA or are you a

19    former -- what's your history?

20            MR. HAYES:  I was -- Your Honor, I have my own

21    practice in Indianapolis and I used to work with a former AUSA.

22    She's since moved to Florida.

23            THE COURT:  You're retained here I take it?

24            MR. HAYES:  I am, Your Honor.

25            THE COURT:  Okay.  All right.  Very good.  Thank you

 1    for your work.

 2            MR. HAYES:  And Judge, if I made just add one thing

 3    based off of -- I guess it's a change in my sentencing

 4    memorandum a little bit.  Given that he's been in prison now

 5    for -- incarcerated for an extra month from when I actually

 6    drafted this, I think I had used 291 as a magic number and I

 7    think that would be 292.

 8            THE COURT:  That's fine.

 9            MR. HAYES:  I just wanted to bring that to the

10    Court's attention.  Thank you.

11            THE COURT:  He'll get the credit for that regardless.

12    Okay.  Thank you for all that, Mr. Hayes.

13            And now Mr. Robinson, of course you have the

14    opportunity to make any remarks you'd like to make on your --

15    your own behalf.  I know that Mr. Robinson is in some anguish

16    and I think we have tissues there for you if you need them.  I

17    have read your statement in the sentence memorandum, but

18    anything else you'd like to say, go right ahead.

19            DEFENDANT ROBINSON:  Thank you, Your Honor.

20            Your Honor, today I stand before you with an

21    abundance of guilt, regret and shame resulting from the sick

22    and terrible crimes that I've committed.

23            Before going any further, I feel it is of the utmost

24    importance that I offer my sincere apologies to all of the

25    victims of my crimes.

 1          It has been over two years since the search warrant
 2   was executed at my property during which State of Minnesota and
 3   local law enforcement officials seized computers and electronic
 4   devices from my home.  Since that day, a day has not gone by in
 5   which I have not felt an enormous amount of guilt for the pain
 6   I have surely caused the victims of my crimes and their
 7   families.  I've thought literally thousands of times if I could
 8   rewind my life, I would certainly do whatever necessary to
 9   avoid -- sorry -- participating in the behavior that I was
10   taking part in.
11          I do not at all enjoy the thought of causing another
12   person either physical or emotional pain.  In fact, it makes me
13   very sad that my thinking came to be so distorted that I was
14   seeing humans as simply emotionless objects.
15          My actions were extremely wrong, sickening and worthy
16   of a stiff punishment.  The guilt and shame I feel daily for
17   everyone I have hurt will always serve as a reminder of my
18   actions.  I am certain I will regret my actions deeply until
19   the day that I die.
20          To all of the victims and their families, friends and
21   any of their loved ones that I have affected through my crimes,
22   I'm truly sorry.
23          I promise that for rest of my life I will assist law
24   enforcement in any way possible so that the instances of this
25   type of crime may be reduced.

1        As a father of two children myself, I realize there

2   may be nothing I can possibly do to redeem myself in the eyes

3   of the victims, the law, the victims' families and even society

4   as a whole, but again, if there is anything I can do to assist

5   the prevention of this type of crime moving forward, I'm

6   certainly hoping that I'm able to help.

7        It is my sincere hope that this sentencing procedure

8   will be a valuable step in the healing process for all of the

9   victims of my crimes.

10        Along with the victims and their families who have

11   been directly affected by my actions, there are many additional

12   people that have been impacted as a result of these crimes.  I

13   would like to apologize to my numerous friends, former

14   employees, co-workers and of course my family.  To my mom

15   Marcy, sister Lisa, brother Brian and my ex-wife Tara who drove

16   through the night from Minnesota to support me here today, I'm

17   so sorry and so thankful for your love and support.

18        Tara, I'm really sorry to have to put you in a

19   position of raising our kids yourself.  I'm so thankful that

20   they have you.

21        To my dad Charles, my daughter Taylor and my son

22   Trevor back home in Minnesota, I am so sorry for the pain and

23   suffering I'm putting you all through.

24        All of my family means the world to me, and besides

25   the pain I have caused the victims and their families, the

1   guilt and shame I feel every day for what I am also putting my

2   own family through is enormous.

3            To all victims, including my family, this is my

4   fault.  I have no one to blame but myself for not seeking

5   professional help earlier than I did.  Because I did not, I

6   have caused so much suffering to so many people.

7            I love you all more than words can describe and I

8   feel so blessed to have a family that has given me so much

9   support and unconditional love during this time even though I

10  so often think how I don't deserve that love.

11           My heart is broken for all the pain I've caused both

12  the victims and my family.  I'm so sorry and I love you all so

13  much.

14           As a person, I'm extremely ashamed of what I've done.

15  There are absolutely no excuses for my behavior.  I would do

16  anything to get a chance to rewind my life and undo all of the

17  pain that I've caused so many people.  Never in my life did I

18  imagine that I would be the cause of so much pain and

19  suffering, and at no time in the future do I want to ever hurt

20  anyone again.  I will always make sure to maintain the

21  self-awareness of how terrible it feels to hurt someone so that

22  I never do anything to hurt someone again.

23           Since June of 2016, I have committed to live the rest

24  of my life maintaining a high moral code and exceptionally high

25  level of integrity, self-accountability and generally living in

1    a way that is a positive influence on others 100 percent of the

2    time.  I will try to redeem myself in any way possible.  If

3    there are ways I can assist in prevention of this type of

4    victimization in the future, I will definitely make any

5    contributions that are possible and that I'm allowed to make.

6              I realize that I may have no redeeming qualities in

7    the minds of many people at this point.  I'm a sex offender and

8    that is understandably how I will be viewed for the rest of my

9    life.

10             I'm also a person that under no circumstances want

11   to -- wants to hurt another person ever again.

12             I realize these are just words and actions are what

13   prove a person's intentions.  I'm committed to allowing my

14   actions for the rest of my life be the actions of the good

15   person I wanted to be all along.

16             I promise everyone I have affected that I will strive

17   each day to learn to be a better person than I was the day

18   before.  I will always treat every human being with the respect

19   and kindness that they all deserve.  I'll ask God for the

20   guidance I need to be a good person for the rest of my life.

21             And finally, I again apologize to everyone that I

22   have affected with my actions.  These words cannot begin to

23   explain how sorry I am not just leading up to today but how

24   sorry I will be for rest of my life.

25             Your Honor, I am hopeful that you will see a

1    possibility for redemption at some point in my future.  Thank

2    you.

3            THE COURT:  Thank you very much, Mr. Robinson.

4    Appreciate those words very much.

5            On behalf of the United States, Ms. Russo has the

6    opportunity to speak as to the appropriate sentence or other

7    factors that you'd like to analyze.  Go right ahead.

8            MS. RUSSO:  Thank you, Your Honor.

9            As with the other sentencing, I'd just like to

10   incorporate any of the victim impacts statements from this

11   morning and the Exhibits A through F.

12           To give a little bit of the background on Mr.

13   Robinson, in -- in about 2012 he joined a group of individuals.

14   You're going to hear that Mr. Eisley was also part of that

15   group.  There were blackmailers in that group, not necess --

16   not Mr. Robinson or Mr. Eisley.  And then in about 2014 he

17   joined the Skype Group which Your Honor knows a lot about, and

18   up until June of 2016 he was a very active member of that

19   group.

20           But HSI discovered that this defendant, Mr. Robinson,

21   was distributing child pornography on a peer-to-peer network.

22   So without knowing about our investigation, we hadn't located

23   Mr. Robinson yet, they executed a search warrant at his

24   residence in June of 2016.

25           Now, the day before that search warrant was executed,

1   Mr. Robinson was communicating with a Skype Group, he was

2   producing child pornography of minors, but that search warrant

3   took place and they didn't arrest him.  They took his devices

4   and they didn't charge him.  They started to look through the

5   devices to see whether charges would be forthcoming.

6            During that time Mr. Robinson did go to a therapist,

7   Your Honor, and he did make those payments to NCMEC that he

8   spoke about.  However, before that time, before our arrest

9   warrant and our criminal complaint, before we found him, he

10  also went back to the website, he went back to Website A, Your

11  Honor, multiple times.  And he did that from work because he

12  didn't have any electronic devices at home and so the only

13  place that he could log on now was from work since HSI had

14  taken his devices.

15           So while I think it is very laudable that he's making

16  these payments to NCMEC, I think it's important to note while

17  he's in therapy, while he's making those payments, while he

18  knows a federal investigation is taking place of him, he is

19  back on this website where children are being exploited, the

20  purpose of the website being to exploit children.  And if you

21  note, even his therapist said that months prior to our arrest

22  of this defendant, before we located him, he goes back to

23  pornography and dating websites.

24           So while I a hundred percent believe that Mr.

25  Robinson is remorseful and I don't believe that of the other

1    defendants frankly, Your Honor, I -- I believe Mr. Robinson's

2    remorse is sincere.  I have seen it from the very beginning of

3    this case.  I saw it while all the victims spoke.  He was the

4    only defendant who wasn't stoic while these victims were

5    pouring out their hearts, so I believe it is sincere.  But I

6    believe he has an addiction that he cannot control because even

7    under investigation, he went back to this website, he went back

8    to these types of websites that he knew he wasn't supposed to

9    be on.

10           For Mr. Robinson having been a part of these two

11   groups, having recorded many of these girls engaged in

12   bestiality and enticement to engage in bestiality, these are

13   the numbers: 28,700 exploitive images and videos.

14           A total length of videos of 666 hours.

15           This defendant had over 250 videos of MV-21 who Your

16   Honor knows is present in the courtroom today who we read her

17   statement, her father spoke to Your Honor.

18           He had 96 videos of MV-8.  This is the minor whose

19   father spoke today, Your Honor.

20           He had a dozen, more than a dozen videos of MV-10

21   whose mom spoke to you too, Your Honor, today.

22           So this is a defendant who is very, very, very active

23   in this conspiracy up until the day when investigators took

24   away his devices.

25           He has a number of statements from family and friends

1   and those statements are extremely compelling, Your Honor.  I

2   think the most compelling one is probably from his daughter.

3   But the problem with that statement in my mind is that while

4   this defendant was doing his daughter's hair and her nails, he

5   was talking about putting up a webcam so he could spy on her

6   teenage friends getting undressed and he was talking about how

7   he wished he could get nude photos of her teenage friends.

8          And even while this defendant was at work, he was

9   engaged in this activity, so we find many, many of his logons

10  to Website A from his work.  And this chat where he's engaged

11  in trying to entice Minor Victim 8 to engage in bestiality with

12  her pet dog is when the defendant ends the conversation by

13  saying, "Okay.  Well, I've" -- you know, to entice this girl to

14  engage in bestiality, "I've recorded it.  Now I'm going to get

15  back to work."  And that's sort of the attitude that he had

16  about what he was doing.

17         His ex-wife writes that he would never harm anyone,

18  and I believe all these statements are so sincere and that he

19  has such a good family and his family is so supportive, but

20  this defendant was living a double life.  He wasn't just

21  deceiving these young girls but he was deceiving his ex-wife,

22  he was deceiving his family.

23         This is the type of things that he was saying to

24  MV-10 right after MV-10 told him that she was cutting herself.

25  MV-10, it was a minor.  He was very reluctant to engage in

1    sexual activity, who kept telling them how scared she was, how

2    she didn't know how to do it, and they were telling her how to

3    masturbate, they were teaching her what to do, how many fingers

4    to use, Your Honor.  And this defendant is Spencer in this

5    conversation and he's the one egging her on along with a couple

6    of the other defendants.

7            So he knew that these girls were hurting, he knew

8    that they were engaged in self-harm, and yet these are the

9    types of things that he would say to them.  So for -- for me, I

10   don't believe that he would never harm anyone because he did

11   harm, he did harm them knowing that he was harming them and

12   continued the activity.

13           Again, Your Honor, this is not -- the defense makes

14   the argument here that this is just an aberrant act, that he

15   has no criminal history, but again, this is something that went

16   on for more than four years with this specific defendant.  It

17   was six years for him, and on a nightly basis he was doing this

18   for hours at a time.

19           Okay.  I want to move on from -- to the evaluator

20   because the evaluator makes a couple of comments about Mr.

21   Robinson.  She said he's a moderate risk under the Stable-2007

22   test and she says that he's low risk under the Static-99.  She

23   fails to score male victims under the Static-99, which is just

24   an arithmetic error.  There are male victims in this case.  Mr.

25   Robinson looped to girls pretending to be a teenage boy, and

1    those boys engaged in masturbation that he used their videos to

2    convince these girls he was a teenager.  And so with that, he

3    would be a 4 and he would be moderate risk also under the

4    Static-99.

5          I should mention the Static-99 is based on conviction

6    data, Your Honor, and not on prior offense data, so the

7    government has some issues with it to begin with.  But even

8    under the defense version of that test, he is a moderate risk

9    offender.

10         These are some of things that his therapist said

11   which I think are a lot more helpful than these tests that I --

12   that I think are of questionable validity.  She said he has

13   sexual deviance, compulsive behavior, substance abuse,

14   addiction to child pornography, he's attracted to 12 to

15   17-year-olds, and as I mentioned, Your Honor, he returned to

16   pornography after having the search warrant executed.

17         I do think though that in his favor a mitigating

18   factor when we look at his risk is his remorse.  I a hundred

19   percent believe that if any of these individuals are going to

20   stop themselves from continuing to commit these types of

21   offenses, they have to be remorseful, and Mr. Robinson has

22   that.

23         The BOP designation argument I wanted to get to

24   because the defense had made this argument that if the

25   defendant receives a sentence of over 24.25 years, that he will

1    not be able to remain near his home, and, Your Honor, that's

2    not true.  There is a facility that is a few hours from his

3    family, FCI Oxford, which he could easily be in regardless of

4    what sentence Your Honor was going to impose today.  But also

5    the facility FCI Sandstone that the defense recommends is not a

6    facility with a sex offender treatment program, so I think that

7    would be problematic anyway.  So I just wanted to explain that.

8            And the final point I want to make for Mr. Robinson

9    is he -- he did have anxiety as a child, he did have

10   depression, and I acknowledge that, Your Honor, but that's true

11   of 20 percent of Americans, and -- and that doesn't justify

12   those 20 percent of Americans going out there and exploiting

13   children.  There's no empirical data to suggest that just

14   because you're anxious and depressed you have to exploit

15   others.  And unfortunately what Mr. Robinson has guaranteed by

16   his actions is that each and every one of these minor victims

17   who are 13, 14, 15-year-old girls are going to have anxiety and

18   depression, are going to suffer from the same things that he

19   suffered with as a child.

20           And so for those reasons, Your Honor, the government

21   requests a sentence of 40 years.

22           THE COURT:  Okay.  Thank you very much and thanks to

23   both of the lawyers who I think have made balanced and very

24   effective presentations and advocacy of their respective

25   client's positions.

1        Once again I will address the sentence I intend to

2    give and then give the lawyers final opportunities to make

3    objections before the sentence is imposed.

4        If we're talking about a departure from a -- or,

5    excuse me, a variance from a term of life in prison, overall

6    Offense Level 43, Criminal History Category I, I would -- I

7    would look to the following factors, a couple of which were

8    identified by Ms. Russo, and in many ways I see the case as --

9    as she does.

10        I -- I believe the defendant was a victim of -- of

11    severe addiction and, you know, these are medical issues.

12        One of the things I have to say is that without in

13    any way saying that the -- that the criminal activity doesn't

14    qualify for the maximum sentence urged, at -- at the time that

15    the individual is committing the criminal activity which has to

16    be punished, which has to be disincentivized and which has to

17    be appropriately dealt with from the perspective of punishment

18    and deterrence, the -- the -- the individual is, if addicted

19    and if soulless, probably not in the position to understand at

20    the time what he understands now.

21        And so when we sentence an individual, we have to

22    sentence based on the conduct that occurred at the time, but I

23    think we have to take into consideration the potential for

24    rehabilitation and give credit where credit is due for people

25    who have at least had some sort of an epiphany, and I believe

1    Mr. Robinson has and I believe that Mr. -- Ms. -- Ms. -- Ms.

2    Russo under -- understands that.

3         A rational person who's well could not live the sort

4    of compartmentalized life that Mr. Robinson was living by, as

5    both lawyers have pointed out, saying the types of things that

6    he was saying to his daughter and loved ones on the one hand

7    and -- and then doing the things that he was doing criminally

8    on the other.  Clearly, I think this is why we see an

9    individual here with the anguish that he has because I think he

10   has indeed rationally looked at the events in which he was

11   involved and confronted what it was that he did.  And so I

12   think the opportunity at rehabilitation and the opportunity at

13   getting better are there.

14        Now, again, that's not to diminish the severe

15   criminal activity in which Mr. Robinson engaged when he was

16   drunk, when he was soulless, when he was whatever he was, and

17   we have to address that, but it's not hard for me to enter a --

18   a little more of a, what would you say, variance because I

19   think this individual's prospects are good as long as you stay

20   in AA and as long as you stay with the treatment and as long as

21   you feel years from now the way you feel here today.

22        Okay.  Pursuant to the Sentence Reform Act of 1984,

23   the Court considered the sentence guidelines and factors in 18

24   USC, Section 3553(a) and I will hereby commit the defendant,

25   Eric Robinson, to the custody of the U.S. Bureau of Prisons for

1    a term of 408 months.

2           It's further recommended that the defendant be

3    designated to an institution with a comprehensive sexual

4    offender treatment program.  I'm not going to take an issue or

5    position on the issue of Sandstone versus Oxford, but it seems

6    to me that if Oxford's close to the family and has sex

7    treatment option, that's the type of facility I would want to

8    recommend to the Bureau of Prisons.

9           Upon release from imprisonment, the defendant shall

10   be placed on a supervised release term of ten years.

11          The defendant must pay a special assessment of a

12   hundred dollars.  That will be due immediately.

13          It's ordered that the defendant pay Justice For

14   Victims of Trafficking Act assessment of $5,000.

15          Parties agree to a restitution amount of $5,000

16   per -- per identified victim, and I take it that's $215,000 in

17   this case, Ms. Russo?

18          MS. RUSSO:  Your Honor, because he is in two groups,

19   it would be 235,000.

20          THE COURT:  235,000 total.  By agreement, that

21   restitution amount will be imposed.  No interest, penalty or

22   fees on the restitution amount.

23          No fine, no costs of incarceration, no costs of

24   supervision due to the defendant's rather complete lack of

25   financial resources.

 1          While in custody, the defendant must participate in

 2     the Inmate Financial Responsibility Program, IFRP.  I'm aware

 3     of the requirements of that program and I approve of the

 4     payment schedule of the program and will hereby order the

 5     defendant's compliance.

 6          Mandatory drug testing is suspended based on the

 7     determination that Mr. Robinson poses a low risk of future

 8     substance abuse.

 9          While on supervision, the defendant shall abide by

10     the standard conditions adopted by the U.S. District Court for

11     the Eastern District of Michigan, and he shall comply with the

12     following -- all the following special conditions which are the

13     14 complete conditions that I imposed on Mr. Kovac and Mr.

14     Meija and which I won't repeat here but will incorporate fully

15     by reference along with the following four additional specific

16     conditions:

17          Defendant shall have all employment pre-approved by

18     the Probation Department.  If the employment requires the use

19     of a computer, the defendant must notify his employer of the

20     nature of the conviction and the notification must be confirmed

21     by the probation officer.

22          The defendant shall not own or possess a camera,

23     photographic device and/or equipment, including video recording

24     equipment, without prior approval of the probation officer.

25          And due to the mental health issues that have been

1    discussed here and in the report, the defendant shall submit to

2    psychological and psychiatric evaluations as determined by the

3    probation officer if necessary.

4           That will be the sentence of the Court unless there

5    are objections.  Ms. Russo?

6           MS. RUSSO:  No objection, Your Honor.

7           THE COURT:  Mr. Hayes?

8           MR. HAYES:  No, Your Honor.  If the Court would

9    indulge us though, we would request that he be recommended to

10   go to the facility in Marion, Illinois.  They have a sex

11   offender program and I believe that'd be the closest.

12          THE COURT:  Marion, Illinois is fine with me but

13   let's make sure he's not in the maximum facility.

14          MR. HAYES:  It's a medium, Your Honor --

15          THE COURT:  All right.

16          MR. HAYES:  -- with the SOTP Program.  Thank you.

17          THE COURT:  Okay.  Very good.  I would accede to

18   that, and you should let the Bureau of Prisons know when they

19   make their placement decision that, you know, I want what's

20   best for him, and I'm sure they know that, but if -- if Marion

21   is the best place for him, that would be best for society as

22   well in my opinion.

23          Mr. Robinson, you waived the right to appeal your

24   sentence and your conviction in your Plea Agreement.  Since I

25   sentenced below the guideline range, that makes your sentencing

1    waiver effective.

2         Waivers of this sort are usually enforceable.  If you

3    don't think that yours is, you can take that up with the U.S.

4    Court of Appeals directly.

5         The defendant will be remanded to the custody of the

6    marshal to further complete the service of his sentence.

7         It looks like the corrections of the Pre-Sentence

8    Report have already been made so corrected copies will all be

9    sent down to -- except for that counsel issue, we need to

10   correct that, and then the final reports will be sent to the

11   Bureau of Prisons and the Sentencing Commission.  Any other

12   copies are to be kept strictly confidential as is the practice

13   of the district.

14        Anything else from Ms. Russo?

15        MS. RUSSO:  Your Honor, we'll move to dismiss

16   Counts 2 through 4 of the indictment at this time.

17        THE COURT:  2 through 4 are dismissed on order of the

18   Court without objection.

19        Anything else from Mr. Hayes?

20        MR. HAYES:  No, Your Honor, thank you.

21        THE COURT:  Okay.  Good luck to you.  You're

22   ultimately going to be okay but keep on a good path, okay?

23        DEFENDANT ROBINSON:  Thank you.

24        THE COURT:  All right.  You're welcome.

25        (Proceedings concluded at 1:46 p.m.)

```
 1              Detroit, Michigan
 2              Tuesday, July 17, 2018
 3                        -  -  -
 4              (Proceedings commenced at 1:46 p.m., all parties
 5              present)
 6              THE COURT:  All right.  Now we'll go to our final one
 7    because we've got to be out of here in an hour.  Mr. -- Judge
 8    Goldsmith needs this courtroom.
 9              So what is next, Ms. Russo?
10              MR. MULCAHY:  Your Honor, may we approach?
11              THE COURT:  Yes.  On the record?
12              MR. MULCAHY:  Off the record.
13              (Brief discussion held off the record)
14              THE COURT:  Let's recess til 2:00 o'clock, all right?
15    10-minute recess.
16              (Court in recess at 1:48 p.m.)
17              (Proceedings resumed at 2:05 p.m., all parties
18              present)
19              THE COURT:  All righty.  Good afternoon.  We are here
20    now for the sentencing of Bret Massey, which is Defendant
21    Number 3 in 17-20632.
22              MS. RUSSO:  Your Honor, actually I -- we've switched
23    things around.  This is our fault.  It's Noel Eisley, Your
24    Honor.
25              THE COURT:  Oh, Noel Eisley.  I'm sorry about that.
```

1    Actually I knew that.  I mis -- I mistook -- you want to enter

2    your appearance there, Ms. Raben?

3              MS. RABEN:  Yes.  Good afternoon, Your Honor,

4    Margaret Raben on behalf of Noel Eisley who sits to my left.

5              THE COURT:  Okay.  Thank you both very much.

6              Let me invite you, Mr. Eisley, along with your

7    counsel, Ms. Raben, to come on up to the microphone and we'll

8    get started here.

9              Have you, sir, had an opportunity to thoroughly

10   review the Pre-Sentence Report, including any revisions that

11   might have come out after it was first published by the U.S.

12   Probation Office?

13             DEFENDANT EISLEY:  Yes, Your Honor.

14             THE COURT:  Okay.  Very good.  I understand there are

15   some objections, four or five of them, that I'd like to go

16   through now, and we'll give both lawyers an opportunity to

17   speak to the objections.

18             With regard to paragraph 17, the defendant objects to

19   some of the findings of the Probation Office with regard to

20   some of the materials that were allegedly on the videos,

21   specifically I guess some stuffed animals.  The -- I mean I

22   don't know how to resolve this.  I don't think it goes to the

23   computation of the guideline range.  It really goes to the

24   ownership and some surrounding facts regarding what was on the

25   videos.  And aside from having an evidentiary hearing on a

1    matter that doesn't affect the guideline range, I wouldn't know

2    how to resolve it.

3           So I would say I'll accept the objection, note it for

4    the record, have it included in the Pre-Sentence Report, but

5    not take a position other than that the government contends

6    that these are accurate and should the Bureau of Prisons or

7    anybody else want to look into the offense conduct they can,

8    but that would be my tendency on -- on Objection Number --

9    Number 1.

10          Ms. Raben?

11          MS. RABEN:  Actually, Your Honor, I was going to --

12          THE COURT:  Sorry about that.

13          MS. RABEN:  I was going to address that as part of my

14   sentencing --

15          THE COURT:  Okay.

16          MS. RABEN:  -- response.

17          THE COURT:  All right.  Well, I'll just note the

18   objection then and -- and you can certainly say what you like

19   within your allocution, okay?

20          MS. RABEN:  Yes.

21          THE COURT:  All right.  Very good.  With regard to

22   Objection Number 2, we're talking about the two-sentence

23   enhancement under 3A1.1(b)(1).  This is the vulnerable victim

24   enhancement.

25          It was my sense that the government and the defendant

1    had -- had agreed to this but apparently they hadn't.  Oh, no,

2    I'm sorry, the defendant did agree with the enhancement applied

3    by accepting the attached worksheets to the Plea Agreement.

4          I would rule as a legal matter that the enhancement

5    deals directly with individuals who are unusually vulnerable

6    due to age or mental condition, and you might argue that at

7    a -- at a reduced age, 12, 14, 11, whatever these girls were,

8    they'd be particularly susceptible to -- to criminal conduct.

9    But again, I won't overrule the objection until and unless I've

10   heard further argument from Ms. Raben.  Would you like to say

11   anything else?

12         MS. RABEN:  Your Honor, I -- I am now better informed

13   about the factual basis for that two-point enhancement.

14         THE COURT:  Right.

15         MS. RABEN:  And I will withdraw that objection.

16         THE COURT:  Okay.  All right.  Thank you very much.

17   Objection Number 2 is withdrawn and we won't rule on that.

18         With regard to paragraph 35, the defendant objects to

19   the enhancement regarding a pattern of activity involving

20   prohibited sexual conduct.  I think this goes to an argument

21   that the U.S. Attorney made earlier on one of the defendants; I

22   don't remember which.  But this deals with the classic legal

23   issue of whether or not an enhancement is an element of the

24   criminal activity to which the individual pled guilty, and so

25   therefore does application of the enhancement double dip.  I

 1    think the Court of Appeals has traditionally said that it

 2    hasn't, but the government lodged a response and the probation

 3    officer lodged a response as well.  But I would be eager to

 4    hear from you about Objection Number 3 and the 2G1.6 -- or

 5    excuse me, the 2G -- excuse me, 4B1.5(b)(1) enhancement.  Go

 6    ahead, Ms. Raben.

 7             MS. RABEN:  Thank you, Your Honor.

 8             I actually addressed that as one of my arguments for

 9    the -- for a variance.  I do think that it's double counting.

10    I have not found a case that says one way or the other that

11    it's double counting.  I look at the definition or the criteria

12    for 4B1.5 and I see that it fits as a subset -- I would think

13    of it as a Venn diagram subset -- of the elements of the CEE.

14             I agreed that it was scored as part of Mr. Eisley's

15    sentencing guidelines because I cannot find anything that says

16    that it is not properly scored, and the guidelines themselves

17    in I think it's 1B1.3, addresses double counting and says yes,

18    there is going to be double counting and it's okay unless we've

19    specifically said that it's not okay.  And this is one of those

20    situations where I don't find anything that says that it's not

21    okay to score it as the guidelines.

22             THE COURT:  Right.

23             MS. RABEN:  But I am still struck by the fact that it

24    adds five levels onto the -- the same basic conduct.  I've

25    heard Ms. Russo's argument that, well, no, it addresses all of

1    the other possible victims.  I don't see anything in 4B1.5 that

2    says, oh, this is how you use that.

3            THE COURT:  Right.

4            MS. RABEN:  So I have made it both as a double

5    counting argument or as what I call a piling on argument.

6            THE COURT:  Yes.

7            MS. RABEN:  An argument where the guideline range is

8    excessive because of the way the guidelines themselves score

9    various aspects.

10           THE COURT:  Okay.  All right.  I understand the

11   argument.  Having listened to Ms. Raben and thought about

12   things, I know now that Mr. Satawa made a highly similar

13   argument, did not object to the guideline range but suggested

14   that the five-point enhancement was enrolled within the

15   prohibited conduct by statute itself.  It is a valid argument

16   and again I -- I understand it.

17           The issue of the cross-reference was addressed by the

18   U.S. Attorney in -- in their response, and I will hear from Ms.

19   Russo if she wants to speak, but my instinct now is to overrule

20   the objection in the absence of any guidance from the Court of

21   Appeals and it appears to be a standard enhancement that's

22   made, but certainly keep my mind open to the argument of

23   counsel in terms of what the appropriate sentence would be when

24   we consider that 2426(b)(1)(A) deals with prohibited sexual

25   conduct.  That is part of the code section under which Mr.

1    Eisley was charged, and the -- the -- the guidelines would seem

2    to give five additional levels for engaging in that very type

3    of -- of conduct.

4              Is there anything else you want to say, Ms. Russo?

5         MS. RUSSO:  Your Honor, I'll just make two quick

6    points.  One is I know there's been some confusion about this,

7    but there's a pattern of activity enhancement in all of the

8    child pornography guidelines.  It's not embedded in the CEE or

9    production guidelines; instead it's in the 4B1.5(b).  But if

10   you go to receipt or distrubution, they have the same

11   five-point enhancement; it's just embedded in their guideline.

12   So it's -- this is -- I know that it -- it's caused some

13   confusion, but it really is -- in every child pornography case

14   it is -- it is applicable.

15             And just the second point I'll make, Your Honor, is

16   that were we to have charged an indictment with, let's say,

17   MV-1 and MV-2 and those were the only victims in the case, this

18   idea of sort of double counting would make a little more sense

19   to me, although I think it would still be an incorrect argument

20   and -- and wouldn't prevail.  But in this situation, Your

21   Honor, all of these victims, the hundreds of victims, the 48

22   identified victims, they're not all charged in the indictment,

23   they're not the basis of the elements.

24        THE COURT:  Right.

25        MS. RUSSO:  So that's all, Your Honor.

1      THE COURT:  All right.  Well, that's what Ms. Raben

2  had anticipated earlier.

3      But any response to what the government prosecutor

4  said?

5      MS. RABEN:  Just that it is still piling on.

6      THE COURT:  Yeah.  Okay.

7      MS. RABEN:  Okay.

8      THE COURT:  All right.

9      MS. RABEN:  And I'll address that a little bit later

10  when I talk about the guideline range.

11      THE COURT:  Indeed.  All right.  Thank you very much,

12  Ms. Raben and Ms. Russo.

13      The Objection Number 3 will be overruled and Ms.

14  Raben will argue the issue in her allocution as mentioned.

15      Objection Number 4 and 5 go to computation of the

16  offense level in light of the objections made in paragraphs 34

17  and 35.  Therefore, I will note Objections Number 4 and Number

18  5 and not rule on them because they're inoperative in light of

19  the Court's prior rulings.

20      And I believe that takes care of the written

21  objections to the Pre-Sentence Report lodged by Ms. Raben and

22  addressed by both the U.S. Attorney and the probation officer.

23      So with that in mind, any other objections,

24  corrections, or issues with the Pre-Sentence Report you'd like

25  to make at this time, Ms. Raben?

1           MS. RABEN:  No, sir.

2           THE COURT:  All right.  How about you, Ms. Russo?

3           MS. RUSSO:  No, Your Honor.  Thank you.

4           THE COURT:  Okay.  Thank you both very much for your

5    arguments.

6           The Offense Level is 43.  The Criminal History

7    Category is I.  The guideline range at that level is life

8    imprisonment and the Plea Agreement reflects a similar term.

9    So those will be the factual and legal findings of the Court

10   from the Pre-Sentence Report for purposes of this sentencing

11   only.

12          I do have the sentence memorandum of Ms. Raben.  It's

13   extensive and it also contains a number of exhibits, mainly and

14   significantly, how would you say it, analytical in nature.

15   There have been a couple of reports of medical professionals

16   along with the CV of one of them, an extensive mental health

17   examination and report.  I've looked at all this.  And at the

18   back there are some letters and, in fact, a -- a lengthy letter

19   from the defendant himself, Mr. Eisley.  So I have read all

20   those materials.

21          I have the government's sentence memorandum as well

22   as their supplemental memorandum.

23          I've heard the victims' statements which are part and

24   parcel of the hearing and incorporated by reference.

25          The Preliminary Forfeiture Order has been resolved,

1       that's taken care of.

2               Restitution is agreed upon to be $5,000 per victim.

3               There is no room for a fine or costs of incarceration

4       or things of that nature in light of the defendant's lack of

5       financial resources.

6               And I think that covers all the bases of our

7       preliminary matters before we get to allocution on behalf of

8       the defendant by Ms. Raben.

9               As the lawyers know, counsel for a defendant or a

10      defendant through counsel has the absolute right to make any

11      remarks on his own behalf before sentencing, and I'd be very

12      glad to hear yours now, Ms. Raben.  Go right ahead.

13              MS. RABEN:  Thank you, Your Honor.

14              The first thing I'm going to say is I am not adopting

15      any of the arguments of the other attorneys, one, because I

16      don't know what they are, I'm not privy to those arguments, and

17      two, what I have heard from their own allocution are arguments

18      that, in fact, I considered and decided not to raise myself.

19              So I would like to start by making some comments

20      about the government's sentencing memorandum and some broad

21      statements that the government had made about the enterprise

22      and the conduct of the enterprise.  I'm not disagreeing with

23      the conduct of the enterprise as described by the government,

24      but I want the Court to know that the -- on page 6 of the

25      government's memoranda when it speaks about one Website A user

1   and one Skype Group member discussing various ways the

2   enterprise interacted with the minor victims, I have no

3   information that Mr. Eisley was -- was targeting minors who

4   were engaging in self-mutilation, and while I don't disagree

5   with the broad statements of how the enterprise was acting, I

6   do disagree that he himself was doing this.  And we have --

7   that's the first thing.

8        The second thing is on page 15 which is a specific

9   statement about Mr. Eisley, and it states that he had a -- the

10  longest child pornography video he had was 66 hours and

11  33 minutes.  Mr. Eisley says that is simply not true.  There

12  might be something on the identifier of the video that says

13  it's that long, but it is not that long as a matter of fact.

14  If the government has actually a video that's 66 hours and 33

15  minutes long, they have not shown it to me, and I -- I -- I

16  don't know, that just seems so off to me as -- as a factual

17  matter.

18       On page 23, again, there's a reference to a video of

19  66 hours spanning -- and the total video length spanning

20  780 hours.  Mr. Eisley disputes that.

21       There's a characterization that he titled videos.

22  And make no mistakes, Mr. Eisley is addicted to child

23  pornography, that is absolutely clear, and it is clear separate

24  from the -- his conduct with the -- the enterprise.  And he

25  had -- has a -- had a collection of these videos.  He denies

```
1    that he titled any of them in any way.  They come titled.  When
2    you download them, they come with a title and the titles are --
3    are horrifying.  The titles are what the government has stated
4    on page 23.  But he did not title them in that way.
5            I've taken a look at the government's recommendation
6    chart here, and, of course, the Court's been talking about it
7    pretty much this morning also, and I'm just trying to figure
8    out what principal difference there is between 40 years for Mr.
9    Eisley, 35 years recommended for Mr. Massey, 30 years
10   recommended for Mr. Phillips, and I -- I don't see it.  I --
11   I -- I just see a -- more similarity than difference between
12   the three of them and certainly not enough difference to
13   justify a 10-year differential in the government's
14   recommendation.
15           On page 30, 30 of the government's recommendation
16   they talk about something that is characterized as sextortion
17   victimization.  There is no evidence that I am aware of that
18   Mr. Eisley did any blackmail or threatening or extortion or --
19   or any individualized contact with the minor victims in the
20   enterprise as a way of getting them to do or not do something
21   else.  It is my understanding that there was such conduct, and
22   Mr. Eisley told the government during his proffer that he had
23   heard about it, he had heard that one or two identified people
24   were doing this, and he gave the names of the government -- to
25   the government of the people that he had heard were doing this.
```

1           But to -- to ascribe that behavior to Mr. Eisley I

2    believe is factually wrong, and I'm hoping that the Court will

3    not assume that because he's part of the enterprise, he was

4    also part of this -- this other piece.  In fact, Mr. Eisley was

5    under the impression that none of these men were to be

6    contacting any of the minor victims themselves for any reason.

7    That was one of the so-called rules for interacting here.  All

8    right.  And -- and I've already addressed that, and that goes

9    on to page 31.

10          I'd also like to comment on the govern -- one of the

11   government's exhibits.  This is Exhibit E to its original

12   sentencing memorandum and it's this two-page printout of

13   certain rules.  Mr. Eisley had never seen this until the

14   government showed it to him during one of his debriefings and

15   he told them he had never seen it.  And if he's never seen it,

16   I don't think that it was as much a part of the enterprise as

17   the government is trying to say that it was.

18          So that's -- oh, wait, I have one more thing here.

19   In the government's supplemental memorandum and reply they

20   dispute a statement I supposedly made about Mr. Eisley getting

21   off of the video chat rooms.  Mr. Eisley got himself off of the

22   video chat rooms but he remained online in other activities.

23   He disclosed those activities to the government during his

24   proffer.

25          My understanding is that the government was not aware

1    of his activities on other websites which were not CEE

2    activities, and if, in fact, he's going to be -- the government

3    is going to use that information he provided during his

4    Kastigar proffer, I would argue that that is -- that is, in

5    fact, a violation of his Kastigar proffer.  What I said in my

6    memoranda is that he left Websites A and B about a year before,

7    and that's what he maintains that he did.  He fully

8    acknowledges and acknowledged to the government that he had not

9    stopped his online activity.

10          The next thing I would like to address is an exhibit

11    that the government provided to the Court today, Exhibit B.

12    It's a color photograph of two stuffed animals --

13          THE COURT:  Yeah.

14          MS. RABEN:  -- with the Band-Aids.

15          THE COURT:  Yeah.

16          MS. RABEN:  This photograph was taken during the

17    search warrant at Mr. Eisley's house.  The stuffed animals

18    there belong to his daughter who was four years old at the

19    time.  The government finds something alarming about these

20    photographs.  Mr. Eisley's wife, or perhaps better

21    characterized now as ex-wife, told me that their daughter was

22    in her Band-Aid phase, that they probably bought two boxes of

23    Band-Aids a week and this child put Band-Aids on herself,

24    Band-Aids on her stuffed animals, Band-Aids on the furniture.

25          I can understand what the government's alarm might be

1    here, but Mr. Eisley's children were referred -- there was a

2    Protective Services case opened because of his conduct

3    occurring in the home where these children are.

4            THE COURT:  Right.

5            MS. RABEN:  The children were evaluated several

6    times.  Nothing -- there is no evidence that anything

7    inappropriate was ever done to these children or that they

8    witnessed anything inappropriate.  And so the government

9    continues to raise some alarm about these stuffed animals

10   except that I am not aware of any basis for any alarm in --

11   in -- in the evaluations of the CPS investigation that was done

12   in the children's placement.

13           THE COURT:  Okay.

14           MS. RABEN:  The government's opening lines of its

15   sentencing memorandum said it: Eisley is addicted, he is

16   obsessed with child pornography and online sexual activity.

17   That's what we have here.  But he never recruited.  He never

18   hunted.  He never managed a website.  He never monitored a

19   website.  He never created a chat room for others to join.  He

20   never directed any girls into a chat room.  There's no evidence

21   that he ever distributed or shared his videos.  He did not

22   contact any minor victim of the CEE directly.  He did not

23   blackmail any minor victim, he did not threaten any minor

24   victim.

25           When I met Mr. Eisley and learned something about

1    him, I was stunned.  I simply could not understand why someone

2    who had been gifted with his obvious intellect could -- could

3    get into this.  I understood the computer addiction part of

4    this because it is toxic, it is absolutely toxic.  You go

5    anywhere at all, you go to a mall and you watch and people are

6    stumbling around with their heads down and they are doing

7    something on their phones.  They are on the Internet.

8              THE COURT:  Right.

9              MS. RABEN:  So I can understand the addictive -- the

10   attraction, the addiction to the computer stuff.  What I

11   couldn't understand is why this.

12             THE COURT:  Right.

13             MS. RABEN:  So I was very interested in Dr. Jack

14   Haynes' assessment of my client because one of Jack Haynes',

15   Dr. Haynes' specialties is sexual addiction and that's what I

16   wanted him to focus on.  And I was particularly struck by

17   the -- the finding in the Carson Psychiatric Profile Evaluation

18   in which Dr. Aines [sic] -- Haynes describes Mr. Eisley as Type

19   9, and here's the characteristic: "May at times function in

20   negative ways that are otherwise inexplicable."  And that was

21   what I was looking for, some explanation for what was going on

22   in the double life that Mr. Eisley was living, and he

23   absolutely was living the double life.

24             He very clearly has an Internet addictive sexual

25   behavior disorder, and it can be identified, it can be treated,

1    it can be resolved.  And even if the judge gives him a 20-year

2    sentence, 20 years is a long, long time.  We toss that number

3    around as though it means nothing.  It is a huge sentence by

4    any measure.

5              The other evaluations that I was looking for were the

6    evaluations for risk of recidivism and risk of actual sexual

7    contact offenses.  In Mr. Eisley's case, both of those

8    evaluations by both of the evaluators come out as low risk for

9    recidivism both of a sexual offense or any kind of offense.

10             Like everyone else apparently, I have argued for a

11   variance sentence and I have argued for a variance sentence of

12   20 years, and I was not aware that everybody did but I'm not

13   surprised by that.  And for my reasons, I have suggested that

14   none of the defendants in this case come out real good, but

15   within that spectrum of bad behavior, I do think that Mr.

16   Eisley's behavior vis-a-vis the other defendants in this case

17   puts him at the lower level of involvement.

18             I also think that his lack of criminal history -- and

19   I heard what Ms. Russo said.  You know, this isn't lack of

20   criminal history, but that argument went to aberrant behavior,

21   and I have not made an aberrant behavior argument as a

22   departure basis because I understand what the definition of

23   aberrant behavior is under the guidelines and we don't have it

24   here because we do have years of conduct.  But for someone with

25   his addictions to get to this point without ever coming across

1    the radar, the police radar in any way certainly indicates to

2    me that -- that he has been circumspect in how he's conducted

3    his behavior.

4           He cooperated with the government.  He did everything

5    he could.  It's not his fault that they interview him fairly

6    late in the investigation and he doesn't have anything new to

7    tell them.

8           THE COURT:  Right.

9           MS. RABEN:  Although I will note that the agents took

10   notes during both of the interviews so perhaps there was

11   something.  Perhaps it was just things that never resulted

12   in -- in substantial assistance.  But that isn't necessary here

13   for the Court to consider because the case law is that you can

14   consider his attempts to cooperate --

15          THE COURT:  Right.

16          MS. RABEN:  -- in good faith, which he did do.

17   Government says he didn't give them anything new.  Well,

18   that -- he can only give them what he has.  And if they already

19   have it, that's -- that's just a fact.

20          I've made an argument and we've talked about it here

21   about the double counting.

22          THE COURT:  Right.

23          MS. RABEN:  Piling on.

24          THE COURT:  Right.

25          MS. RABEN:  I -- I understand it's correctly scored

1    in terms of the rules for guidelines, but I -- I do think it's

2    piling on in this -- this particular case because -- primarily

3    because 2G2.6 is a one-offense guideline, probably the only

4    one-offense guideline that's -- that's in the guidelines.  It

5    was created when the CEE offense -- the Sentencing Commission

6    added that guideline when Congress created the CEE offense in

7    the -- whenever it was, 2004, 2003, whenever they created the

8    CEE offense.

9              THE COURT:  Right.

10             MS. RABEN:  So I've listened to Ms. Russo talk about

11   defendants who are remorseful.  Mr. Eisley has trouble

12   communicating.  He has trouble communicating with me even after

13   all of these months of us talking.  I can easily see how he

14   could adopt an online persona that was talky and verbal and

15   funny and -- and all of the other things that he was online.

16   I -- I -- I'm not a psychiatrist.  I wasn't smart enough to go

17   to med school.  But as a -- as a mother, as someone who deals

18   with people, I can really see how he got sucked into this,

19   especially given the -- the assessment of his -- the things he

20   thinks were deficiencies as a teenager, the -- the social

21   deficiencies that he had but didn't quite know what to do with

22   because there's a downside to being too smart, and he -- he

23   just couldn't figure out how to deal with any of this stuff.

24             I also know that he -- he could not seek professional

25   assistance because under New York law, a counselor or therapist

1    would be required to report him to police if he disclosed his

2    child pornography activities or the CEE activities.  And that's

3    kind of a catch-22 for defendants who -- who realize that they

4    need some help: they can't extricate themselves from what

5    they're doing on their own but fear the cost --

6              THE COURT:  Yeah.

7              MS. RABEN:  -- of -- of seeking that help.  So Mr.

8    Eisley's solution to that was to try to commit suicide, which,

9    of course --

10             THE COURT:  Right.

11             MS. RABEN:  -- is -- is not the solution.  But it

12   also meant that when he did get psychiatric assistance after

13   that suicide attempt, he still could not really tell anyone

14   what the problem was.

15             So there we are, there we have it.

16             THE COURT:  Right.

17             MS. RABEN:  Thank you.

18             THE COURT:  Thank you very much, Ms. Raben.

19   Appreciate those strong and incisive remarks on behalf of your

20   client which are very assistive to the Court.

21             And I would now recognize Dr. Eisley in his own right

22   to speak personally as to any remarks he'd like to make as to

23   the sentence or any mitigating factors at this time.  Go right

24   ahead.

25             DEFENDANT EISLEY:  Thank you.  Thank you, Your Honor.

1      As my attorney already said, I'm not very good at

2  public speaking, but I did want to -- I wanted to express my

3  apologies to the victims and to their families for -- for all

4  the harm that I've caused.  I have learned that I did cause

5  many people harm, but I think today hearing the statements

6  helps -- has helped me understand the -- the true nature and

7  the depth of the harm, and I know that I will carry the intense

8  guilt and remorse for what I did for every day for the rest of

9  my life.

10      And I hope that in contrast, the victims, my victims,

11  will some day, and hopefully sooner rather than later, overcome

12  what I've put them through.  And I realize that that might not

13  be possible, but -- but I hope that at least every day it

14  brings them a little closer, and I hope that -- I hope that

15  today is a significant such day in their lives towards --

16  towards healing.

17      And lastly, I wanted to also apologize to my family

18  for turning their lives upside down forever.

19      Thank you, Your Honor.

20      THE COURT:  Thank you very much, Dr. Eisley.  I'm

21  grateful for those words.

22      On behalf of the United States, Ms. Russo, your

23  statement with regard to the appropriate sentence would be

24  greatly appreciated.

25      MS. RUSSO:  Thank you, Your Honor.

1    I would incorporate the victims' statements from this

2    morning and the Exhibits A through F.

3    With respect to the -- the 4B1.5 argument I'll just

4    say one thing about that, Your Honor, which is -- I've already

5    made a couple of arguments on this, but if 4B1.5(b) was not

6    applied for -- for CEE cases, Your Honor, that would result in

7    production, one count of production for one victim having a

8    higher guideline range than CEE, or one count of enticement of

9    a minor, for one victim, having a higher guideline range.  In

10   fact, distribution of child pornography might have a higher

11   guideline range, which would make absolutely no sense.  So I

12   think that argument has been fleshed out enough.

13   I have three main topics I want to cover with respect

14   to Mr. Eisley.  The first deals with the nature and

15   circumstances of the offense.  And here, Your Honor, defense in

16   their memo mentions that we initially believed he was one of

17   the less egregious offenders in this group.  And that's true,

18   Your Honor, because what we believed about Mr. Eisley was based

19   on the statements he had made on the day of the search warrant

20   and he wasn't forthright.  And really that's Mr. Eisley's

21   story; he doesn't tell the truth.  And that is why

22   unfortunately Ms. Raben has been told things that are not true

23   over and over and over again by Mr. Eisley, and -- and that's

24   part of the problem and part of what makes him so dangerous in

25   my mind, Your Honor.

1       So number one, he told Ms. Raben that he had left

2   this group for two six-month periods of time, and that

3   compelled me to file a reply to the sentencing memorandum, the

4   only reply that I filed for any of the six defendants, Your

5   Honor, because that is absolutely false.  This defendant was

6   involved in this Skype Group chat exploiting minors on both

7   Website A and Website B during those two time periods that he

8   says he was gone from the group almost every day and engaging

9   in conversations about these girls that are absolutely horrific

10  in every way.

11      He says today that he did not know these girls were

12  self-harming.  Absolutely false.  He knew they were

13  self-harming.  They made fun of the girls self-harming in these

14  chats, Your Honor.  I attached many of them to my reply

15  supplemental brief where Mr. Eisley was talking during these

16  two time periods he says he wasn't.

17      Number three, Exhibit B, why did I give you Exhibit B

18  with these stuffed animals, Your Honor?  Because Mr. Eisley did

19  tell us over and over again that there was nothing to these

20  stuffed animals that were recovered, but then he told his

21  evaluator, which was -- it was attached to the defense

22  sentencing memorandum in an exhibit, that he used these stuffed

23  animals as props to entice minors on Website A and Website B.

24  So he used stuffed animals from his home to entice these

25  minors.  Now, I don't know whether the Band-Aids are related to

1    that or not, Your Honor, and I'm not arguing one way or the

2    other, but the fact that he never told us that despite being

3    asked many times about this is another thing that I wanted to

4    point out.

5            Your Honor, he also says that these videos, that he

6    didn't title them, Your Honor.  They don't come titled because

7    he didn't download these videos.  He recorded them himself and

8    he had to put a title on them.  He could use the default title

9    which he did not do.  Instead, he chose to title them in

10   horrific ways.  And the fact that he denies that today is --

11   I -- just incredible to me.

12           That he didn't individually target any of these

13   girls?  Your Honor, this is the defendant that did this.  Out

14   of the six defendants, this defendant more than any other

15   defendant targeted girls one on one.  How do I know that his

16   activity continued after October of 2016?  Not from the

17   proffer, Your Honor, but because from the forensic review of

18   his devices what we learned after he made statements to us that

19   were not true was that he had been recording girls and

20   producing child pornography 10 days before the search warrant

21   was executed at his house, and he was talking to minors the day

22   before the search warrant, and that's from evidence recovered

23   from his computer, not from his proffer statements.

24           The rules that he says, Exhibit E, that he's never

25   seen before, those are from his computer, Your Honor, that's

1    where we got them is from his devices.

2            So those are just some examples, Your Honor, of the

3    things that he has told apparently his attorney but certainly

4    has told us that are not true about his conduct.

5            And this defendant, when we do look at his actual

6    conduct and the nature and circumstances of his offense, I

7    don't know about this longest video.  Maybe he just left the

8    recording software on and that's why it recorded 66 hours.  I'm

9    not saying that he purposely sat there at the computer

10   recording 66 hours.

11           But what we do know is he had 9,527 child exploitive

12   images and videos, 1,960 child pornography videos.  This is a

13   year after he's told his wife he's quit this activity, he's not

14   doing this anymore, he's not talking to minors.  She figured it

15   out and he told her he was stopping.  This is what he's doing.

16   And this computer was found under his bed, Your Honor, under

17   the bed that he slept in every single night, that's where we

18   found all this.

19           Okay.  I want to talk -- second topic is about the

20   very compelling letters on his behalf that were submitted by

21   family, by friends.  It is very clear to me that this defendant

22   is extremely educated: Brown, Princeton, Ivy league schools,

23   incredibly intelligent, incredibly sophisticated.  And it is

24   that intelligence that allowed him to keep committing this

25   crime and hide it from all of his family and all his friends.

1    They believed things about him that are completely inconsistent

2    with his online behavior, and I'll just give a couple examples.

3         He had a family member say he's always been gentle

4    and kind.  And this is Eisley talking to a girl telling her to

5    put a hair bush in herself because that would make her feel

6    even better, telling her he's going to rip her panties off.

7         A family member who says he's extremely kind to

8    people and animals.  And this is Eisley, and I attached this to

9    the reply brief, talking about a girl and how the group's going

10   to help her commit an abortion by tell -- because she's

11   pregnant, and so they're going to figure out -- and Eisley

12   says, "To be fair, preggo would qualify as girl problems."

13   Another group member says, "Someone give her a coat hanger,"

14   and Eisley says, "The plastic ones won't work though."  So that

15   is not consistent with someone who's kind to people and

16   animals.

17        Another family member said, "Noel did not perceive

18   that the acts were harmful to the girls."  Here's a girl

19   telling him that she's suicidal, and the following day he

20   says -- she says, "I'm never shoving anything up my vagina."

21   He says, "Never ever, not even pleasurable things?," and she

22   says, "Never ever ever ever."  I didn't put this on here, Your

23   Honor, but you have the whole chat where he goes on to tell her

24   what to put in her vagina.

25        So, Your Honor, this defendant truly deceived them,

1    and despite all of the support he had from his family, he kept

2    doing this activity.  Despite his wife telling him, "I'm going

3    to stay with you even though I've discovered that you're

4    chatting with -- with teenage girls," even after that he kept

5    doing this.

6           And that's what makes him so dangerous is that not

7    only did he deceive his family, his friends, these young girls,

8    me and -- initially when he told us things that weren't true,

9    and even his attorney apparently because she's written things

10   in her sentencing memorandum that I can only assume came from

11   him.

12          So the third topic I want to talk about is the

13   evaluations that were done of him.  When we're looking at risk

14   of recidivism in these types of cases, the Sentencing

15   Commission says we look at sexual deviance and antisocial

16   behavior, those are the two things we look at.  This defendant

17   had a Static-99 evaluation done.  That evaluation again did not

18   account for male victims which should have been scored and did

19   not account for the fact that the victims here were strangers.

20   So those two points were added as they should have been.  He

21   would have been a 3 instead of a 1.

22          Regardless, I think the evaluation is helpful, and I

23   think what the evaluators -- the two different evaluations he

24   had are helpful for a couple of reasons.  They -- they help us

25   figure out whether there is these factors, antisocial behavior,

1    sexual deviance, whether there is a risk for recidivism, and

2    those factors are present.

3            So what did the evaluator say about Mr. Eisley?  They

4    said he has an inability to control his behavior.  That is a

5    classic antisocial behavior risk factor.

6            He's emotionally constricted.  They wrote he is

7    capable of empathy, not that he had empathy, that he is capable

8    of it.

9            They wrote that he had sexual compulsion, sexual

10   addiction.  They wrote that he had viewed thousands of child

11   pornography images starting at the age of 15 years old.  Your

12   Honor, this defendant, while he's never been convicted, has

13   been committing crimes since he was an 18-year-old, he's been

14   viewing child pornography since then.

15           They wrote that he masturbated while viewing these

16   child pornography images and that he is socially isolated.

17           And as I mentioned, that he used these children's

18   stuffed animals that were in his house, his children's stuffed

19   animals, as props to entice minors to engage in sexual activity

20   online.

21           This defendant acknowledged that he had emotional

22   affairs with these girls, and one of his evaluators pointed out

23   a relationship he had with a 14-year-old girl that lasted

24   several years and which eventually Eisley tells his real age to

25   this girl and they continue to be in a relationship of sorts

1     for nine months after that apparently.

2            But these are the types of relationships he had with

3     multiple girls, yearlong relationships, constant interactions

4     where they're chatting every day engaged in the sexually

5     explicit conversations with him.

6            And that sets him apart from each of these other

7     defendants because they didn't do that.  They didn't have these

8     long-lasting, one-on-one relationships with these girls the way

9     that Eisley did.  And you're going to hear about other

10    defendants in the future, Your Honor, who were similar to

11    Eisley who carried on these relationships, but when we're

12    talking about the defendants who have been sentenced so far

13    today, Eisley stands apart.

14           These are the risk factors that the Sentencing

15    Commission has given.  I'm not going to go over them again,

16    Your Honor, because I know I've gone over them before.  But my

17    point here is just that all of these are present when it comes

18    to Noel Eisley's behavior.

19           And I want to wrap up now.  I want to wrap up just by

20    talking about protection of the public.  And so one of the

21    people that wrote a statement on Noel Eisley's behalf wrote

22    that "Eisley did physical, mindless jobs early on during the

23    summer.  At 15 he painted the next-door neighbor's house.  At

24    16 he washed dishes and scrubbed pots.  And at 17 he dusted

25    books in the college library all summer until he left on a

1    National Science Foundation Programming in engineering."  And

2    then we know, Your Honor, that he went on to Brown and then to

3    Princeton.

4              This sort of normal childhood is exactly what Noel

5    Eisley took away from the hundreds of girls that were this age

6    or younger when he targeted them.  Now they have to live in

7    fear that an Internet predator's going to hunt them down.  They

8    have to take time to miss school to deal with this offense.

9    They have to suffer from failing grades, and maybe they won't

10   be able to get into the Ivy League colleges that he was able to

11   get into because he had a supportive family and he didn't have

12   this type of thing happen to him when he was 14 years old.

13   They have to deal with knowing that images of them are out

14   there, and those images are of them in their most vulnerable

15   state and they will confront them wherever they go.

16             I'm glad that Noel Eisley did not have a bad

17   childhood, Your Honor, and I'm glad that he was able to go to

18   Brown and then Princeton to get a doctorate degree.  I'm not

19   glad that he used his extreme intelligence and education to

20   hurt hundreds of innocent girls who may not ever have the

21   opportunities that he had thanks to what he did.

22             We would ask for 40 years.

23             THE COURT:  Okay.  Thank you very much.

24             All righty.  The Court will state the sentence and

25   then I'll give the attorneys for both sides the opportunity to

1    object.  This is the fourth sentencing that we've conducted

2    today and the most perplexing and most difficult.  The

3    defendant does have a Ph.D. from Princeton University.  He's

4    been employed.  As Ms. Russo -- Ms. Russo mentioned, the

5    letters on his behalf are significant.  Dr. Haynes' report was

6    complete.  Lengthy, compelling letter from Mrs. Eisley.  Mr. --

7    or Dr. Eisley's wife wraps up by saying he deserves to be

8    appropriately punished for his deeds but he also needs help.

9    That's exactly where we're at today.

10           I, like Ms. Raben, don't know and I can't comprehend

11   what would put an individual like this in a situation where he

12   committed crimes in a child exploitation enterprises and --

13   enterprise and faces a life sentence as he does.  But -- but I

14   can assure myself I think that the drive of the addiction, the

15   fascination of the Internet, the -- you know, whatever it is of

16   the subject matter must take hold coupled with the weaknesses

17   and the deficit that the defendant encounters in a

18   psychological way that have been written up by the doctors.

19           I don't think Dr. Eisley should deserve to spend the

20   rest of his life in jail and I'd like to see him have some time

21   to do something productive after a lengthy prison term.

22           On the other hand, I don't see a great deal to vary

23   downward from what others have gotten or what others in other

24   cases have gotten.  I think this is a -- a classic case where

25   an individual committed a serious crime who needs to be

1    incarcerated for the protection of the public and for the

2    deterrence of others from doing it while hopefully at the same

3    time he will examine the motivations that caused the behavior

4    and reflect upon the devastation that he talked about in his

5    allocution and hopefully do something where he can contribute

6    down the line.

7          So whereas I'm not willing to, and I don't think it's

8    appropriate for me to, write off Dr. Eisley, I think I also

9    have to impose a very significant punishment to reflect both

10   the -- the will of Congress, the will of the people of the

11   United States and -- and what I perceive to be an appropriate

12   penalty for the behavior that caused so much victimization that

13   we heard about today.

14         Therefore, pursuant to the Sentence Reform Act of

15   1984, the Court has considered the sentence guidelines and

16   factors in 18 USC, Section 3553(a) and will hereby commit Noel

17   Eisley to the custody of the Bureau of Prisons for a term of

18   420 months.

19         It's further recommended that the defendant be

20   designated to an institution with a comprehensive sexual

21   offender treatment program.

22         Upon release from imprisonment, the defendant shall

23   be placed on a supervised release term of ten years.

24         It's further ordered that the defendant pay a special

25   assessment of a hundred dollars and that'll be due immediately.

1      It's ordered that the defendant pay a Justice For

2   Victims of Trafficking Act assessment of five thousand dollars.

3      The Court's aware that the parties agreed to

4   restitution in the amount of $5,000 per identified victim, and

5   I will waive any interest, penalties and fees on the

6   restitution amount, total amount being $215,000 across all the

7   victims who are entitled to a payment.

8      No fine, no costs of incarceration, no costs of

9   supervision due to the defendant's lack of financial resources.

10      Mandatory participation in the Inmate Financial

11   Responsibility Program, the requirements of which I am aware

12   of, and I'll hereby approve the payment schedules of the

13   program and order the defendant's compliance.

14      A mandatory drug testing condition is suspended based

15   on my determination that the defendant poses a low risk of

16   future substance abuse.

17      While on supervision, the defendant shall abide by

18   the standard conditions adopted by the U.S. District Court for

19   the Eastern District of Michigan.

20      He must also comply with the following special

21   conditions which I'm going to summarize now.  There's 19 of

22   them and I've gone through all of them in great detail

23   throughout the day.  They'll be stated with specificity in the

24   Judgment and Commitment Order.

25      But essentially the special conditions of supervised

1    release will be compliance with the SORNA or registration as a

2    sex offender.

3           Completion of sex offender evaluations, treatment and

4    counseling.

5           Submission to periodic testing on supervised release

6    to ensure compliance with supervision and treatment.

7           No association with any minor children under the

8    age -- year of 18 without the -- age of 18 without the prior

9    approval of the probation officer.

10          Notification of anyone that Mr. Eisley dates or

11   marries with a minor child under the age of 18 of the

12   conviction.

13          No selling, viewing, purchasing, possession of any

14   pornography, sexually explicit material, child erotica and

15   things of that nature.

16          Employment pre-approved by the Probation Department.

17          Residences, pre-approved by the Probation Department.

18          And participation in the Computer/Internet Monitoring

19   Program that's run by the U.S. Probation Department.

20          Submission of person, residence, papers, what have

21   you, to search if the probation officer has reasonable cause to

22   think of the possession of contraband or things of that nature.

23          No contact, directly or indirectly, with any victim

24   or witness in the instant case.

25          Employment pre-approved by the Probation Department.

1    If it requires the use of a computer, then the employer has to

2    know about the nature of the conviction, and the notification

3    of that must be confirmed by the probation officer.

4          No possession or ownership of a camera or

5    photographic device without prior approval.

6          Given the mental health issues and the prior history

7    from 2014 which was written about in the Pre-Sentence Report,

8    we're going to order psychological and psychiatric evaluation,

9    participation in a program approved by the Probation Department

10   for mental health counseling, and taking all medications that

11   are prescribed in the dosages and at the times proposed.

12         Given the restitution order, no credit or additional

13   lines of credit.

14         Access of the probation officer to any requested

15   financial information.

16         Monthly installment payments on any remaining balance

17   of the fine.

18         And that will be it for the special conditions.

19         Are there any objections to the sentence that I just

20   stated, Ms. Russo?

21         MS. RUSSO:  No, Your Honor.  The restitution amount

22   for this defendant is 235,000, but I'm going to submit for each

23   defendant a stipulated order, Your Honor.

24         THE COURT:  All right.  Any objections to the

25   sentence from, Ms. Raben?

 1            MS. RABEN:  Yes, Your Honor.  I believe the sentence

 2   is excessive.

 3            THE COURT:  Okay.

 4            MS. RABEN:  And also I don't know if -- my client,

 5   because he's from the East Coast --

 6            THE COURT:  Yes.

 7            MS. RABEN:  -- was interested in being housed at

 8   Danbury or Otisville or Fort Dix.

 9            THE COURT:  Okay.

10            MS. RABEN:  I don't know if either of those has a

11   SOTP Program.

12            THE COURT:  Yes.

13            MS. RABEN:  But could the judgment include those

14   three possible designations?

15            THE COURT:  Potentially yes.  If you're willing to

16   supply through e-mail or a piece of paper our case manager with

17   those facilities, we'll incorporate them.  My first preference

18   is he gets sex treatment.  Secondly, I'd recommend he be close

19   to his children and family.  And if you can combine the two at

20   one of those facilities, I would strongly recommend that as

21   well.

22            MS. RABEN:  Thank you.

23            THE COURT:  Thank you.

24            So with all that in mind and after the objection of

25   counsel, I will nevertheless impose the sentence that I stated

1    previously.

2            The defendant, Mr. Eisley, has agreed to give up the

3    right to appeal his conviction as part of his plea.  And in

4    addition, Dr. Eisley, you will waive the right to appeal your

5    sentence since I was below the applicable guideline range.

6            Those types of waivers are usually enforceable.  If

7    you don't think yours is, you can take that up directly with

8    the Court of Appeals.

9            The defendant will be remanded to the custody of the

10   marshal to carry out the further sentence, serving of his

11   sentence.

12           Complete copies of the Pre-Sentence Report will be

13   sent to the Bureau of Prisons and the Sentencing Commission,

14   and any other copies are to be kept strictly confidential as

15   the lawyers know.

16           And I do want to commend both lawyers for their hard

17   work and expert representation in this case, and especially Ms.

18   Raben for her continued service to the Court for taking

19   appointments of this nature.

20           MS. RABEN:  Your Honor, Mr. Eisley -- I'm retained.

21           THE COURT:  Oh, you're retained.  Okay.  All right.

22           MS. RABEN:  Yes.

23           THE COURT:  Well, even better.

24           MS. RABEN:  Thank you.

25           THE COURT:  Okay.  You did a great job.

1          Anything else?

2          MS. RUSSO:  I'll move to dismiss at this time, Your

3     Honor, Counts 2 through 4.  And that would be all from the

4     government.

5          THE COURT:  Okay.  All right.  Thank you.  We'll be

6     in recess now.

7          (Court in recess at 3:10 p.m.)

8                              —  —  —

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T I O N
 2              I, Linda M. Cavanagh, Official Court Reporter of the
 3    United States District Court, Eastern District of Michigan,
 4    appointed pursuant to the provisions of Title 28, United States
 5    Code, Section 753, do hereby certify that the foregoing pages 1
 6    through 184 comprise a full, true and correct transcript of the
 7    proceedings held in the matter of United States of America vs.
 8    D-1 Noel Eisley, D-2 Terry Kovac, D-4 Felipe Dominguez-Meija
 9    and D-6 Eric James Robinson, Case No. 17-20632, on Tuesday,
10    July 17, 2018.
11
12
13                        s/Linda M. Cavanagh
                          Linda M. Cavanagh, RDR, RMR, CRR, CRC
14                        Federal Official Court Reporter
                          United States District Court
15                        Eastern District of Michigan
16
17
18    Date: August 30, 2018
      Detroit, Michigan
19
20
21
22
23
24
25
```